2012 UT 46

**STATE of Utah, Plaintiff and Appellee,**

v.

**Floyd Eugene MAESTAS, Defendant and Appellant.**

No. 20080508.

Supreme Court of Utah.

July 27, 2012.

Rehearing Denied Sept. 24, 2012.

Mark L. Shurtleff, Att'y Gen., Thomas Brunker, Karen A. Klucznik, Asst. Att'ys Gen., Salt Lake City, for appellee.

Joan C. Watt, David P.S. Mack, Michael R. Sikora, Denise M. Porter, Michael D. Misner, Debra M. Nelson, Salt Lake City, for appellant.

Chief Justice DURRANT, opinion of the Court:

## INTRODUCTION

¶ 1 Floyd Eugene Maestas was charged with aggravated murder, a violation of sec-

tion 76–5–202 of the Utah Code, and aggravated burglary, a violation of section 76–6–203 of the Utah Code.[1] After being tried and convicted on both charges, he was sentenced to death. On appeal, he raises numerous arguments concerning his convictions, the imposition of the death penalty, and Utah's death penalty scheme. We reject each of Mr. Maestas's arguments and affirm his convictions and sentence.

## BACKGROUND

¶ 2 Because Mr. Maestas's numerous claims encompass various aspects of his convictions and sentence, we provide a broad overview of the facts and procedural history of this case and include additional facts as we address each issue in the analysis section. As an initial matter, we note that jurors in capital cases consider guilt and sentencing in separate proceedings. Accordingly, the facts and procedural history of this case are set forth in different sections: (I) the crime and investigation, (II) the guilt phase of the trial, and (III) the penalty phase of the trial.

## I. CRIME AND INVESTIGATION

¶ 3 On appeal, we construe "the record facts in a light most favorable to the jury's verdict."[2]

### A. The Burglaries

¶ 4 On September 28, 2004, Mr. Maestas met William Irish and Rodney Renzo. While traveling together in Mr. Maestas's car, the three men agreed to rob a house. Mr. Maestas identified seventy-two-year-old Donna Bott's home as the one they would rob and entered the home, followed by Mr. Irish and Mr. Renzo. Upon entering, Mr. Maestas went into a back room, and Mr. Irish saw him on top of a woman who was struggling on a bed. Mr. Irish saw the woman's legs move and heard that her screams were muffled by a pillow covering her face. At that point, Mr. Irish heard Mr. Maestas threaten

to stab the woman if she did not tell him where he could find some money. Later, Mr. Renzo saw Mr. Maestas punching and stomping on the woman "over and over" while she was on the floor. Mr. Renzo stated that, after Mr. Maestas stopped punching and stomping on the woman, she did not appear to be moving. At that point, the men decided to leave Ms. Bott's home.

¶ 5 After leaving Ms. Bott's home, the men drove to the home of eighty-seven-year-old Virginia Chamberlain. Mr. Irish remained outside while Mr. Maestas and Mr. Renzo entered the home. Upon entering, Mr. Maestas pulled Ms. Chamberlain's shirt over her head, scratching her arm and causing it to bleed. He then hit her and asked her for her purse. At that point, Ms. Chamberlain pushed her medical alert button and the two men left her home.

¶ 6 Sometime after the men left Ms. Chamberlain's home, Mr. Maestas's car ran out of gas on a freeway on-ramp. The men abandoned the car, and Mr. Irish and Mr. Renzo left Mr. Maestas. A police officer later found Mr. Maestas's abandoned car on the freeway and discovered Ms. Chamberlain's wallet inside.

### B. The Investigation

¶ 7 Approximately three days after the robberies, a neighbor became concerned about Ms. Bott and called the police. The officer responding to the call found Ms. Bott's body on the floor next to her bed. She was naked from the waist down. Another detective found a ripped pair of women's underwear on the bed and collected usable fingerprints from Ms. Bott's home.

¶ 8 The medical examiner, Dr. Todd Grey, performed an autopsy on Ms. Bott and found internal and external injuries on her body and face. Specifically, Dr. Grey discovered numerous and extensive bruises and abrasions on Ms. Bott's body, including her chest area, shoulders, abdomen, face, knees, and hips. He also found a laceration through Ms.

---

1. Throughout this opinion, we cite to the current version of the Utah Code because no substantive changes have been made to the relevant statutory provisions that would affect the resolution of the issues presented on appeal. *See Stone Flood &*

*Fire Restoration, Inc. v. Safeco Inc. Co. of Am.,* 2011 UT 83, ¶ 19, 268 P.3d 170.

2. *State v. Jeffs,* 2010 UT 49, ¶ 3, 243 P.3d 1250 (internal quotation marks omitted).

Bott's lower lip; a one-inch wide, three-inch deep stab wound on her face; and bruises consistent with strangulation. Regarding her internal injuries, Dr. Grey discovered severe tearing around Ms. Bott's heart and a tear in her aorta. Based on the nature and extent of her injuries, Dr. Grey concluded that Ms. Bott's death was a homicide. He then collected DNA from under Ms. Bott's fingernails—"fingernail scrapings"—to test for possible DNA.

¶ 9 As part of the investigation, police officers interviewed Mr. Maestas twice. Both times, he asserted that no one else ever drove his car and that he was driving it the night it was abandoned. When a homicide detective noticed cuts and scrapes on Mr. Maestas's arms, he had a lab technician collect blood samples from Mr. Maestas, Mr. Irish, and Mr. Renzo. The DNA from Ms. Bott's fingernail scrapings was then tested using a Y-chromosome short-tandem repeats (Y–STR) DNA analysis[3] to determine if Mr. Maestas, Mr. Irish, or Mr. Renzo could be excluded as the source. The test results indicated that Mr. Irish and Mr. Renzo could be excluded, but Mr. Maestas could not be ruled out as the source of the DNA found under Ms. Bott's fingernails. In addition, a fingerprint expert determined that two fingerprints taken from inside Ms. Bott's home matched Mr. Maestas and another matched Mr. Irish.

¶ 10 Based on the foregoing evidence, the State charged Mr. Maestas with the aggravated murder of Ms. Bott and the aggravated burglary of Ms. Chamberlain's home.

## II. GUILT PHASE

### A. Pretrial Motions and Death Penalty Exemption Hearing

¶ 11 Before trial on these charges, Mr. Maestas filed motions regarding the admissibility of the fingerprint and DNA evidence and a motion to strike the option of the death penalty pursuant to *Atkins v. Virginia,*[4] a case that precludes the execution of persons who are mentally retarded.[5] During a pretrial hearing to discuss the motions regarding the admissibility of the fingerprint and DNA evidence, the prosecution brought to the judge's attention the fact that Mr. Maestas was not present in the courtroom. Mr. Maestas was then brought into the courtroom and the judge explained what had been discussed in his absence.

¶ 12 In his motion regarding the fingerprint evidence, Mr. Maestas claimed that such evidence is not inherently reliable and requested that the court hold a hearing to determine the reliability of fingerprint evidence prior to such evidence being admitted. In the alternative, he requested a cautionary jury instruction regarding fingerprint evidence. The court heard argument on this issue during a pretrial hearing, but ultimately denied his motion. In his motion regarding the DNA evidence, Mr. Maestas argued that the Y–STR testing method was novel and not inherently reliable. The court held a hearing on Mr. Maestas's motion and heard testimony from a forensic scientist employed by Sorenson Forensics. At the end of this testimony, the court took judicial notice of the inherent reliability of Y–STR DNA testing and allowed the DNA evidence to be introduced at trial.

---

3. The Y–STR DNA analysis focuses specifically on the Y-chromosome, found in males and inherited through the male's paternal lineage. Because all males in the same paternal lineage have the same forensic markers, called alleles, on their Y chromosomes, the Y–STR DNA analysis indicates whether an individual and all of his paternal relatives can be excluded as possible contributors of the DNA sample. *See, e.g., Powers v. State,* 343 S.W.3d 36, 45 n. 13 (Tenn.2011) ("Y–STR testing permits DNA analysis on the Y-chromosome. Since the Y-chromosome is inherited paternally, all men in the same paternal lineage should have the same Y-chromosome STRs, or 'Y-STRs.'" (alteration omitted) (citations omitted) (internal quotation marks omit-

ted)); *State v. Bander,* 150 Wash.App. 690, 208 P.3d 1242, 1246 (2009) ("Based on PCR–YSTR typing, a forensic analyst may determine whether a known source and all of his paternal relatives can be excluded as possible contributors to an unknown DNA sample.").

4. 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).

5. Although we recognize that the phrases "mentally retarded" and "mental retardation" are now disfavored, because this language is used in the *Atkins* opinion and the Utah Code, we use these phrases in this opinion.

¶ 13 Concerning Mr. Maestas's claim that he was mentally retarded and therefore exempt from the death penalty under *Atkins,* the court heard testimony from Mr. Maestas's expert and the State's two experts. After hearing this testimony, the court denied Mr. Maestas's motion and declined to remove the death penalty as a potential sentence.

### B. *Jury Selection*

¶ 14 After the pretrial motions, the court proceeded to empanel a jury. In the jury selection process, the court held an initial meeting with potential jurors where it distributed a questionnaire, asked preliminary questions about their qualifications for service, and admonished them regarding proper juror conduct.[6] Mr. Maestas was not present for this initial meeting with the potential jurors, but he was present when the court conducted the traditional voir dire and questioned potential jurors regarding their feelings about imposing the death penalty. As part of the voir dire process, Mr. Maestas tried to remove three prospective jurors for cause: jurors 16, 20, and 27. The court denied each of these challenges. Mr. Maestas then used three of his four peremptory challenges to remove these jurors from the juror pool. The State successfully removed one prospective juror for cause, juror 50, and used three of its four peremptory challenges to remove other jurors. At the close of voir dire, the court empaneled the jury, and the six-day trial began.

### C. *Evidence and Arguments*

¶ 15 During the trial, the State presented evidence that Mr. Maestas was guilty of aggravated murder and aggravated burglary. Specifically, the State introduced the testimony of Mr. Irish and Mr. Renzo, linking Mr. Maestas to the murder of Ms. Bott and the burglary of Ms. Chamberlain's home. The State also introduced the testimony of Mr. Maestas's ex-wife, who lived in Ms. Bott's neighborhood. In addition, the State presented DNA and fingerprint evidence and the medical examiner's testimony.

#### 1. DNA and Fingerprint Evidence

¶ 16 Regarding the DNA evidence, the forensic scientist explained the Y–STR DNA testing method and testified that, based on this analysis, both Mr. Irish and Mr. Renzo could be excluded as the source of the DNA from under Ms. Bott's fingernails. But he stated that neither Mr. Maestas nor his paternal relatives could be excluded. Regarding the fingerprint evidence, an expert testified that two fingerprints taken from inside Ms. Bott's home matched Mr. Maestas and one fingerprint matched Mr. Irish.

#### 2. Medical Examiner's Testimony

¶ 17 At trial, the medical examiner, Dr. Grey, testified concerning the cause and manner of Ms. Bott's death. After explaining his role as a medical examiner, he stated that he found injuries on Ms. Bott consistent with stabbing, strangulation, and blunt force trauma, but that he found no evidence of rape or trauma to the vaginal area. Dr. Grey was also asked whether the injuries inflicted on Ms. Bott were "purposely inflicted." In response, he testified that the stab wounds "appeared to be consistent with an intentional stab wound" and that the strangulation was "purposefully inflicted."

#### 3. Mr. Maestas's Defense

¶ 18 At the close of the State's case, Mr. Maestas moved for a directed verdict, arguing that the State had not proven that the murder was committed in an especially heinous manner or that the murder was committed during an attempt to commit forcible sexual abuse. In addition, Mr. Maestas claimed that the State had not proven that he had the requisite intent to support a conviction for aggravated murder. The court denied the motion.

¶ 19 Mr. Maestas then proceeded to present his defense, claiming that Mr. Renzo and Mr. Irish stole his car, committed the crimes, and framed him. For support, he presented the testimony of witnesses who claimed to have heard Mr. Irish use racial slurs and admit to stealing the car and framing Mr.

---

**6.** Over the course of the proceedings, the court repeatedly admonished the jury, but failed to admonish the jury before breaks in the proceedings on nine occasions. *See infra* ¶ 51 & n. 33.

Maestas. On cross-examination, the State challenged the credibility of these witnesses.

### 4. Closing Arguments

¶ 20 After Mr. Maestas presented his defense, the parties presented their closing arguments to the jury. During the State's closing arguments, the prosecution stated that "defendants usually testify." Further, it indicated that, if Mr. Maestas disputed the DNA evidence, he could have tested it himself.

### D. Jury Notes

¶ 21 On the last day of trial, the judge received two notes from the jury. The first note indicated that a juror had read a newspaper article about the trial. Although there is no record of whether the judge made counsel aware of the note, the judge did hold a meeting with the juror who allegedly read the newspaper article and determined that she could continue to serve on the jury. Defense counsel and the prosecution were both present at this meeting with the juror.

¶ 22 The second note from the jury asked, "Are we here until we've reached a verdict? Overnight? Until 5?" The judge responded with a note stating, "Not overnight. How long? We will all have a say if necessary." Although the judge met with counsel that day regarding a note from the jury, it is unclear from the record whether the judge informed the parties of this note or of his written response.

### E. Conviction

¶ 23 The jury convicted Mr. Maestas of the aggravated murder of Ms. Bott and the aggravated burglary of Ms. Chamberlain's home. Regarding the aggravated murder charge, the jury found four aggravating factors: (1) the murder was committed in the course of an aggravated burglary; (2) the murder was committed in the course of an aggravated robbery; (3) the murder was committed in the course of an attempt to commit forcible sexual abuse; and (4) the murder was committed in an especially heinous, atrocious, cruel, or exceptionally depraved manner.

## III. PENALTY PHASE

### A. Evidence of Aggravating Circumstances

¶ 24 After the jury reached its verdict, the State sought to prove that death was the appropriate penalty. The State therefore introduced aggravating circumstances relevant to the sentence, as well as victim impact evidence concerning the crime.

### 1. Criminal History and Other Crimes

¶ 25 The State presented evidence concerning Mr. Maestas's history of criminal conduct, both as a youth and as an adult. For example, the State introduced a certified copy of Mr. Maestas's conviction in 1990 for burglary of the home of Phyllis Demetropolos. The State also presented Ms. Demetropolos to testify about the circumstances surrounding the burglary.

¶ 26 In addition, the State introduced the following evidence regarding specific crimes that Mr. Maestas committed as an adult, but for which he was not convicted: (a) the aggravated burglary of Alinda McClean's home and (b) the aggravated burglary of Leone Nelson's home.

#### a. The McClean Incident

¶ 27 In the 1970s, Mr. Maestas pled guilty to the third degree felony of theft by receiving stolen property, based on his possession of property stolen from Ms. McClean. The State sought to prove beyond a reasonable doubt that he had actually committed aggravated burglary, although he had not been convicted of that crime. Specifically, the State introduced Mr. Maestas's plea, parole revocation documents, and police testimony to show that he committed aggravated burglary. Because Ms. McClean had since passed away, the State also presented testimony about the incident from her granddaughter.

#### b. The Nelson Incident

¶ 28 In the 1990s, Mr. Maestas pled guilty to the class A misdemeanor of theft for stealing Ms. Nelson's property. Again, although he had not been convicted of aggravated

burglary for this incident, the State sought to prove beyond a reasonable doubt that he had committed aggravated burglary. Specifically, the State introduced Mr. Maestas's plea and presented Ms. Nelson to testify about the incident. Ms. Nelson testified that she was attacked in her home by a man who repeatedly hit her while he tried to rob her. Although she had been unable to identify her assailant at the time of the attack, at the trial in this case, she identified Mr. Maestas.

**2. Other Aggravating Circumstances and Victim Impact Evidence**

¶ 29 The State also presented other aggravating evidence, including pictures of Ms. Bott's bedroom after her assault and photographs of her body. Further, the State introduced the testimony of Mr. Maestas's ex-wife, who testified that Mr. Maestas had not taken responsibility for the crime. The State also introduced the testimony of an agent with Adult Probation and Parole, and the testimony of a prison caseworker who had supervised Mr. Maestas.

¶ 30 Further, the State introduced testimony from Ms. Bott's family about the impact of her murder. Specifically, Ms. Bott's granddaughter read from her personal blog about how the murder had affected her.

**B. Evidence of Mitigating Circumstances**

¶ 31 After the State presented its case that death was the appropriate penalty, Mr. Maestas's counsel began presenting evidence of mitigating circumstances. But the day after defense counsel began its presentation, Mr. Maestas personally sent a letter to the court objecting to his counsel's plan to present a witness to testify that she had observed Mr. Maestas having sex with his sister when he was a child. He claimed this testimony was a lie. In response, defense counsel stated that they intended to proceed with presenting all the mitigating evidence they had compiled, despite Mr. Maestas's objections. When the court inquired if defense counsel would be willing to refrain from presenting the specific evidence to which Mr. Maestas objected, but still present the remaining evidence, defense counsel refused and said "it's not negotiable."

¶ 32 The trial court then ordered defense counsel to advise Mr. Maestas of the importance of presenting mitigating evidence and to consult with him regarding what evidence, if any, he wanted to present. Defense counsel discussed the mitigating evidence in "broad terms" with Mr. Maestas and described "in pretty specific terms ... what each individual witness would say." After this discussion, Mr. Maestas informed the court that he wished to waive the right to present mitigating evidence. He acknowledged that his decision was knowing and voluntary. He had initially requested that he be allowed to represent himself during the remainder of the penalty phase, but later agreed to retain his defense counsel so that they could make the closing argument on his behalf.

¶ 33 The trial court concluded that Mr. Maestas's decision to waive the right to present mitigating evidence was knowingly and voluntarily made and ordered defense counsel not to present further mitigating evidence. Mr. Maestas then briefly spoke to the jury and said that he did not commit the crime. No other mitigating evidence was presented.

**C. Jury Deliberations, Sentence of Death, and Motion for a New Trial**

**1. Jury Deliberations and Sentence of Death**

¶ 34 During jury deliberations in the penalty phase, the judge received a note from the jury. The note asked whether the parole board could "overrule" a jury's sentence of life without parole. The judge responded with a note stating that the jury was "directed to the jury instructions as a whole and specifically Instruction No. 12." Instruction No. 12 stated that "[i]f a person is sentenced to life in prison without parole, this means that he will never be eligible for parole and will spend the remainder of his life in prison." The judge informed counsel of this note and his response before the jury's sentence was read in open court, but after the jury had reached its verdict. Defense counsel did not object at the time, but did object five days later, before the court formally imposed

Mr. Maestas's sentence. The court ruled that this motion was untimely. The jury ultimately sentenced Mr. Maestas to death.

## 2. Motion for a New Trial

¶ 35 After the jury reached its verdict, Mr. Maestas filed a motion for a new trial, arguing that two jurors, jurors 8 and 18, engaged in misconduct. Specifically, he alleged that jurors 8 and 18 provided false information on their court questionnaires and interjected prejudicial extraneous information into the jury's deliberative process. The trial court denied this motion.

## STANDARD OF REVIEW

¶ 36 Our standard of review varies with the different types of challenges that Mr. Maestas raises. "In reviewing a jury verdict, we view the evidence and all reasonable inferences drawn therefrom in a light most favorable to the verdict." [7] When reviewing the trial court's discretionary rulings, we will find that it has abused its discretion only if "no reasonable [person] would take the view adopted by the trial court." [8] Further, we review "conclusions of law for correctness." [9] But when we review mixed questions of fact and law, "the amount of deference that results will vary according to the nature of the legal concept at issue." [10]

¶ 37 We also note that we "will review errors raised and briefed on appeal in death penalty cases, even though no proper objection was made at trial, but will reverse a conviction based upon such errors only if they meet the manifest and prejudicial error standard." [11] "[I]n most circumstances the term 'manifest injustice' is synonymous with the 'plain error' standard." [12] "To be consid-

ered plain or manifest error, an error must be both harmful and obvious." [13] An error is obvious only if "the law governing the error was clear at the time the alleged error was made." [14] An error is harmful if, "absent the error, there is a reasonable likelihood of a more favorable outcome for the appellant, or phrased differently, [if] our confidence in the verdict [or sentence] is undermined." [15]

## ANALYSIS

¶ 38 On appeal, Mr. Maestas raises several arguments concerning his convictions and his sentence under Utah's death penalty scheme. We have organized his claims into six categories: (I) jury issues, (II) evidence and arguments in the guilt phase of the trial, (III) challenges regarding the death penalty exemption hearing, (IV) evidence and arguments in the penalty phase, (V) constitutional challenges to Utah's death penalty scheme, and (VI) claims of cumulative error.

## I. JURY ISSUES

¶ 39 Mr. Maestas raises five challenges concerning the selection of the jury, communications with the jury, and the jury's deliberations. Specifically, he alleges that he is entitled to a new trial because (A) during voir dire, the court improperly granted and improperly denied for-cause challenges to prospective jurors; (B) the court erred when it failed to admonish the jurors on some occasions; (C) the court erred when it conducted proceedings and communicated with the jury in the absence of Mr. Maestas and his counsel; (D) the court improperly responded to the jury's question regarding life without parole; and (E) jurors committed

---

7. *State v. Honie*, 2002 UT 4, ¶ 2, 57 P.3d 977 (internal quotation marks omitted).

8. *State v. Butterfield*, 2001 UT 59, ¶ 28, 27 P.3d 1133 (alteration in original) (internal quotation marks omitted).

9. *State v. Levin*, 2006 UT 50, ¶ 20, 144 P.3d 1096.

10. *Id.* ¶ 21.

11. *State v. Menzies (Menzies I)*, 845 P.2d 220, 224–25 (Utah 1992) (internal quotation marks omitted).

12. *State v. Casey*, 2003 UT 55, ¶ 40, 82 P.3d 1106 (internal quotation marks omitted).

13. *Menzies I*, 845 P.2d at 225.

14. *State v. Dean*, 2004 UT 63, ¶ 16, 95 P.3d 276.

15. *State v. Munguia*, 2011 UT 5, ¶ 12, 253 P.3d 1082 (internal quotation marks omitted).

misconduct by considering extraneous preju-dicial information during their deliberations. For the following reasons, we reject each of these claims.

### A. The Trial Court Did Not Commit Any Prejudicial Error Regarding the For–Cause Challenges to the Prospective Jurors

¶ 40 Mr. Maestas argues that the trial court committed reversible error in granting the State's for-cause challenge to prospective juror 50 and in denying his for-cause chal-lenges to prospective jurors 16, 20, and 27. He contends that, as a result, he was forced to use three of his four peremptory chal-lenges to remove those jurors.

¶ 41 As an initial matter, when reviewing the propriety of a denial or grant of a challenge for cause, "we look to the entire voir dire exchange with the challenged juror." [16] In addition, "a trial court's deter-mination of whether to excuse a prospective juror for cause [should] not be reversed ab-sent an abuse of discretion." [17] Further, un-der Utah law, "a per se reversible error does not occur whenever a party is compelled to use a peremptory challenge to remove a jury member that the trial court erroneously failed to remove for cause." [18] Instead, to prevail on a claim of error based on the court's failure to remove a prospective juror, a defendant must demonstrate that (1) the court erred when it failed to excuse a pro-spective juror for cause, and (2) the error prejudiced the defendant, or, in other words, that "a member of the jury [that was empan-eled] was partial or incompetent." [19] We ad-dress both elements below.

16. *State v. Lafferty (Lafferty II)*, 2001 UT 19, ¶ 58, 20 P.3d 342.

17. *State v. Wach*, 2001 UT 35, ¶ 25, 24 P.3d 948.

18. *Id.* ¶ 24 (internal quotation marks omitted).

19. *State v. Menzies (Menzies II)*, 889 P.2d 393, 398 (Utah 1994); *accord Wach*, 2001 UT 35, ¶ 24, 24 P.3d 948.

20. *Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980) (emphasis added); *accord State v. Kell*, 2002 UT 106, ¶ 19, 61 P.3d 1019.

#### 1. The Trial Court Erred Only When It Denied the For–Cause Challenge to Pro-spective Juror 20

¶ 42 Regarding jury selection in death pen-alty cases, the U.S. Supreme Court has held that "a juror may not be challenged for cause based on his views about capital punishment *unless* those views would prevent or substan-tially impair the performance of his duties as a juror in accordance with his instructions and his oath." [20] Rule 18(e)(10) of the Utah Rules of Criminal Procedure reflects this standard.[21] And rule 18(e)(14) provides that a for-cause challenge is also appropriate if the prospective juror's "[c]onduct, responses, state of mind or other circumstances [would] reasonably lead the court to conclude the juror is not likely to act impartially." [22]

¶ 43 Thus, once statements are made during voir dire that "facially raise a question of [a prospective juror's] partiality or preju-dice, an abuse of discretion occurs unless the challenged juror is removed by the court or unless the court or counsel investigates fur-ther and finds the inference rebutted." [23] "Rebuttal is accomplished by showing that a juror's statement was merely the product of a light impression and not one that would close the mind against the testimony that may be offered in opposition." [24] With this standard in mind, we turn to the prospective jurors challenged in this case—prospective jurors 50, 16, 27, and 20.

¶ 44 First, Mr. Maestas asserts that, because the court based its decision on pro-spective juror 50's "hesitation or conscien-tious scruples against [imposing the] death penalty," it erred in removing that prospec-tive juror for cause. We disagree. The

21. UTAH R.CRIM. P. 18(e)(10) (allowing a for-cause challenge if "the juror's views on capital punish-ment would prevent or substantially impair the performance of the juror's duties").

22. *Id.* 18(e)(14).

23. *State v. Bishop*, 753 P.2d 439, 451 (Utah 1988) (plurality opinion), *overruled on other grounds by Menzies II*, 889 P.2d 393.

24. *Wach*, 2001 UT 35, ¶ 27, 24 P.3d 948 (internal quotation marks omitted).

court removed prospective juror 50 for two reasons entirely unrelated to his views on the death penalty: (1) his statement that he would be unable to concentrate during a trial because of the business he would lose during that time and (2) his comments that he might not follow the law if empaneled on a jury. During voir dire, prospective juror 50 repeatedly stated that he had financial concerns about sitting for a lengthy trial and that these concerns "would make it difficult [for him] to render a fair and impartial verdict in this case." In addition, he would not commit to following the court's instructions about when the death penalty would be appropriate. In fact, he consistently stated that he *could not* commit to following the law or abiding by the court's instructions because he would not set aside his own legal education, opinions, and attitude. Given these repeated and unrebutted statements, it was not an abuse of discretion for the trial court to remove prospective juror 50.

¶ 45 Second, Mr. Maestas argues that the court erred in failing to remove prospective juror 16 after the prospective juror indicated that "he would consider evidence that is mitigation under Utah's statute as aggravation." According to Mr. Maestas, the prospective juror's single statement that he would "probably" consider an actor's drug use as an aggravating circumstance demonstrated that he would not act impartially. We disagree. Prospective juror 16's statement was made without context or a discussion of the relevant statutory aggravating and mitigating circumstances. Indeed, prospective juror 16 was never told that an actor's drug use during the commission of a crime was statutorily considered a mitigating circumstance.[25] Without this background or any context, his isolated statement does not suggest that he would be unable to follow the law and act impartially. Rather, at most, his response appears to be "merely the product of a light impression and not one that would

close the mind" against the evidence and the law.[26] Indeed, prospective juror 16 consistently and repeatedly stated that he would follow the law and the court's instructions. Accordingly, the trial court did not abuse its discretion in determining that prospective juror 16 would act impartially.

¶ 46 Third, Mr. Maestas argues that the court erred in failing to remove prospective juror 27 after she stated that death was the appropriate penalty in cases of intentional murder. He asserts that her statement demonstrates that she would not act impartially. We disagree. Although prospective juror 27's statement may raise a question of partiality, the statement appears to be merely a light impression. It was made after defense counsel rephrased the prospective juror's original statement that death may be appropriate for "cold-blooded murder." Further, the challenged remark was rebutted by prospective juror 27's responses that she did not believe that the death penalty was the only appropriate sentence for aggravated murder, that she did not have strong feelings about the death penalty, and that she would follow the law and the trial court's instructions regarding when to impose the death penalty. Because it appears that the challenged statement was merely a light impression that was sufficiently rebutted, the trial court did not abuse its discretion in determining that prospective juror 27 could act impartially.

¶ 47 Fourth, Mr. Maestas argues that the trial court abused its discretion in failing to remove prospective juror 20 after he made repeated statements about his preference for a sentence of death and said that he would look less favorably on Mr. Maestas because of his race. We agree that, based on the entire voir dire exchange with prospective juror 20, his views would likely "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." [27]

---

**25.** *See* Utah Code § 76–3–207(4)(d) ("Mitigating circumstances include ... at the time of the homicide, the capacity of the defendant to appreciate the wrongfulness of his conduct or to conform his conduct to the requirement of law was impaired as a result of a mental condition, intoxication, or influence of drugs....").

**26.** *Wach*, 2001 UT 35, ¶ 27, 24 P.3d 948 (internal quotation marks omitted).

**27.** *Kell*, 2002 UT 106, ¶ 19, 61 P.3d 1019 (internal quotation marks omitted).

¶ 48 The record demonstrates that prospective juror 20 stated numerous times that death was always the appropriate penalty for murder, that his religion "expected" death for the crime of murder, and that he had very strong opinions about the punishment being equal to the crime. In addition, prospective juror 20 stated that he could not think of anything that defense counsel could say that would change his mind regarding death being the appropriate punishment for "murder of an innocent." Further, the prospective juror's comment that he would look less favorably on Mr. Maestas because of his race was never rebutted. Although prospective juror 20 did state that he could follow the law, this comment alone is not enough to show that his numerous other statements about always imposing a sentence of death were merely light impressions.[28] And there is no other evidence that rebuts the question of partiality or prejudice raised by prospective juror 20's responses. Hence, the court had insufficient evidence that prospective juror 20 was impartial and therefore erred in failing to remove him for cause.

2. The Error Was Not Harmful Because Mr. Maestas Has Not Demonstrated that a Biased Juror Was Empaneled

■ ¶ 49 Having determined that the court abused its discretion only in denying only the for-cause challenge to prospective juror 20, we next examine whether that error prejudiced Mr. Maestas. Following the denial of his for-cause challenge, Mr. Maestas used a peremptory challenge to remove prospective juror 20. Where a defendant uses a peremptory challenge to remove a juror who should have been removed for cause, we require that the defendant demonstrate prejudice.[29] To show prejudice, a defendant must demonstrate that "as a result of the loss of his peremptory challenge he was not able to remove another subsequently summoned juror who ultimately sat on the jury, and who was partial or incompetent." [30]

¶ 50 In this case, Mr. Maestas does not make such an assertion. Instead, he claims that, under *State v. Saunders*, we can find prejudice if we "take into account on a cumulative basis all erroneous rulings with respect to rulings on voir dire and for-cause challenges." [31] As an initial matter, we note that the position espoused in *Saunders* is not controlling in this case.[32] But even under Mr. Maestas's position, there is no cumulative error regarding the for-cause challenges in this case. Indeed, we have recognized only one error—the failure to remove prospective juror 20. Accordingly, we reject his claim that any error during voir dire entitles him to a new trial.

B. The Court's Occasional Failures to Admonish the Jury Did Not Result in Harm to Mr. Maestas

¶ 51 Mr. Maestas claims that the trial court failed to admonish the jury nine times over the course of the two-week trial: before one break on the first day of the guilt phase, four breaks on the second day, two breaks on the fifth day, and a break on both the first and second days of the penalty phase. He claims that he should be afforded a new trial because of these failures to admonish the jury. Because this claim was not preserved, Mr. Maestas must show plain error, meaning

---

28. *See Wach*, 2001 UT 35, ¶ 33, 24 P.3d 948 (explaining that "[i]t is not enough if a juror believes that ... she can be impartial and fair" because such an expression of belief "loses much of its meaning in light of other testimony and facts which suggest a bias" (internal quotation marks omitted)).

29. *See id.*, ¶ 24; *Menzies II*, 889 P.2d at 400.

30. *Wach*, 2001 UT 35, ¶ 36, 24 P.3d 948 (internal quotation marks omitted).

31. 1999 UT 59, ¶ 55, 992 P.2d 951 (plurality opinion).

32. There was no majority opinion in *Saunders,* so the "cumulative basis" language is not controlling. Additionally, in subsequent cases, we have required defendants to show prejudice by demonstrating that a biased juror was actually empaneled. *See, e.g., Wach*, 2001 UT 35, ¶¶ 36, 41, 24 P.3d 948. Further, the *Saunders* opinion based its finding of cumulative error on the court's "undue limitations on voir dire questions *and* the trial court's refusal to strike [a juror for cause]." 1999 UT 59, ¶ 55, 992 P.2d 951 (emphasis added). Because there were no such limitations on the voir dire questions in the case currently before us, *Saunders* has limited applicability.

an error that was obvious and harmful.[33] In this case, Mr. Maestas has not shown harm.[34]

¶ 52 Mr. Maestas contends that we should presume harm and grant a new trial in every case where the court fails to admonish a jury at any recess. We decline to adopt such a rule. Automatically granting a new trial for any instance where the court fails to admonish the jury before a recess fails to take into account whether, and to what extent, the jury has been properly admonished by the court in other instances. If the admonition "is not given but the harm that it was designed to forestall never occurs, it would be pointless to order a new trial simply to have the [admonition] given." [35]

¶ 53 We do not, however, foreclose the possibility that a presumption of harm may be warranted based on the particular circumstances of a case.[36] But no presumption of harm is warranted in this case. Here, the court properly admonished the jury at least seventeen times over the two-week proceedings, including at key times, such as at the initial meeting with prospective jurors and at the end of every day during the guilt phase. Although the court failed to admonish the jury in nine instances, some of those failures occurred before short interludes where the jury would have had little opportunity to forget prior admonitions, engage in discussion, or be exposed to extraneous information.

¶ 54 Because this case does not warrant a presumption of harm, Mr. Maestas must show that he was actually harmed by the court's failures to admonish the jury. He contends that he *must have* been harmed because the court's failure resulted in a juror being exposed to publicity about the case.[37] But although a juror admitted that she had seen a headline about the case and a picture in the newspaper, there is nothing in the record to indicate that the failures to admonish played any role in the juror's conduct. Indeed, the jurors had been properly admonished regarding reading newspapers. Further, the questioning of the juror indicates that she understood the admonitions and, consistent with the previous admonitions, she "didn't read the stories" and "ha[d]n't really been looking" for anything about the case. Accordingly, Mr. Maestas has not shown harm, and we therefore decline to grant a new trial on this basis.

C. *Mr. Maestas's Constitutional Rights Were Not Violated When, in His Absence and the Absence of His Counsel, the Court Conducted Certain Proceedings and Communicated with the Jury*

¶ 55 Mr. Maestas asserts that he is entitled to a new trial because his constitutional rights to be present and to counsel were violated when he and his counsel were absent from certain court proceedings and communications with the jury.[38] We disagree.

**33.** *See Menzies I*, 845 P.2d 220, 224–25 (Utah 1992).

**34.** We note that rule 17(k) of the Utah Rules of Criminal Procedure states that "[a]t each recess of the court . . . [the jurors] shall be admonished by the court that they may not "converse among themselves or . . . converse with . . . any other person on any subject of the trial, and that it is their duty not to form or express an opinion thereon until the case is finally submitted to them." The State argues that the failure to admonish cannot be an obvious error because we have not yet considered "whether the rule is mandatory or merely directory," and we have not "addressed the meaning of 'recess' under this rule." While "shall" may be directory in some instances, it is not directory here. Indeed, we have previously held that "on adjournment the jury *must* be admonished not to converse among themselves nor with anyone else on any subject connected with the trial." *State v. Garcia*, 11 Utah 2d 67, 355 P.2d 57, 59 (1960) (emphasis

added). Accordingly, the rule clearly imposes a mandatory requirement on the court. But we recognize that we have not yet considered whether a break of very short length constitutes a recess, such that the failure to admonish the jury constitutes an obvious error under this rule. Because we conclude that Mr. Maestas did not suffer harm from the court's occasional failures to admonish the jury, we need not address that issue at this time.

**35.** *United States v. Nelson*, 102 F.3d 1344, 1348 (4th Cir.1996).

**36.** *See, e.g., United States v. Hart*, 729 F.2d 662, 668 (10th Cir.1984).

**37.** *See infra* Part I.C.2.a.

**38.** Mr. Maestas also claims that his rights under article I, section 12 of the Utah Constitution were violated when he was *absent* from certain court

¶ 56 "[A]n otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt." [39] And we note that "a defendant is guaranteed the right to be present at any stage of the criminal proceeding that is *critical* to its outcome if his presence would contribute to the fairness of the procedure." [40] Thus, the defendant is entitled to appear "whenever his presence has a relation, reasonably substantial, to the ful[l]ness of his opportunity to defend against the charge" [41] or where his "presence would contribute to the fairness of the procedure." [42] But "this privilege of presence is not guaranteed when presence would be useless, or the benefit but a shadow." [43]

¶ 57 In addition to the right to be present, the Sixth Amendment affords the defendant the right to assistance of counsel. [44] "As a general matter, a defendant alleging a Sixth Amendment violation must demonstrate a reasonable probability that ... the result of the proceeding would have been different" had the defendant been granted the assistance of counsel. [45] But "[t]here is an exception to this general rule." [46] The denial of counsel is a structural error that does not require a showing of harm "where assistance of counsel has been denied *entirely* or during a *critical stage* of the proceeding." [47] A critical stage is "a step of a criminal proceeding ... that h[olds] significant consequences for the accused." [48] Determining whether a given stage of a proceeding is critical involves considering "whether the presence of ... counsel is necessary to preserve the defendant's basic right to a fair trial[,] .... whether potential substantial prejudice to the defendant's rights inheres in the particular confrontation[,] and the ability of counsel to help avoid that prejudice." [49]

¶ 58 With these standards in mind, we address Mr. Maestas's claim that he was denied the right to be present and the right

proceedings. But he does not offer any analysis of this constitutional provision to support his argument. Although there is not "a formula of some kind for adequate framing and briefing of state constitutional issues before ... this court," we have "frequently noted that mere mention of state [constitutional] provisions will not suffice." *State v. Tiedemann*, 2007 UT 49, ¶ 37, 162 P.3d 1106. Because Mr. Maestas has provided us with no argument to consider, we do not address his state constitutional claim.

39. *Delaware v. Van Arsdall*, 475 U.S. 673, 681, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986).

40. *Kentucky v. Stincer*, 482 U.S. 730, 745, 107 S.Ct. 2658, 96 L.Ed.2d 631 (1987) (emphasis added); *see also United States v. Gagnon*, 470 U.S. 522, 526, 105 S.Ct. 1482, 84 L.Ed.2d 486 (1985) (per curiam) ("[T]he presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only.") (alteration in original) (internal quotation marks omitted).

41. *Gagnon*, 470 U.S. at 526, 105 S.Ct. 1482 (citation omitted) (internal quotation marks omitted).

42. *Stincer*, 482 U.S. at 745, 107 S.Ct. 2658.

43. *Id.* (internal quotation marks omitted).

44. U.S. Const. amend. VI. ("In all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence.").

45. *Mickens v. Taylor*, 535 U.S. 162, 166, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2002) (internal quotation marks omitted); *see also id.* ("[D]efects in assistance that have no probable effect upon the trial's outcome do not establish a constitutional violation.").

46. *Id.*

47. *See id.* (emphases added); *see also United States v. Cronic*, 466 U.S. 648, 659 n. 25, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984) ("The [U.S. Supreme] Court has uniformly found constitutional error without any showing of prejudice when counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceeding."). Unlike most constitutional errors, which are reviewed for harm, structural errors are subject to automatic reversal without a showing of harm because they are not "simply ... error[s] in the trial process itself," but instead are errors that affect the very "framework within which the trial proceeds." *Arizona v. Fulminante*, 499 U.S. 279, 309–10, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). The Court has "found structural errors only in a very limited class of cases." *Johnson v. United States*, 520 U.S. 461, 468, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997).

48. *Bell v. Cone*, 535 U.S. 685, 695–96, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002).

49. *United States v. Wade*, 388 U.S. 218, 227, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967).

to counsel when (1) he and his counsel·were absent from certain proceedings and (2) the judge responded to jury notes without first informing the parties.

1. Mr. Maestas's Absence and the Absence of His Counsel from Certain Court Proceedings Did Not Violate His Constitutional Rights

¶ 59 Mr. Maestas contends that his right to be present and right to counsel were violated when he and his counsel were absent from certain court proceedings over the course of the guilt and penalty phases of the trial. Specifically, he claims that his rights were violated when (a) he and his counsel were absent from an initial meeting with prospective jurors, (b) he was absent from the beginning of a preliminary motion hearing, and (c) he and his counsel were absent during the judge's unrecorded conversation with and dismissal of the jury on one day in the penalty phase. Because these claims were not preserved, we consider them only for plain error, which means that an error must be both harmful and obvious.[50]

a. Mr. Maestas's Absence and the Absence of His Counsel from the Initial Meeting with Prospective Jurors Did Not Violate His Right to Be Present and Right to Counsel

¶ 60 Prior to holding the initial meeting with prospective jurors, the judge and the parties discussed the scheduled meeting on multiple occasions, but the judge stated that it was not necessary for the parties to attend. As a result, neither Mr. Maestas nor his counsel appeared at the initial jury meeting. At that meeting, the judge administered an oath and asked the prospective jurors a few preliminary questions regarding their general qualifications·for jury service.[51] The judge presented each· prospective juror with a questionnaire and admonished them regarding proper juror conduct. The prospective jurors then began completing their questionnaires. But when they had questions, the judge told them to answer the questionnaire to the best of their ability and informed them that questions would be addressed at a following meeting with counsel present.

¶ 61 Mr. Maestas asserts that we should grant him a new trial because holding the meeting in the absence of his counsel constituted a structural error that does not require a showing of harm, or, in the alternative, holding the meeting in his absence and the absence of his counsel was a harmful error. We disagree.

¶ 62 First, because the initial meeting was not a "critical stage" of the proceeding, Mr. Maestas has not demonstrated that holding the meeting in the absence of his counsel constituted a structural error. The focus of the meeting was on basic ministerial matters.[52] Indeed, the judge simply administered the oath, asked basic questions about the jurors' eligibility for service, and gave each prospective juror a questionnaire. No jurors were selected or removed at this meeting, and the judge deferred all substantive questions and discussion until a time when counsel would be present. Accordingly, the initial meeting did not "h[old] significant consequences for the accused."[53] Because it was not a critical stage, defense counsel's absence was not a structural error and so we will not grant a new trial without a showing of harm.

¶ 63 Second, Mr. Maestas has failed to demonstrate that it was a harmful error to

50. *See Menzies I*, 845 P.2d at 224–25.

51. Specifically, the judge asked whether they were citizens and residents of Salt Lake County; whether they were over the age of eighteen; whether they could read, write, and understand English; and whether they had any prior felonies.

52. Because the judge asked the prospective jurors questions regarding their qualifications for jury service, Mr. Maestas argues that the meeting was not confined to ministerial matters, and that it was instead "the first day of voir dire." We disagree. These questions were merely part of the initial screening of the jurors' competency to serve. And all substantive questioning of the jurors took place at a following meeting with the parties present. Accordingly, this initial meeting was not the first day of voir dire, and it would not have been obvious to the court that Mr. Maestas and his counsel should have been present at this meeting.

53. *Bell*, 535 U.S. at 695–96, 122 S.Ct. 1843.

conduct the meeting in his absence and the absence of his counsel. Indeed, there is no indication that their absence from that initial meeting resulted in an impartial jury or an otherwise unfair trial. Mr. Maestas contends that he was harmed because his absence prevented him from "exerting . . . [a] subtle psychological connection with the jury" and "demonstrating to the jury from the first day that he was a human being on trial for his life." But he had ample opportunity to establish such a connection with the jury throughout voir dire and the trial.

¶ 64 Mr. Maestas also asserts that he was harmed because his counsel's absence prevented them from being able to answer the prospective jurors' questions or follow up on concerns about the jurors' qualifications for service. But his counsel was provided an opportunity to question jurors during voir dire to ensure that the jurors were qualified. Because the judge deferred the prospective jurors' questions and did not remove any jurors, the prospective juror pool remained the same and Mr. Maestas was not placed in a different position as a result of the meeting. Accordingly, Mr. Maestas has not demonstrated that he was harmed by his or his counsel's absence from this initial meeting. We therefore decline to grant a new trial on this basis.

b. Mr. Maestas's Absence from the Beginning of a Pretrial Motion Hearing Did Not Violate His Right to Be Present

▇▇▇ ¶ 65 Prior to trial, the court held a pretrial motion hearing to review the parties' various motions. Before Mr. Maestas came into the courtroom, counsel made their appearances and discussed the outstanding evidentiary motions to be heard that day, including issues related to the motion regarding fingerprint evidence. At that point, the prosecution noted that Mr. Maestas was not present and defense counsel requested that Mr. Maestas be brought into the courtroom. Shortly thereafter, Mr. Maestas entered the courtroom and the court explained what had occurred in his absence. Neither Mr. Maes-

tas nor his counsel raised any objections to his absence before or after he came into the courtroom. On appeal, however, Mr. Maestas contends that his absence from the beginning of this hearing violated his right to be present. We disagree.

¶ 66 Mr. Maestas has not demonstrated that the court committed an obvious and harmful error. The beginning of this pretrial motion hearing was not a "stage of the criminal proceeding that [was] critical to its outcome." [54] Further, there is no indication that Mr. Maestas's "presence would [have] contribute[d] to the fairness of the procedure." [55] At the beginning of the pretrial motion hearing, the judge and counsel only briefly discussed the motions before Mr. Maestas entered the courtroom. And as soon as Mr. Maestas was present, the court informed him of what had occurred in his absence. He was then present for the substantive discussion that took place during the remainder of the hearing. Thus, there is no indication that his presence would have contributed to the fairness of the beginning of the pretrial motion hearing. Because his absence from the beginning of the pretrial motion hearing was not an obvious and harmful error, we decline to grant Mr. Maestas a new trial on this basis.

c. The Absence of Mr. Maestas and His Counsel During the Judge's Unrecorded Communication and Dismissal of the Jury Did Not Violate Mr. Maestas's Rights

¶ 67 On the third day of the penalty phase, Mr. Maestas asked to proceed as his own counsel. In response, the judge and counsel for both parties discussed this request outside the presence of the jury. The court then took a brief recess before ruling on Mr. Maestas's request. When the judge returned, he stated as follows:

Just prior to coming in I excused the jury and asked them to come back in the morning, because earlier when I went back to advise the jury there was a delay, several indicated that they had appointments, had

---

54. *Stincer,* 482 U.S. at 745, 107 S.Ct. 2658; *see also Gagnon,* 470 U.S. at 526, 105 S.Ct. 1482.

55. *Stincer,* 482 U.S. at 745, 107 S.Ct. 2658.

made arrangements at 3, 4, 4:30 expecting [us to adjourn at the] normal time. I told them that in any event had we gone forward we would have accommodated that. They will be here in the morning.

Neither Mr. Maestas nor his counsel objected to the judge's interaction with the jury.

¶ 68 On appeal, however, Mr. Maestas contends that the judge's interaction violated his right to be present and right to counsel because the interaction took place in his absence and the absence of his counsel. He argues that prejudice should be presumed when a judge engages in ex parte communication with the jury. But we decline to adopt an automatic presumption of prejudice, and, because Mr. Maestas has not shown that the judge's unrecorded communication with the jury resulted in harm, we reject Mr. Maestas's claim that he should be granted a new trial on this basis.

■■■ ¶ 69 In declining to automatically presume prejudice where a judge communicates ex parte with the jury, we note that we have held that a presumption of prejudice may arise as a result of *some* ex parte contact with the jury.[56] But we have never held that a presumption of prejudice automatically arises from *every* instance of ex parte communication between the judge and the jury.

In fact, the U.S. Supreme Court has held that "[t]he defense has no constitutional right to be present at every interaction between a judge and a juror" and that the "mere occurrence of an ex parte conversation between a trial judge and a juror does not constitute a deprivation of any constitutional right."[57] This is because "the Constitution does not require a new trial every time a juror has been placed in a potentially compromising situation."[58] Indeed, "[t]here is scarcely a lengthy trial in which one or more jurors do not have occasion to speak to the trial judge about something, whether it relates to a matter of personal comfort or to some aspect of the trial."[59] Thus, while the Court has acknowledged that ex parte communications between the judge and the jury may necessitate overturning a conviction because of prejudice on some occasions,[60] it has held that ex parte communication between a trial judge and a juror can be reviewed for harmless error.[61]

¶ 70 We note that it may be appropriate to presume prejudice in some instances, such as where the judge discusses substantive matters with jurors.[62] In such cases, the judge's communication may have influenced the jury in unknown ways that could potentially affect the outcome of the case.[63] But in this case,

---

**56.** *See State v. Pike*, 712 P.2d 277, 280 (Utah 1985) ("[A] rebuttable presumption of prejudice arises from any unauthorized contact during a trial between witnesses, attorneys or court personnel and jurors which goes beyond a mere incidental, unintended, and brief contact."); *see also State v. Erickson*, 749 P.2d 620, 621 (Utah 1987) (explaining that the presumption arises when the contact goes beyond "a brief, incidental contact where only remarks of civility were exchanged"). In such cases, "the burden is on the prosecution to prove that the unauthorized contact did not influence the juror." *Pike*, 712 P.2d at 280.

**57.** *Gagnon*, 470 U.S. at 526, 105 S.Ct. 1482 (internal quotation marks omitted).

**58.** *Rushen v. Spain*, 464 U.S. 114, 118, 104 S.Ct. 453, 78 L.Ed.2d 267 (1983) (internal quotation marks omitted).

**59.** *Id.*

**60.** *See, e.g., United States v. U.S. Gypsum Co.*, 438 U.S. 422, 460, 98 S.Ct. 2864, 57 L.Ed.2d 854

(1978) (finding prejudice when the judge met privately with the foreman of the jury and gave what amounted to a supplemental jury instruction).

**61.** *Rushen*, 464 U.S. at 117, 119, 104 S.Ct. 453 (explaining that the Court "emphatically disagree[d]" with the Ninth Circuit's conclusion that "unrecorded *ex parte* communication between trial judge and juror can never be harmless error").

**62.** *See, e.g., U.S. Gypsum*, 438 U.S. at 460–62, 98 S.Ct. 2864 ("Any *ex parte* meeting or communication between the judge and the foreman of a deliberating jury is pregnant with possibilities for error. This record amply demonstrates that even an experienced trial judge cannot be certain to avoid all the pitfalls inherent in such an enterprise."). In *U.S. Gypsum*, the judge met with the foreman of a deadlocked jury and the record suggests that the foreman carried away from the meeting an impression that "the judge wanted a verdict 'one way or the other.' " *Id.*

**63.** *See id.*

the judge's communication with the jury did not involve any substantive issues; instead, the interaction was brief and dealt with the timing of the jury's dismissal for the day. Further, to the extent that this communication could be considered "relate[d] to some aspect of the trial," the judge appropriately disclosed the communication and neither Mr. Maestas nor his counsel objected to the interaction. Accordingly, we do not presume prejudice in this case.

¶ 71 Without a presumption of prejudice, Mr. Maestas must show harm in order to prevail on his claim. He has not done so. While he contends that the judge's off-the-record dismissal of the jury could have caused the jury to feel "a greater warmth and affinity toward the judge," it seems unlikely that jurors would feel any differently toward the judge than if he had dismissed them with counsel and Mr. Maestas present. Further, as the judge was not an adversary to Mr. Maestas in the proceedings, it would not have been problematic if jurors felt appreciative toward the judge after being dismissed. In addition, while Mr. Maestas contends that it is possible that the judge said something to the jurors to indicate that Mr. Maestas was causing a delay, he proffers no evidence to support this conjecture. Because he has not demonstrated harm, we decline to grant Mr. Maestas a new penalty phase on this basis.

2. The Judge's Responses to Three Notes from the Jury Did Not Violate Mr. Maestas's Right to Be Present or His Right to Counsel

¶ 72 Mr. Maestas argues that he was denied his right to be present and his right to counsel when the judge responded to three notes sent by the jury without first informing counsel. Specifically, he challenges the judge's response to (a) two notes the jury sent during the guilt phase of the trial and (b) one note sent during the penalty phase. We reject these claims.

a. The Judge Did Not Commit Reversible Error in His Responses to the Two Notes the Jury Sent During the Guilt Phase

¶ 73 As an initial matter, we set forth the contents of the two notes the jury sent to the judge during the guilt phase, along with the judge's responses. The first note (Juror Tainting Note) was written on the sixth day of the guilt phase and stated, "Last week I made a comment about hoping to not miss all 3 weeks my kids are off track. [Juror 8] (on the back row) leaned over and said, 'I *may* have read an article in the paper that said trial would last only two weeks.'" Although it is not clear from the record that the judge informed counsel that he had received this note, he did hold an in-chambers meeting with defense counsel, the prosecution, and juror 8.

¶ 74 During that meeting, the judge told juror 8, "We have some concerns about whether or not anything in the press or anything in the paper has come to your attention, that you have read about the trial." Juror 8 responded that she had read a headline about the trial and saw a picture in the paper, but that she was not looking for any information and did not read the accompanying story. Defense counsel declined to ask any additional questions. The prosecution, however, inquired into whether juror 8 would follow the court's instructions despite any information she gleaned about the case from the headline. Based on juror 8's assurances that she had not read any articles and that she would follow the court's instructions, the judge, the prosecution, and defense counsel agreed that juror 8 would not be removed.

¶ 75 The jury sent the judge a second note (Scheduling Note) during or before deliberations on the last day of the guilt phase. The note asked, "Are we here until we've reached a verdict? Overnight? Until 5?" Although it is unclear whether the judge informed the parties of this note, the record shows that the judge wrote a note to the jury responding, "Not overnight. How long? We will all have a say if necessary."

¶ 76 Mr. Maestas contends that the judge committed reversible error in responding to the two jury notes without disclosing the exact content of the notes on the record. Because he did not preserve these arguments

below, we review for plain error.[64] Accordingly, Mr. Maestas must demonstrate an error that was both obvious and harmful.[65]

### (i) The Judge's Response to the Juror Tainting Note Was Not Erroneous

¶ 77 We note that, in this case, counsel was present during the judge's response to the allegations raised in the Juror Tainting Note. Although the judge and counsel met with juror 8 regarding whether she had read any newspaper articles about the case, Mr. Maestas asserts that his right to be present and his right to counsel were violated because there is no record that the judge disclosed the contents of the note to him or his counsel. We are not persuaded that this was a reversible error.

¶ 78 As an initial matter, "[a]n in-chambers conference concerning the dismissal of a juror ... is not a stage of the trial when the absence of the defendant would frustrate the fairness of the trial so long as counsel for the defendant is present."[66] And Mr. Maestas's counsel was present for the in-chambers conference regarding juror 8. Further, we have held that, where a court addressed with counsel and the defendant the concerns raised in a juror's note, failing to disclose the exact contents of a note on the record prior to responding is not a reversible error.[67] In *State v. Kozik*, the jury's foreman sent a note to the judge inquiring whether "if the jury were 'hung' on one count of the [charge], it would invalidate the others."[68] Although the judge responded to the jury's question in the presence of counsel and the defendant, he did not read the jury's question into the record until after he gave

his response.[69] The "[d]efendant objected to the fact that he did not know the contents of the question before it was answered and asked for a mistrial."[70] In declining to find a reversible error, we stated that a defendant must show harm in order to prevail on a claim that a judge should have disclosed the exact contents of a note from the jury on the record before responding.[71] Thus, to prevail on his claim, Mr. Maestas must demonstrate harm.

¶ 79 In this case, even if the judge did not show the Juror Tainting Note to Mr. Maestas or his counsel, the error was harmless for three reasons. First, Mr. Maestas has not alleged that juror 8 was partial or biased because of any newspaper article that she read during the course of the trial.[72] Second, nothing in juror 8's responses indicated that she was partial or biased. Indeed, juror 8 stated that she had seen only a headline and a photograph, but had not read any articles. Mr. Maestas has not proffered any evidence to rebut this statement. Finally, the judge informed defense counsel about allegations that juror 8 had read a newspaper article about the case. And when the judge questioned juror 8 about these allegations, defense counsel was present and had an opportunity to ask questions. But after juror 8 stated that she had read only a headline and could still follow the judge's instructions, defense counsel responded that he did not object to her remaining on the jury. If there was any doubt about juror 8's impartiality, defense counsel could have asked further questions or taken other action at that point.

¶ 80 Because defense counsel was present at the in-chambers conference to address the allegations in the Juror Tainting Note and

64. *Menzies I*, 845 P.2d at 224–25.

65. *See id.*

66. *United States v. Brown*, 571 F.2d 980, 987 (6th Cir.1978); *accord Stincer*, 482 U.S. at 745, 107 S.Ct. 2658 (holding that "a defendant is guaranteed the right to be present" only at "any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure").

67. *See State v. Kozik*, 688 P.2d 459, 460–61 (Utah 1984) (per curiam).

68. *Id.* at 460.

69. *Id.*

70. *Id.*

71. *See id.* at 461.

72. Although he does raise allegations of juror misconduct concerning juror 8, those allegations involve juror 8's knowledge of the meaning of "life without parole" based on her studies in a criminology class. *See infra* Part I.E.

had an opportunity to question juror 8, Mr. Maestas was not deprived of his right to counsel or his right to be present at a critical stage of the proceeding. Further, we conclude that Mr. Maestas has not demonstrated that he was harmed by the judge's failure to disclose the exact contents of the note on the record. Accordingly, we reject the assertion that Mr. Maestas is entitled to a new trial on this basis.

#### (ii) The Judge's Response to the Scheduling Note Was Not Erroneous

¶ 81 Mr. Maestas asserts that, when the judge responded to the Scheduling Note, he reinstructed the jury outside of his presence and the presence of his counsel. We reject this characterization of the judge's response.

¶ 82 A defendant has the constitutional right to be present at "any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure." [73] In addition, a defendant has the constitutional right to counsel during any "critical stage of the proceeding," [74] meaning a step "that h[olds] significant consequences for the accused." [75] Some courts have held that a critical stage of a criminal proceeding occurs when the jury is given supplemental instructions about the substantive elements of an offense, or when a deadlocked jury is given further instructions about how to proceed. [76] But courts have

recognized that a judge's communication with jurors regarding scheduling information does "not fit[ ] within the category of jury instruction or re-instruction that demands the presence of counsel." [77]

¶ 83 In *Valentine v. United States*, the judge delivered a note to the jury without the parties' knowledge. [78] The note informed the jury that, if the jury had not finished deliberating by a certain time, it would have to reconvene at a later date because the judge was scheduled to travel. [79] The reviewing court held that, because the note conveyed only "scheduling information," the communication did not constitute instruction or re-instruction and therefore was not a critical stage of the proceeding. [80] Similarly, in *United States v. McMurry*, a trial judge verbally informed a jury, in the absence of the defendants and the counsel for one of the defendants, "that he had to catch a plane in several hours and that if [the jury] had not finished deliberating by then he would call a recess over the weekend and allow deliberations to continue the following week." [81] The United States Court of Appeals for the Tenth Circuit reasoned that the statement "had nothing whatever to do with the length of deliberations but was . . . a needed schedule," and therefore "can in no way be considered as an instruction." [82] Thus, the court concluded "that the statement was simply not an instruction at all," and rejected the

---

73. *Stincer*, 482 U.S. at 745, 107 S.Ct. 2658.

74. *Cronic*, 466 U.S. at 659 n. 25, 104 S.Ct. 2039; see also *Roe v. Flores–Ortega*, 528 U.S. 470, 483, 120 S.Ct. 1029, 145 L.Ed.2d 985 (2000) ("[D]enial of counsel during a *critical stage* of a judicial proceeding mandates a presumption of prejudice . . . ." (emphasis added)).

75. *Bell*, 535 U.S. at 695–96, 122 S.Ct. 1843.

76. See, e.g., *Caver v. Straub*, 349 F.3d 340, 349 n. 6 (6th Cir.2003) (finding a critical stage when the jury was reinstructed "on certain elements of the offense after they had deliberated"); *French v. Jones*, 332 F.3d 430, 436, 438 (6th Cir.2003) (finding a critical stage when the judge gave a supplemental jury instruction that was not the standard deadlock instruction).

77. *Valentine v. United States*, 488 F.3d 325, 335 (6th Cir.2007).

78. *Id.* at 334; *United States v. McMurry*, 818 F.2d 24, 26–27 (10th Cir.1987).

79. *Valentine*, 488 F.3d at 334. The judge's note read as follows:

> Dear jury, there is no time limit nor is there any hurry in your deliberations. However, I must catch a plane today at 1:30. Therefore, if you do not have a verdict by 12:00, I will discharge you until Tuesday morning at 8:30, February the 15th, 2000.
> *Id.*

80. *Id.* at 335–36. *Valentine*, 488 F.3d at 335; *McMurry*, 818 F.2d at 26–27.

81. 818 F.2d 24, 26 (10th Cir.1987).

82. *Id.*

defendants' challenge to this communication.[83]

¶ 84 As in *Valentine* and *McMurry*, the judge's response to the Scheduling Note in this case addressed only scheduling matters. Specifically, the jury asked the judge whether they were to deliberate "until [they] reached a verdict? Overnight? Until 5?" And the judge's response was that everyone would "have a say if necessary" on when proceedings would end for the day. This response was not an "instruction" at all. Indeed, the response did not charge the jury to take any action, to return a verdict by a certain time, or to consider any substantive issue. Rather, the judge's response simply informed the jury that, if they did not reach a verdict by the end of the day, they would "have a say" in determining when to conclude their deliberations. Because the response involved only scheduling issues, it was not a critical stage of the proceeding. Accordingly, we do not presume harm.[84]

¶ 85 Mr. Maestas must therefore demonstrate a reasonable probability that, but for his absence and the absence of his counsel, there would have been a more favorable outcome.[85] In evaluating the effect of a judge's response to the jury, courts consider "the statement in context, assessing it under the totality of the circumstances."[86] In this case, the judge's response cannot be said to have harmed Mr. Maestas because it was truthful and did not give the impression "that it was more important [for the jury] to be quick than to be thoughtful."[87] Further, given the accurate and limited nature of the response, it is unlikely that the court would have given a different response had the defense been informed of the Scheduling Note. Finally, there is no evidence to suggest that the jury convicted Mr. Maestas because of its concerns about the length of jury deliberations. Thus, Mr. Maestas was not harmed by the judge's response.

¶ 86 Because it was not a critical stage of the proceeding, and because the response did not harm Mr. Maestas, neither his right to be present nor his right to counsel were violated by the judge's responses to the two notes from the jury during the guilt phase.[88] Accordingly, we reject the assertion that Mr. Maestas is entitled to a new trial on this basis.

b. The Judge's Response to the Jury's Note in the Penalty Phase Did Not Violate Mr. Maestas's Right to Be Present or His Right to Counsel

¶ 87 After the jury began deliberations regarding Mr. Maestas's sentence, it had a question about life without parole (LWOP). It sent a note (LWOP Note) asking, "If we make the decision of life without parole, is that a guarantee? Can the parole board over-rule our decision?" Without informing the parties of the note, the judge responded, "You are directed to the jury instructions as a whole. And specifically [I]nstruction No. 12." Instruction No. 12 provided: "If a person is sentenced to life in prison without parole, this means that he will never be

---

83. *Id.*

84. *See Mickens,* 535 U.S. at 166, 122 S.Ct. 1237 (recognizing that courts will presume prejudice only "where assistance of counsel has been denied entirely or during a critical stage of the proceeding").

85. *See State v. Dean,* 2004 UT 63, ¶ 22, 95 P.3d 276.

86. *Valentine,* 488 F.3d at 336 (internal quotation marks omitted).

87. *United States v. Green,* 523 F.2d 229, 236 (2d Cir.1975).

88. *See, e.g., Mickens,* 535 U.S. at 166, 122 S.Ct. 1237 (explaining that "a defendant alleging a Sixth Amendment violation must demonstrate a reasonable probability that ... the result of the proceeding would have been different" with the assistance of counsel, and stating that "defects in assistance that have no probable effect upon the trial's outcome do not establish a constitutional violation" (internal quotation marks omitted)); *Stincer,* 482 U.S. at 745, 107 S.Ct. 2658 (explaining that the "privilege of presence is not guaranteed when presence would be useless, or the benefit but a shadow" (internal quotation marks omitted)); *see also Van Arsdall,* 475 U.S. at 681, 106 S.Ct. 1431 ("[A]n otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt.").

eligible for parole and will spend the remainder of his life in prison."

¶ 88 After the jury had reached a verdict, but before the verdict was announced in open court, the judge called the prosecution and defense counsel into his chambers and informed them of the LWOP Note and his response. Neither the prosecution nor defense counsel made any objections at that time. But before the court formally imposed Mr. Maestas's sentence, defense counsel objected to the judge's response on the grounds that the judge, by responding to the LWOP Note without informing the parties, had violated Mr. Maestas's right to be present, right to counsel, and right to due process. The judge ruled that his response to the LWOP Note was proper, that Mr. Maestas's motion was untimely, and that the parties had agreed to the appropriateness of the judge's response.

¶ 89 On appeal, Mr. Maestas renews his claims that the judge's response to the LWOP Note violated his right to be present, right to counsel, and right to due process. He argues that jury re-instruction is a critical stage of the proceeding and therefore contends that it was structural error for the judge to respond to the note without notifying the parties of the note's contents. He asserts that he should be granted a new penalty phase on this basis. We disagree.

 ¶ 90 While some courts have found that jury re-instruction qualifies as a critical stage of the proceeding,[89] courts have also concluded that, when the judge reiterates a prior jury instruction, the response *does not* constitute a critical stage that would implicate the defendant's constitutional rights.[90] Because directing the jury to instructions previously agreed upon by the parties is unlikely to prejudice the defendant, we likewise conclude that the reiteration of a jury instruction is not a critical stage of the proceeding. Accordingly, it is not structural error for a judge to reiterate a jury instruction without the defendant or counsel present. In such circumstances, a defendant must therefore show harm in order to prevail on a claimed constitutional violation.[91]

¶ 91 In this case, by directing the jury to the instructions as a whole, and particularly to Instruction No. 12, the judge merely reiterated the prior instructions upon which the parties had agreed. Thus, to prevail on his claim, Mr. Maestas must show that he was harmed by the judge's response to the LWOP Note.

 ¶ 92 Mr. Maestas contends that he was harmed because the jury's question shows that it voted to impose death based on an incorrect understanding of the sentencing options, and defense counsel would have requested additional clarification if they had been informed of the note. We are not persuaded by this argument for three reasons. First, as discussed below in Part I.D., we conclude that the judge's response was appropriate and that Mr. Maestas was not harmed by the response because Instruction No. 12 actually misstated the law to his benefit. Second, while juror affidavits indicate that discussion about the meaning of life

89. See, e.g., Caver, 349 F.3d at 349–50 ("[I]f Petitioner's trial counsel was, indeed, absent during the re-instruction, a structural error occurred in the trial court proceeding...."). *But see United States v. Widgery*, 778 F.2d 325, 329 (7th Cir. 1985) ("A judge's failure to show jurors' notes to counsel and allow them to comment before responding violates Fed.R.Crim.P. 43(a), not the constitution.").

90. See, e.g., United States v. Hillsman, 480 F.3d 333, 335–36 (5th Cir.2007) (holding that the trial court's response to a jury note without first informing counsel did not violate the defendant's right to counsel because the court's response simply refused to give the jury further instructions and therefore "was not a critical stage"); *Hudson v. Jones*, 351 F.3d 212, 217 (6th Cir. 2003) ("[R]ereading of identical jury instructions is not a critical stage of a criminal trial."); *United States v. Morrison*, 946 F.2d 484, 503 (7th Cir.1991) ("[R]eading of the jury instructions ... [is not] a critical stage of the proceedings." (emphasis omitted)).

91. See, e.g., Mickens, 535 U.S. at 166, 122 S.Ct. 1237 (explaining that "a defendant alleging a Sixth Amendment violation must demonstrate a reasonable probability that ... the result of the proceeding would have been different" with the assistance of counsel, and stating that "defects in assistance that have no probable effect upon the trial's outcome do not establish a constitutional violation" (internal quotation marks omitted)); *Stincer*, 482 U.S. at 745, 107 S.Ct. 2658 (explaining that the "privilege of presence is not guaranteed when presence would be useless, or the benefit but a shadow" (internal quotation marks omitted)).

without parole prompted jurors to write the LWOP Note, one juror's affidavit explicitly stated, "Upon reading Instruction [No.] 12, the question was answered, the jurors agreed to follow the instruction, and the discussion moved on to a different topic." And the other juror affidavits do not contradict this statement. Third, the judge informed counsel of the LWOP Note and of his response prior to the jury announcing its verdict in open court, and counsel did not object. Thus, Mr. Maestas has failed to show that he was harmed by the judge responding to the LWOP Note in his and his counsel's absence.

¶ 93 Because the judge's response to the LWOP Note was merely a reiteration of jury instructions previously agreed upon by the parties, and because Mr. Maestas has not shown that he was harmed by this response, we conclude that Mr. Maestas's constitutional rights were not violated. Accordingly, we reject the assertion that Mr. Maestas is entitled to a new penalty phase on this basis.

¶ 94 But we note that, even though the judge did not commit reversible error in responding to the jury's three notes, it is advisable for judges to inform counsel and disclose the contents of any jury notes on the record before providing a response. When a judge answers a jury's note without consulting counsel, the judge exposes the verdict to challenges that could easily be avoided. To protect a verdict and to respect a defendant's right to a fair trial, judges should inform counsel of each note they receive from the jury.

### D. The Trial Court Did Not Err When it Directed the Jury to Instruction No. 12 in Response to the LWOP Note

■ ¶ 95 Mr. Maestas argues that the trial court committed a reversible error be-cause it failed to ensure that the jury understood the meaning of a sentence of life without parole. He asserts that the trial court violated his rights under the Due Process Clause and the Eighth Amendment by its response to the LWOP Note from the jury. Specifically, he argues that the court should have responded that the jury's sentencing decision *could not* be overruled by the Board of Pardons, instead of directing the jury to Instruction No. 12. Because Mr. Maestas raises constitutional questions, we review the court's conclusions for correctness.[92]

¶ 96 The U.S. Supreme Court has held that the principles of due process require the sentencing jury in a capital case to be informed that the defendant is ineligible for parole when "the defendant's future dangerousness is at issue, *and* state law prohibits the defendant's release on parole." [93] Because "nothing in the Constitution prohibits the prosecution from arguing any *truthful* information relating to parole or other forms of early release," [94] the jury must be informed of the defendant's parole ineligibility only when both of the above conditions are met. Additionally, the Court has recognized that the Eighth Amendment is implicated when "there is a reasonable likelihood that a juror will misunderstand a sentencing term." [95]

¶ 97 In *Simmons v. South Carolina*, the prosecution argued at trial that the defendant's "future dangerousness was a factor for the jury to consider when fixing the appropriate punishment." [96] But the trial court prohibited the defense from arguing in rebuttal that, if the defendant was sentenced to life imprisonment, state law ensured that the

**92.** *See State v. Candedo*, 2010 UT 32, ¶ 7, 232 P.3d 1008.

**93.** *Simmons v. South Carolina*, 512 U.S. 154, 156, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994) (plurality opinion) (emphasis added); *see also Shafer v. South Carolina*, 532 U.S. 36, 40, 121 S.Ct. 1263, 149 L.Ed.2d 178 (2001) (applying holding from *Simmons*); *Kelly v. South Carolina*, 534 U.S. 246, 248, 122 S.Ct. 726, 151 L.Ed.2d 670 (2002) (same).

**94.** *Simmons*, 512 U.S. at 168, 114 S.Ct. 2187 (emphasis added); *see also People v. Boyer*, 38

Cal.4th 412, 42 Cal.Rptr.3d 677, 133 P.3d 581, 634 (2006) ("[The trial] court was not obliged to instruct further on the 'true meaning' of life without parole. Any instruction that such a sentence guaranteed defendant's incarceration until his death would be inaccurate, considering the Governor's commutation and pardon powers.").

**95.** *Simmons*, 512 U.S. at 172, 114 S.Ct. 2187 (Souter, J., concurring).

**96.** *Id.* at 157, 114 S.Ct. 2187 (plurality opinion).

defendant would never be eligible for parole.[97] During deliberations, the jury in *Simmons* sent the judge a note inquiring whether "imposition of a life sentence carr[ies] with it the possibility of parole."[98] The judge responded that the jury should not consider parole or parole eligibility and that "[t]he terms life imprisonment and death sentence are to be understood in their [plain] and ordinary meaning."[99] The jury ultimately sentenced the defendant to death.[100]

¶ 98 In finding a violation of the principles of due process, the U.S. Supreme Court highlighted the point that the defense had conclusively established that the defendant "was in fact ineligible for parole under [state] law."[101] Because the defendant could not be paroled, the Court stated that the trial court erred in "refus[ing] to provide the jury with accurate information regarding [the defendant's] parole ineligibility."[102] This error resulted in the jury's question remaining unanswered and the jury being given a "false choice between sentencing [the defendant] to death and sentencing him to a limited period of incarceration."[103]

¶ 99 Unlike the instructions given in *Simmons*, in the case currently before us, the trial court's instructions regarding life without parole were sufficient to satisfy Mr. Maestas's constitutional rights for two reasons. First, even if we assume that Mr. Maestas's future dangerousness was at issue,[104] the jury was sufficiently informed about his parole eligibility. In contrast to *Simmons*, where the jury was told not to consider parole eligibility,[105] in this case the judge directed the jury to Instruction No. 12, which stated, "[i]f a person is sentenced to life in prison without parole, *this means he will never be eligible for parole* and will spend the remainder of his life in prison." (Emphasis added.) Thus, the jury was specifically instructed regarding Mr. Maestas's ineligibility for parole. In addition, during voir dire, prospective jurors were asked about their understanding of the term "life without parole," and counsel had the opportunity to correct any misunderstanding. Because the jury was sufficiently informed regarding parole eligibility, we conclude that there is not a reasonable likelihood that a juror would have misunderstood the meaning of life without parole.

¶ 100 Second, the trial court was not obliged to tell the jury that the Board of Pardons and Parole could *never* overrule the jury's sentence of life without parole because such a statement is inaccurate under Utah law. The U.S. Supreme Court's language in *Simmons* does not require a jury to be instructed in a manner that affirmatively conceals the legal possibility of a defendant's parole.[106] And under Utah law, a sentence of life without parole *does not* preclude the Board of Pardons and Parole from eventually releasing on parole "a person sentenced to life in prison without parole if the board finds by clear and convincing evidence that the person is permanently incapable of being a

---

**97.** *Id.* at 158–60, 114 S.Ct. 2187.

**98.** *Id.* at 160, 114 S.Ct. 2187 (internal quotation marks omitted).

**99.** *Id.* (internal quotation marks omitted).

**100.** *Id.*

**101.** *Id.* at 158, 114 S.Ct. 2187; *see also id.* at 158 n. 2, 114 S.Ct. 2187 (" 'The board [of probation, parole, and pardons] must not grant parole nor is parole authorized to any prisoner serving a sentence for a second or subsequent conviction ....' " (quoting S.C.Code Ann § 24–21–640 (Supp.1993))).

**102.** *Id.* at 162, 114 S.Ct. 2187; *see also id.* at 169, 114 S.Ct. 2187 ("Because truthful information of parole ineligibility allows the defendant to 'deny or explain' the showing of future danger-

ousness, due process plainly requires that he be allowed to bring it to the jury's attention....").

**103.** *Id.* at 161, 114 S.Ct. 2187.

**104.** The parties dispute whether his future dangerousness outside of prison was at issue. But because Mr. Maestas's claim fails regardless of whether it was at issue, we need not address this question.

**105.** *Id.* at 160, 114 S.Ct. 2187.

**106.** *See id.* at 168, 114 S.Ct. 2187; *see also People v. Arias*, 13 Cal.4th 92, 51 Cal.Rptr.2d 770, 913 P.2d 980, 1032 (1996) ("Nor does *Simmons* suggest the jury must be instructed in a manner that affirmatively conceals the possibility of commutation or pardon.").

threat to the safety of society."[107]

¶ 101 For the foregoing reasons, we conclude that the principles of due process and the Eighth Amendment were not violated when the judge responded to the LWOP Note by directing the jury to Instruction No. 12. Accordingly, we reject Mr. Maestas's claim of error.

### E. The Trial Court Did Not Err When It Denied the Motion for a New Trial

¶ 102 Mr. Maestas asserts that the trial court erred in denying his motion for a new trial based on two instances of alleged juror misconduct. He asserts that (1) two jurors failed to honestly answer material questions during voir dire and (2) the jury was exposed to and considered extraneous prejudicial information during its deliberations.[108]

¶ 103 A trial court may grant a new trial "in the interest of justice if there is any error or impropriety which had a substantial adverse effect upon the rights of a party."[109] We will not reverse a trial court's denial of a motion for a new trial absent a clear abuse of discretion.[110] "[W]e review the legal standards applied by the trial court in denying such a motion for correctness" and "review the trial court's factual findings for clear error."[111] With that standard in

mind, we reject Mr. Maestas's arguments and affirm the trial court's denial of his motion.

1. The Two Jurors Did Not Provide Dishonest Answers on Their Jury Questionnaires

¶ 104 When determining whether a juror's answers during voir dire warrant a new trial, we have adopted the test set forth in *McDonough Power Equipment, Inc. v. Greenwood*.[112] Under *McDonough*, a court must order a new trial based on a juror's answers during voir dire "if the moving party demonstrates that (1) 'a juror failed to answer honestly a material question on voir dire,' and (2) 'a correct response would have provided a valid basis for a challenge for cause.'"[113] "Both elements are necessary to successfully challenge the participation of the juror in question."[114]

¶ 105 Under the first prong of the *McDonough* test, a juror's objective honesty is assessed by evaluating whether the answer was true or false at the time it was given.[115] Thus, "an incorrect prediction [about how a juror will behave in a certain instance] does not amount to a dishonest answer" absent evidence that the juror intended to give an incorrect response.[116] Fur-

**107.** Utah Code § 77-27-9(6). We note that the instruction the jury received regarding life without parole actually misstated the law in Mr. Maestas's favor because it stated that a person sentenced to life without parole would *never* be eligible for parole.

**108.** We note that Mr. Maestas has not preserved his claims that juror 8 failed to honestly answer material questions during voir dire, or that juror 18 introduced extraneous prejudicial information during jury deliberations. Because he makes these arguments for the first time on appeal, we review these claims for plain or manifest error. *Menzies I*, 845 P.2d at 224–25.

**109.** Utah R.Crim P. 24(a).

**110.** *State v. Pinder*, 2005 UT 15, ¶ 20, 114 P.3d 551.

**111.** *Id.* (internal quotation marks omitted).

**112.** 464 U.S. 548, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984); *accord State v. Evans*, 2001 UT 22, ¶ 25, 20 P.3d 888; *State v. Thomas*, 830 P.2d 243, 245 (Utah 1992).

**113.** *Thomas*, 830 P.2d at 245 (quoting *McDonough*, 464 U.S. at 556, 104 S.Ct. 845).

**114.** *State v. Shipp*, 2005 UT 35, ¶ 19, 116 P.3d 317.

**115.** *Thomas*, 830 P.2d at 246 (reviewing voir dire answer to a question regarding whether a prospective juror "or a close relative [had] been a victim of a violent crime"); *Shipp*, 2005 UT 35, ¶ 21, 116 P.3d 317 (reviewing voir dire answer to a question regarding whether a prospective juror "knew or recognized the names of the State's witnesses" (alterations omitted)).

**116.** *State v. Hauptman*, 2011 UT App 75, ¶ 6, 249 P.3d 1009; *see also State v. Redding*, 2007 UT App 350, ¶ 22, 172 P.3d 319 ("There is no evidence that the jury panel, at the time they responded to the trial court's questions relevant to their ability to obey the court's instructions to disregard the issue of punishment and extraneous evidence, intended to disregard those instructions.").

ther, "a juror who mistakenly fails to reveal relevant information because of a clearly ambiguous question cannot be said to have 'dishonestly' answered a material question." [117] As to the second prong of the *McDonough* test, there is a valid basis for a challenge for cause if the juror expresses an inability to view the evidence impartially.[118] With these principles in mind, we examine the voir dire responses given by jurors 8 and 18, and we conclude that Mr. Maestas has failed to satisfy the first prong of *McDonough* for either juror.

¶ 106 First, juror 8 stated in voir dire that, based on her attendance in a criminology class, she understood "life without parole" to mean that an individual must serve at least twenty years in prison, but "there is still an option of parole ... after that time." Nonetheless, when asked whether she would follow the judge's instructions and statement about the meaning of a sentence of life without parole, even if those instructions conflicted with her studies, juror 8 stated that she "would follow the judge." Mr. Maestas argues that juror 8's response was a dishonest answer requiring a new trial. We disagree.

¶ 107 Juror 8's answer that she could set aside her understanding of the meaning of "life without parole" and follow the judge's instructions was not objectively dishonest because it called for a prediction of a *future event*. Moreover, Mr. Maestas has not proffered any evidence that juror 8 intended to, or actually did, disregard the judge's instructions in voting for the death penalty. Indeed, the State proffered an affidavit from juror 8 in which she stated that, after the judge instructed the jury to follow Instruction No. 12, "the jurors agreed to follow [his] instruction, and the discussion [about the meaning of life without parole] moved on to a different topic." For the

foregoing reasons, we conclude that juror 8's answer during voir dire was not objectively dishonest and therefore fails under the first *McDonough* prong.

¶ 108 Second, juror 18 was asked in her court questionnaire whether anyone in her family had ever been "charged with a crime" and, if so, "what crime and what was the outcome?" The questionnaire gave one line of writing space to identify the "crime" and two lines to describe the "outcome." Juror 18 answered that her son had been arrested and charged with "passing a check that didn't belong to him" and was on probation. In responding to a separate question, juror 18 indicated that her son had also been charged with "busting in [her] door." Further, juror 18 stated that she thought that courts are too "soft" on criminals but that she did not have strong or negative feelings toward the legal system.

¶ 109 After sentencing, juror interviews indicated that, during deliberations, juror 18 had told the other jurors that her son had "a substantial juvenile history with over 65 felonies before he reached the age of 18 and that nothing had happened to him as far as meaningful punishment by the court." Based on this information, Mr. Maestas argues that juror 18 provided dishonest answers during voir dire when she failed to document the extent of her son's juvenile history and answered that she did not have strong feelings about the criminal justice system.[119] We disagree.

¶ 110 Juror 18's responses regarding her feelings toward the criminal justice system do not qualify as objectively dishonest. As an initial matter, juror 18's statement during deliberations is likely barred from our consideration by rule 606(b) of the Utah Rules of Evidence.[120] But even assuming that we can

117. *Thomas*, 830 P.2d at 246.

118. *See* UTAH R.CRIM. P. 18(e) (listing potential challenges for cause).

119. We note that, despite the disclosure of two incidents resulting in criminal charges against juror 18's son, defense counsel did not ask any follow-up questions regarding her son's criminal history. And where defense counsel fails to ask

necessary follow-up questions, any claim of potential juror impropriety on the issue may be deemed waived. *See State v. DeMille*, 756 P.2d 81, 83 (Utah 1988).

120. UTAH R. EVID. 606(b) ("[A] juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indict-

consider the comment, nothing demonstrates that juror 18 provided objectively dishonest answers during voir dire. Indeed, her feelings about her son's punishment do not necessarily implicate her feelings toward the entire legal system. Further, in her questionnaire, juror 18 answered that she felt courts were too "soft" on those charged with a crime, and defense counsel did not follow up on this response.

¶ 111 In addition, juror 18's failure to disclose the extent of her son's juvenile history was not objectively dishonest because the questionnaire's inquiries were ambiguous. Specifically, the questionnaire asked whether a family member was "ever charged with *a* crime?" and provided only one line of writing space for the answer. (Emphasis added.) A reasonable interpretation is that a lengthy list of criminal charges was not required. Juror 18's response therefore cannot be said to have been objectively dishonest in light of the ambiguous nature of the question.

¶ 112 For the foregoing reasons, we conclude that Mr. Maestas has not satisfied the first prong of the *McDonough* test because neither juror's answers were objectively dishonest.

2. Because the Two Jurors' Statements Did Not Contain Extraneous Prejudicial Information, We May Not Consider Them Under Rule 606(b)

¶ 113 Next, we analyze whether the jury was exposed to and considered extraneous prejudicial information during its delibera-

tions. We recognize that "[t]he requirement that a jury's verdict must be based upon the evidence developed at the trial goes to the fundamental integrity of all that is embraced in the constitutional concept of trial by jury." [121] Yet our system imposes rules to "insulate[ ] the deliberations of the jury from subsequent second-guessing by the judiciary." [122] One such safeguard is rule 606(b) of the Utah Rules of Evidence, which bars the consideration of testimony regarding jury deliberations. [123] Although this rule "denies the court access to what may be relevant information ... that might, for example, justify a motion for a new trial," it also ensures that "jurors [may] express themselves candidly and vigorously as they discuss the evidence presented in court." [124]

¶ 114 But rule 606(b) has an exception that allows a juror to testify on the question of "whether ... *extraneous prejudicial information* was improperly brought to the jury's attention." [125] Typically, extraneous prejudicial information "cover[s] misconduct such as jurors reading news reports about the case, jurors communicating with third parties, bribes, and jury tampering." [126] It includes the jury's consideration of evidence not admitted in court, [127] and instances where a juror "conduct[ed] his own investigation and [brought] the results into the jury room." [128] But extraneous prejudicial information does not include "evidence of discussions among jurors" [129] or instances where "a juror ... brings his personal experiences to bear on the matter at hand." [130] In light of

ment or concerning the juror's mental processes in connection therewith. . . .").

121. *Turner v. Louisiana*, 379 U.S. 466, 472, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965) (internal quotation marks omitted); *see also Smith v. Phillips*, 455 U.S. 209, 217, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982) ("Due process means a jury capable and willing to decide the case solely on the evidence before it. . . .").

122. *United States v. Benally*, 546 F.3d 1230, 1233 (10th Cir.2008).

123. *See* Utah R. Evid. 606(b); *see also* Fed. R. Evid. 606(b) (mirroring Utah rule 606(b)).

124. *Benally*, 546 F.3d at 1234.

125. Utah R. Evid. 606(b)(2)(A) (emphasis added); *see also* Fed.R.Evid. 606(b) (providing that "a

juror may testify about whether ... extraneous prejudicial information was improperly brought to the jury's attention").

126. *Benally*, 546 F.3d at 1236.

127. *See Gov't of Virgin Islands v. Gereau*, 523 F.2d 140, 149 (3d Cir.1975).

128. *Benally*, 546 F.3d at 1237.

129. *Gov't of Virgin Islands*, 523 F.2d at 150.

130. *Benally*, 546 F.3d at 1237; *see also id.* ("[T]he inquiry is not whether the jurors became witnesses in the sense that they discussed any matters not of record, but whether they discussed specific extra-record *facts* relating to the defendant, and if they did, whether there was a

these principles, we consider whether the statements of jurors 8 and 18 qualify as extraneous prejudicial information and therefore fall within the exception to rule 606(b).

¶ 115 First, Mr. Maestas contends that juror 8's assertion that individuals sentenced to life without parole could nevertheless be paroled constitutes extraneous prejudicial information. And he claims that he was prejudiced by this statement. We disagree. The question of whether jury discussions of parole eligibility constitute extraneous information is an issue of first impression in our state. Other jurisdictions, however, have examined this issue and reached various results.[131] But because we conclude that Mr. Maestas has not demonstrated that this statement affected the jury's decision, we need not decide whether it constituted extraneous information. Instead, for the following reasons, we hold that juror 8's comment did not contain extraneous *prejudicial* information and therefore does not fall within the exception to rule 606(b)'s general bar.

¶ 116 Juror 8's comment was not prejudicial to Mr. Maestas because the evidence shows that the jury was already confused about the meaning of life without parole before juror 8 made her comment. And after juror 8's statement about her understanding of life without parole, the jury submitted the LWOP Note to the judge. When the jury was instructed to reread Instruction No. 12, it is uncontested that "the question was answered, the jurors agreed to follow the instruction, and the discussion moved on to a different topic." Accordingly, there is no evidence that juror 8's statement about her understanding of life without parole influenced the jury's decision or prejudiced Mr. Maestas.

¶ 117 Second, Mr. Maestas contends that juror 18's statements during jury deliberations regarding her son's juvenile history and her feelings about his punishment constitute extraneous prejudicial information. We disagree. Neither a juror's personal experiences nor her feelings or beliefs constitute extraneous prejudicial information.[132] Because juror 18's statements reflected only her personal feelings and experiences about her son's punishment, "those representations emanate[d] from inside the jury" and cannot be considered extraneous.[133] Accordingly,

significant possibility that the defendant was prejudiced thereby." (internal quotation marks omitted)).

131. *See, e.g., United States v. Straight,* 42 M.J. 244, 250 (C.A.A.F.1995) ("Lay opinions about the possibility of parole, made as expressions of opinion or common knowledge, do not fall within the exceptions to [rule] 606(b)."); *McWhorter v. State,* — So.3d ——, ——, 2011 WL 4511231 (Ala.Crim.App.2011) (holding that juror's testimony regarding discussions of parole in jury deliberations was not considered extraneous information); *Veasey v. State,* 276 Ark. 457, 637 S.W.2d 545, 547 (1982) (discussing jury's consideration of parole and noting that rule 606(b) "states plainly that a juror may not testify as to the effect of anything upon his mind as influencing him to assent to the verdict"); *Berrier v. Thrift,* 107 N.C.App. 356, 420 S.E.2d 206, 211 (1992) (noting that "information about parole eligibility was general information rather than information dealing with this particular defendant" and so was barred by rule 606(b) (internal quotation marks omitted)); *see also Erikson v. Rowland,* No. 92-55371, 1993 WL 128865, *3 (9th Cir. Apr. 26, 1993) (holding rule 606(b) barred "declarations describ[ing] conversations between jurors and alternates, allegedly misinterpreting the significance of a life sentence without parole"). *But see Harris v. Commonwealth,* 13 Va.App. 47, 408 S.E.2d 599, 599–600 (1991) (remanding for a hearing on the influence of parole discussion where juror who "was associated in some fashion with the Department of Corrections … proceeded to explain to the jury how the parole system would come into play," but noting Virginia's rule allowing questioning of jurors in "exceptional cases where juror testimony might be admissible to impeach their verdict to prevent a miscarriage of justice" (internal quotation marks omitted)).

132. *See DeMille,* 756 P.2d at 84 (holding that juror's statement during deliberations about her belief or opinion that she received a revelation confirming defendant's guilt was not extraneous prejudicial information); *Marquez v. City of Albuquerque,* 399 F.3d 1216, 1223 (10th Cir.2005) ("A juror's personal experience … does not constitute 'extraneous prejudicial information.' "); *see also* 27 Charles Alan Wright et al., Federal Practice and Procedure Evidence § 6075 (2d ed. 2007) (stating that "the [606(b)] exception does not apply where jurors use general background facts or data having nothing specifically to do with the case …. [because] no juror can approach deliberations with an entirely clean cognitive slate").

133. *See Hines v. State,* 3 S.W.3d 618, 623 (Tex. App.1999).

testimony regarding these statements is barred by rule 606(b).

¶ 118 In sum, we reject each of Mr. Maestas's five challenges concerning the selection of the jury, the judge's communications with the jury, and the jury's deliberations. Accordingly, we decline to grant him a new trial on these bases.

## II. GUILT PHASE

¶ 119 Mr. Maestas next raises four arguments regarding the guilt phase of his trial. Specifically, he asserts that he is entitled to a new guilt phase because (A) the court erred in admitting expert testimony about the Y-STR DNA analysis and fingerprint testing, (B) the court erred in allowing certain portions of the medical examiner's testimony, (C) the prosecution made three improper comments that tainted the fairness of the proceeding, and (D) there was insufficient evidence to support his convictions for the aggravated murder of Ms. Bott and the aggravated burglary of Ms. Chamberlain's home. We reject each of these claims.

### A. The Court Did Not Err in Admitting the Expert Testimony Regarding Y-STR DNA and Fingerprint Evidence

¶ 120 Mr. Maestas asserts that the trial court erred when it admitted scientific and expert testimony regarding the Y-STR DNA results and the fingerprint testing because such evidence is unreliable and unduly prejudicial. We disagree.

¶ 121 The admission of scientific evidence and expert testimony is governed by rules 702 and 403 of the Utah Rules of Evidence.[134] Rule 702(b) provides that scientific knowl-edge may serve as the basis for expert testimony if "there is a threshold showing that the principles or methods that are underlying in the testimony (1) are reliable, (2) are based upon sufficient facts or data, and (3) have been reliably applied to the facts of the case."[135] This threshold showing "is satisfied if the underlying principles or methods, including the sufficiency of facts or data and the manner of their application to the facts of the case, are generally accepted by the relevant expert community."[136] Even if the evidence and testimony satisfy the threshold showing, the court must determine that the testimony is more probative than prejudicial, as required by rule 403.[137]

¶ 122 We review a trial court's decision to admit expert testimony for an abuse of discretion and find error only if no reasonable person would take the view the trial court adopted.[138] Thus, our task is not to determine whether the particular type of scientific evidence should always be admitted, or whether the particular scientific analysis represents the best possible test. Instead, we must decide whether the trial court made a permissible choice in exercising its discretion to admit the scientific evidence in this case. With this standard in mind, we address Mr. Maestas's arguments that the trial court erred in admitting the expert testimony regarding (1) the Y-STR DNA analysis and (2) the fingerprint testing.

### 1. The Y-STR DNA Expert Testimony Satisfied the Requirements of Rule 702(b) and Rule 403

¶ 123 Before addressing Mr. Maestas's claims concerning the admission of the Y-

**134.** *See Eskelson ex rel. Eskelson v. Davis Hosp. & Med. Ctr.*, 2010 UT 59, ¶¶ 9–10, 242 P.3d 762. Before rule 702 was amended in 2007, "the standard for determining the admissibility of technical or scientific expert testimony was that announced in *State v. Rimmasch.*" *Id.* ¶ 10. The *Rimmasch* standard required the court to determine that (1) the scientific principles and techniques underlying the expert's testimony are inherently reliable, (2) the principles and techniques have been properly applied to the facts of the case by sufficiently qualified experts, and (3) the proffered evidence will be more probative than prejudicial as required by rule 403. *Id.* (citing *State v. Rimmasch*, 775 P.2d 388, 398 nn. 7–8, 403 (Utah 1989)). In amending rule 702, we intended "to clarify the requirements for ad-mission" of expert testimony and subsume the *Rimmasch* standard into rule 702. *Id.* ¶ 11; *State v. Clopten*, 2009 UT 84, ¶ 38, 223 P.3d 1103. Although the rules were again amended after we heard oral argument in this case, because the changes were not substantive, we cite to the current version of the rules in this opinion.

**135.** Utah R. Evid. 702(b).

**136.** *Id.* 702(c).

**137.** *Id.* 403.

**138.** *State v. Butterfield*, 2001 UT 59, ¶ 28, 27 P.3d 1133.

STR DNA evidence, we provide a brief overview of the trial court's decision to admit the expert testimony and how the expert testimony was used at trial. Prior to trial, the court conducted an evidentiary hearing to determine whether the Y–STR DNA analysis satisfied the requirements of rule 702(b). At that hearing, the court heard testimony from Dr. Todd Wrigley, a forensic scientist employed by Sorenson Forensics. In addition to describing his own credentials, Dr. Wrigley testified that Sorenson Forensics was a private institution accredited by Forensic Quality Services, Inc., and was soon to be accredited by the American Society of Crime Laboratory Directors International Program.

¶ 124 At the evidentiary hearing and at trial, Dr. Wrigley testified that the Y–STR DNA analysis uses the same process and technology to extract, amplify, and identify DNA that is generally employed with polymerase chain reaction (PCR) STR DNA tests. But instead of focusing on all the chromosomes in a person's DNA, as in PCR STR testing, the Y–STR analysis focuses specifically on the Y-chromosome, found only in males and inherited through the male's paternal lineage. Dr. Wrigley testified that because all males in the same paternal lineage have the same forensic markers, called alleles, on their Y-chromosomes, the Y–STR analysis indicates whether an individual and all of his paternal relatives can be excluded as possible contributors as the source of a DNA sample. He stated that, although the analysis may not be able to affirmatively identify an individual as the source of the DNA, Y–STR analysis is "a very strong tool for excluding an individual." Dr. Wrigley testified that a Y–STR analysis is especially helpful when the DNA sample is mixed with female DNA or when there are multiple male suspects. And he explained that the State selected the Y–STR test in this case because the State assumed that Ms. Bott fought her attacker and that they were looking for a male suspect.

¶ 125 Dr. Wrigley also explained the Y–STR analysis process. He stated that, during the short tandem repeat process, analysts look for alleles on the Y-chromosome. The Y–STR analysis generates a graphic representation of the presence of an allele and the amount of relative fluorescence units (RFUs) that the allele generates. Dr. Wrigley testified that Sorenson Forensics's practice is to find a viable marker for any allele with an RFU of 75 or above, and to compare that allele with the unknown source sample (in this case, the DNA found under Ms. Bott's fingernails—"fingernail scrapings") to determine if the two samples contain the same allele. When the same allele is present in both samples, the individual cannot be excluded as a possible contributor of the DNA. Dr. Wrigley explained that the statistical significance of such a match is determined by comparing the allele to a database of 3,561 sample Y-chromosomes.

¶ 126 Regarding the Y–STR analysis in this case, Dr. Wrigley stated that the DNA from Ms. Bott's fingernail scrapings was not consistent with DNA from Mr. Irish or Mr. Renzo. Thus, both men could be excluded as the source of the DNA. But Dr. Wrigley testified that the DNA from Ms. Bott's fingernail scrapings contained an allele that was consistent with, or that "matched," the DNA from Mr. Maestas. Dr. Wrigley clarified to the jury that the term "match" meant that neither Mr. Maestas nor his paternal relatives could be excluded as the source of the DNA. Then, for statistical purposes, Dr. Wrigley outlined the "random match probability" that someone within the sample database of 3,561 DNA profiles would have the same allele as the DNA from Ms. Bott's fingernail scrapings. He explained that the probability that a profile from the database would have the same allele as the DNA from Ms. Bott's fingernail scrapings was 1 in 746 for the DNA taken from her left hand and 1 in 1,203 for the DNA taken from her right hand.

¶ 127 After the evidentiary hearing, the court took judicial notice of the reliability of a Y–STR analysis and determined that the analysis was reliably applied to the facts in this case because Sorenson Forensics was qualified to conduct the testing. Accordingly, the court concluded that the DNA test met the threshold requirements of rule 702(b) and could therefore be presented to the jury.

¶ 128 In closing argument during the trial, defense counsel reiterated that the Y–STR DNA analysis was a tool of exclusion and was not conclusive as to whether a specific individual committed the crime. Defense counsel also explained that, while the analysis failed to exclude Mr. Maestas and all of his paternal relatives as the source of the DNA from Ms. Bott's fingernail scrapings, it did not positively identify him. But in its closing, the prosecution told the jury that the DNA "matches the defendant."

¶ 129 On appeal, Mr. Maestas argues that the court abused its discretion in admitting the evidence and expert testimony about the Y–STR DNA testing because (a) the Y–STR analysis did not satisfy the requirements of rule 702(b), and (b) the evidence was more prejudicial than probative, in violation of rule 403. We disagree.

a. The Y–STR DNA Expert Testimony Satisfied the Threshold Requirements of Rule 702(b)

¶ 130 Mr. Maestas claims that the trial court erred in concluding that the Y–STR DNA expert testimony satisfied the requirements of rule 702(b). First, he argues that Y–STR analysis is not generally accepted in the scientific community and that the court therefore erred when it took judicial notice of the inherent reliability of the Y–STR analysis. Second, he asserts that Sorenson Forensics was not qualified to perform the testing and that its minimum threshold of 75 RFUs was inadequate. Accordingly, he claims that the court erred when it concluded that the

analysis was reliably applied in this case. We reject these arguments.

¶ 131 First, we conclude that the court did not abuse its discretion when it took judicial notice of the inherent reliability of the Y–STR DNA analysis. A "court may take judicial notice of the inherent reliability of the scientific principles and techniques at issue if they have been generally accepted by the relevant scientific community."[139] In determining whether a scientific technique has been accepted by the relevant scientific community, a court may look to the law from its own jurisdiction and from other jurisdictions.[140]

¶ 132 In this jurisdiction, we have previously stated that analyses serving to exclude particular individuals can be inherently reliable.[141] Further, in State v. Butterfield, we concluded that the STR method of DNA testing is inherently reliable such that judicial notice is appropriate.[142] In taking judicial notice of the inherent reliability of the Y–STR DNA analysis, the trial court noted that Dr. Wrigley stated that the testing uses the same process and techniques as those generally employed in a PCR STR analysis. Indeed, Dr. Wrigley explained that Y–STR DNA testing is simply a specialized form of STR testing specific to the Y-chromosome.

¶ 133 In addition, the trial court emphasized that STR DNA testing has been accepted by the relevant scientific community and other jurisdictions have treated Y–STR DNA testing as "merely a type of STR DNA testing."[143] Further, although not cited by the trial court,[144] we note that Y–STR testing has

139. *Id.* ¶ 29 (internal quotation marks omitted); *see also* Utah R. Evid. 702(c).

140. *See Butterfield,* 2001 UT 59, ¶ 34, 27 P.3d 1133 (noting that many other jurisdictions had concluded that PCR STR DNA testing was "scientifically valid"); *see also id.* ¶ 33 n. 5 ("'[A]ppellate endorsement of a technique ends the need for case-by-case adjudication ....'" (internal quotation marks omitted)).

141. *See Kofford v. Flora,* 744 P.2d 1343, 1351 (Utah 1987).

142. 2001 UT 59, ¶ 34, 27 P.3d 1133 (concluding that STR testing is scientifically valid); *see also id.* ¶ 35 (basing our conclusion on "the decisional

law from other jurisdictions and the overwhelming endorsement by the relevant scientific and forensic literature").

143. *See, e.g., Shabazz v. State,* 265 Ga.App. 64, 592 S.E.2d 876, 879 (2004) (explaining that "testimony from the expert witnesses established that Y–STR DNA testing is merely one specific type of STR DNA testing" and that "this latter method of DNA testing has been accepted as valid") (internal quotation marks omitted).

144. We are not confined to the record in determining whether a particular method of DNA testing is generally accepted in the scientific community. *See Butterfield,* 2001 UT 59, ¶ 33 n. 5, 27 P.3d 1133.

been recognized in scientific and forensic journals as a reliable method for excluding individuals as the source of the unknown DNA[145] and that many other jurisdictions have upheld the introduction of Y–STR DNA for exclusionary purposes.[146] Because Y–STR testing is a particularized form of STR testing, which we have concluded is reliable, and because scientific journals and other jurisdictions have found the testing to be reliable for exclusionary purposes, the trial court did not abuse its discretion in taking judicial notice of the reliability of the Y–STR DNA testing.

¶ 134 Second, we conclude that the court did not abuse its discretion in determining that Sorenson Forensics was qualified to perform the analysis and that its minimum threshold of 75 RFUs was adequate. As an initial matter, we note that, in determining whether laboratories are qualified to perform certain testing, courts examine whether the laboratory's testing methods are consistent with those that are scientifically accept-

able.[147] Thus, laboratories do not need to have a specific accreditation in order for their tests to be reliable under rule 702(b).[148] Nonetheless, the trial court heard testimony that Sorenson Forensics was accredited by one institution and soon to be accredited by another. And Dr. Wrigley testified about his own education and significant experience performing DNA analyses.[149] Based on this testimony, we cannot say that no reasonable person would have reached the trial court's conclusion that Sorenson Forensics was qualified to perform the Y–STR DNA analysis.

¶ 135 Regarding the minimum threshold of 75 RFUs, other courts have admitted DNA analyses that have used RFU thresholds at or below 75.[150] In addition, other sources endorse the use of a minimum threshold of 50 RFUs for exclusionary purposes.[151] Based on this evidence, a reasonable person could find that the 75 RFU minimum threshold is sufficient to exclude an individual as the source of the DNA.[152]

145. See, e.g., J.M. Butler, *Recent Developments in Y–Short Tandem Repeat and Y–Single Nucleotide Polymorphism Analysis*, 15 FORENSIC SCI. REV. 91, 107 (2003) ("Validation and interlaboratory studies have demonstrated that Y–STR typing is reliable."); P. Gill et al., *DNA Commission of the International Society of Forensic Genetics: Recommendations on Forensic Analysis Using Y–chromosome STRs*, 114 INT'L J. LEGAL MED. 305, 305 (2001) ("The use of Y–chromosome STR polymorphisms has become commonplace in forensic laboratories."); L. Gusmão et al., *DNA Commission of the International Society of Forensic Genetics (ISFG): An Update of the Recommendations on the Use of Y–STRs in Forensic Analysis*, 157 FORENSIC SCI. INT'L 187, 187 (2006) ("Y chromosome-specific STR analysis is an important tool in the majority of laboratories working in forensic genetics.").

146. See, e.g., State v. Calleia, 414 N.J.Super. 125, 997 A.2d 1051, 1064 (N.J.Sup.Ct.App.Div.2010) ("[W]e are satisfied that there is a general acceptance of Y–STR DNA analysis in the scientific community."), rev'd on other grounds, 206 N.J. 274, 20 A.3d 402 (2011); Curtis v. State, 205 S.W.3d 656, 661 (Tex.Ct.App.2006) ("[W]e hold that the trial court did not abuse its discretion by determining that the YSTR evidence was reliable and relevant...."); State v. Bander, 150 Wash. App. 690, 208 P.3d 1242, 1254–55 (2009) (allowing admission of Y–STR DNA evidence and statistical analysis in part because both the U.S. Scientific Working Group on DNA Analysis Methods and the International Society of Forensic Genetics DNA Commission recognized the

statistical analysis method as acceptable for interpreting Y–STR test results).

147. See Kofford, 744 P.2d at 1356 (explaining that "[t]o satisfy rule 702, evidence must be produced that the particular tests relied upon in the case were conducted as specified by the [appropriate scientific] [s]tandards or in an equally reliable manner").

148. See id.

149. Dr. Wrigley's credentials include a Bachelor of Science in cellular-molecular biology and over ten years of experience analyzing DNA for private laboratories and the Utah State Crime Lab.

150. See State v. Whittey, 149 N.H. 463, 821 A.2d 1086, 1095 (2003) (admitting DNA evidence with RFU between 40 and 60); Bander, 208 P.3d at 1247 (admitting DNA evidence with RFU of 75).

151. Erin Murphy, *The Art in the Science of DNA: A Layperson's Guide to the Subjectivity Inherent in Forensic DNA Typing*, 58 EMORY L.J. 489, 50304 (2008) (noting that "[t]he makers of commercial equipment for DNA testing recommend a minimum of 150 RFU" but that "[o]ther laboratories allow thresholds as low as 50 RFU for inculpation").

152. Even though the Y–STR analysis satisfied the threshold showing required by rule 702(b), Mr. Maestas was still free to argue that Sorenson Forensics's minimum threshold of 75 RFUs ren-

¶ 136 Thus, the court did not abuse its discretion in determining that the Y–STR DNA testing was reliable, Sorenson Forensics was qualified to perform the analysis, and its minimum threshold of 75 RFUs was adequate. Accordingly, we conclude that the trial court did not abuse its discretion when it determined that this evidence satisfied the threshold showing required by rule 702.

b. The Y–STR DNA Expert Testimony Satisfied the Requirements of Rule 403

 ¶ 137 Mr. Maestas claims that the trial court abused its discretion when it admitted the Y–STR DNA expert testimony because the testimony was significantly more prejudicial than probative, in violation of rule 403. Specifically, he asserts that, because the prosecution stated that the DNA "matched" Mr. Maestas, the jury was unduly impressed with the evidence. We disagree.

¶ 138 Rule 403 provides that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . misleading the jury." [153] Evidence is unfairly prejudicial "[o]nly when [it] poses a danger of rous[ing] the jury to overmastering hostility." [154] "The critical question is whether . . . testimony is so prejudicial that the jury will be unable to fairly weigh the evidence." [155]

¶ 139 In this case, we conclude that the Y–STR DNA evidence was not unduly prejudicial because it was likely that the jury was able to fairly weigh the evidence. As mentioned above, Dr. Wrigley repeatedly explained that the Y–STR analysis was a tool for excluding individuals as the source of the DNA from Ms. Bott's fingernail scrapings. And he consistently stated that the Y–STR DNA test results showed that Mr. Irish and Mr. Renzo could be excluded as the source of

the DNA, but that Mr. Maestas and his paternal relatives could not. Although the prosecution and Dr. Wrigley occasionally spoke in terms of the DNA "matching" Mr. Maestas, Dr. Wrigley clarified that a "match" meant that the DNA profiles had the same allele, such that the individual *could not be excluded.* Because Dr. Wrigley consistently presented the analysis as a tool for exclusion, and clarified that "match" meant only that the individual could not be excluded, the jury would have been able to fairly weigh his testimony. Thus, the Y–STR DNA evidence was not unfairly prejudicial and did not violate rule 403.

¶ 140 For the foregoing reasons, we conclude that the Y–STR DNA expert testimony satisfied the requirements of rule 702(b) and rule 403.

2. The Trial Court Did Not Abuse Its Discretion in Admitting the Expert Testimony Regarding Fingerprint Identification Evidence and No Separate Cautionary Jury Instruction Was Warranted

¶ 141 Mr. Maestas next argues that fingerprint identification evidence is not reliable, and accordingly, that the trial court abused its discretion when it admitted the expert testimony about such evidence. In the alternative, he asserts that even if fingerprint evidence is deemed to be reliable, the trial court erred when it failed to give the jury a separate cautionary instruction regarding the reliability of that evidence. We are not persuaded by either of Mr. Maestas's arguments.

a. The Trial Court Did Not Abuse Its Discretion in Admitting the Expert Testimony Regarding Fingerprint Identification Evidence

 ¶ 142 As we previously noted, an expert may testify about scientific methods

---

dered the analysis unreliable in this instance. And Mr. Maestas did in fact make this argument to the jury. But this argument went to the weight the testing results should be given, not to whether they were admissible. *See Whittey,* 821 A.2d at 1095 ("[T]he defendant's argument, that [the laboratory] failed to conduct sufficient validation studies before raising the minimum relative fluorescence unit (RFU) level at which it would consider a peak on the electropherogram an allele from forty RFUs to sixty, goes to the

weight of the evidence rather than its admissibility . . . .").

153. UTAH R. EVID. 403.

154. *State v. Killpack,* 2008 UT 49, ¶ 53, 191 P.3d 17 (third alteration in original) (internal quotation marks omitted).

155. *State v. Guzman,* 2006 UT 12, ¶ 27, 133 P.3d 363.

that meet a "threshold showing that the principles or methods that are underlying in the testimony (1) are reliable, (2) are based upon sufficient facts or data, and (3) have been reliably applied to the facts of the case." [156] This threshold showing is made when the knowledge or principles "are generally accepted by the relevant expert community." [157] A court may look to the law from its own jurisdiction and from other jurisdictions to determine whether a technique has been accepted by the relevant expert community.[158] And in this case, both Utah case law and decisions from other jurisdictions indicate that fingerprint identification evidence has been widely accepted.[159]

¶ 143 Nonetheless, Mr. Maestas argues that fingerprint identification evidence is not generally accepted in the scientific community. Accordingly, in his motion to the trial court and in his brief on appeal, Mr. Maestas cites two articles criticizing fingerprint identification evidence.[160] Although courts have considered such research, we do not find any case in which a court has relied on such academic articles to conclude that fingerprint evidence is unreliable or not generally accepted.[161] Indeed, the author of one of the articles that Mr. Maestas cites acknowledges

that, although a number of defense attorneys have filed motions contesting the admissibility of fingerprint identification evidence, "[t]hus far, there is no reported decision granting such a motion." [162]

¶ 144 Further, at the pretrial hearing to consider Mr. Maestas's motion regarding the admissibility of the fingerprint evidence, defense counsel did not argue that fingerprint identification evidence is inherently unreliable or that fingerprint identification methods had been unreliably applied in Mr. Maestas's case. Instead, defense counsel conceded that the Utah Court of Appeals' opinion in *State v. Quintana*,[163] which held that fingerprint evidence was inherently reliable, governed the situation. Defense counsel did not challenge the holding in *Quintana* or its applicability to Mr. Maestas's case. Indeed, after defense counsel acknowledged that *State v. Quintana* governed the issue, the court asked defense counsel, "Do you think there is anything at issue in this case that this [c]ourt would be free to deviate from or not follow *Quintana* in any way? Is there any room in this case with these facts that makes *Quintana* inapplicable to this one?" Defense counsel responded, "I think if *Quintana* is viewed

156. Utah R. Evid. 702(b).

157. *Id.* 702(c).

158. *See Butterfield*, 2001 UT 59, ¶ 35, 27 P.3d 1133.

159. *See, e.g., State v. Quintana*, 2004 UT App 418, ¶ 5, 103 P.3d 168 ("[W]e conclude that fingerprint identification is not novel scientific evidence."); *United States v. Baines*, 573 F.3d 979, 991 (10th Cir.2009) (noting that fingerprint analysis has received an "overwhelming acceptance" by the expert community); *United States v. Crisp*, 324 F.3d 261, 268 (4th Cir.2003) ("While the principles underlying fingerprint identification have not attained the status of scientific law, they nonetheless bear the imprimatur of a strong general acceptance, not only in the expert community, but in the courts as well."); *United States v. Collins*, 340 F.3d 672, 682 (8th Cir.2003) ("Fingerprint evidence and analysis is generally accepted.").

160. *See* Simon A. Cole, *More Than Zero: Accounting for Error in Latent Fingerprint Identification*, 95 J.Crim. L. & Criminology 985 (2005); Robert Epstein, *Fingerprints Meet Daubert: The Myth of Fingerprint "Science" Is Revealed*, 75 S. Cal. L.Rev. 605 (2002).

161. *See, e.g., Baines*, 573 F.3d at 987–88 (concluding that fingerprint identification is reliable despite defendant's citation to a law review article questioning the reliability of such evidence); *Crisp*, 324 F.3d at 267–68 (same). Indeed, even after these articles were published, courts have continued to hold that fingerprint identification is reliable. *See, e.g., United States v. Scott*, 403 Fed.Appx. 392, 397 (11th Cir.2010) (per curium) ("We previously have upheld the admission of expert fingerprint evidence...."); *United States v. Pena*, 586 F.3d 105, 110 (1st Cir.2009) ("Numerous courts have found expert testimony on fingerprint identification ... to be sufficiently reliable....").

162. Epstein, *supra* ¶ 143 n. 160, at 649–50. Although courts have been reluctant to accept challenges to fingerprint evidence, we do not foreclose the possibility that such challenges may be successful in the future. We merely conclude that, under the circumstances of this case, Mr. Maestas has not established that the trial court abused its discretion in admitting the fingerprint identification evidence.

163. 2004 UT App 418, 103 P.3d 168.

as controlling law, then *Quintana* is viewed as controlling law. I think there is a good-faith basis to challenge that ruling in *Quintana* at a later date, but I don't know that this is the matter where we want to do that." Without asking the court to rule on the applicability of *Quintana* or the inherent reliability of fingerprint evidence, counsel stated that if the court planned to consider only whether fingerprint identification methods had been reliably applied to the facts to Mr. Maestas's case, they were "prepared to relent on [the] request for a . . . hearing on the fingerprint issue and just save it for cross examination at the time of trial." [164]

¶ 145 In response, the State said that it "was prepared to put on a witness today to satisfy both prongs of the objections in this case." But after defense counsel reported that they would "relent on [the] request for a . . . hearing" regarding the reliability of fingerprint evidence, the State asked that its witness be excused. It also asked that the record reflect that "should *Quintana* have been found to not be applicable to this case, [it] would have put on testimony that fingerprint evidence is unique, that it is inherently reliable, separate and apart from the fact that there is an appellate decision on that point."

¶ 146 Defense counsel did not object or request that the State put forth evidence establishing the reliability of the fingerprint evidence. Nor did defense counsel assert that they were prepared to offer expert testimony to address the questions of whether fingerprint identification evidence is inherently reliable or whether the methods had been reliably applied to the facts of the case. Indeed, defense counsel did not re-

quest further discussion on the admissibility of the fingerprint identification evidence at the pretrial hearing, nor did they request an additional hearing on the matter. Further, defense counsel did not present expert testimony, either at the hearing or at trial, asserting either that fingerprint evidence is generally unreliable or that fingerprint identification methods were not properly applied in this case. Morever, defense counsel did not move to strike the expert testimony presented by the State at trial.

¶ 147 Under these circumstances, we cannot say that no reasonable person would have taken the position adopted by the trial court. [165] Accordingly, we reject Mr. Maestas's argument that the trial court abused its discretion in admitting the fingerprint identification evidence.

b. A Separate Cautionary Jury Instruction Was Not Warranted

¶ 148 Having determined that the trial court did not abuse its discretion in permitting the fingerprint identification evidence, we are not persuaded that a separate cautionary jury instruction about the reliability of fingerprint evidence was warranted. We have previously stated that "fingerprint evidence is not entitled to special treatment" and therefore does not require a special cautionary instruction. [166] Further, although we review a court's ruling on a proposed jury instruction for correctness, [167] we look at the jury instructions "in their entirety and will affirm when the instructions taken as a whole fairly instruct the jury on the law applicable to the case." [168] Thus, a trial court does not err by refusing a proposed instruction "if the

---

164. Mr. Maestas initially filed a motion for a hearing to determine whether fingerprint identification evidence is inherently reliable under *State v. Rimmasch*, 775 P.2d 388 (Utah 1989). At the time Mr. Maestas filed the motion, the holding in *Rimmasch* governed the analysis of whether expert scientific evidence is inherently reliable. *See id.* at 397–400. But by the time of the pretrial motion hearing, rule 702 of the Utah Rules of Evidence had been amended. *See* Utah R. Evid. 702. "Because the current version of rule 702 incorporates an updated reliability analysis for expert testimony, the *Rimmasch* test has been subsumed in the new rule." *Clopten*, 2009 UT 84, ¶ 38, 223 P.3d 1103.

165. *See Butterfield*, 2001 UT 59, ¶ 28, 27 P.3d 1133.

166. *State v. Hamilton*, 827 P.2d 232, 238 (Utah 1992).

167. *Id.*

168. *State v. Robertson*, 932 P.2d 1219, 1231 (Utah 1997), *overruled on other grounds by State v. Weeks*, 2002 UT 98, 61 P.3d 1000.

point is properly covered in other instructions."[169]

¶ 149 Here, Mr. Maestas requested that the jury be told that "there is no . . . basis to believe that fingerprint examiners are infallible" and that "there are no national standards to ensure the proficiency or skill of fingerprint examiners." The trial court denied the request, stating that the information in Mr. Maestas's proposed instruction had been incorporated in the general expert witness instruction. We agree. The expert instruction explained that the jury should "look at [the expert's] qualifications, the reasoning process the experts used, and the overall credibility of their testimony." The instruction further stated that "[e]xperts can testify about facts, and they can give their opinions in their area of expertise," but the jury is free to accept or reject the expert's opinion. This instruction was sufficient to guide the jury in its evaluation of the fingerprint expert's testimony. Thus, Mr. Maestas's cautionary instruction was unnecessary.

¶ 150 For the foregoing reasons, we conclude that the trial court did not err in admitting the fingerprint evidence or in failing to give a cautionary instruction about the reliability of such evidence.

### B. The Trial Court Did Not Err in Admitting the Medical Examiner's Testimony

¶ 151 Next, Mr. Maestas argues that the trial court abused its discretion when it admitted the medical examiner's testimony that Ms. Bott's injuries were "purposefully inflicted" and that they would have been painful. Before addressing his claims, we provide a brief overview of the medical examiner's testimony.

¶ 152 During trial, Dr. Grey explained that, in his role as a medical examiner, he determines whether an individual's death was natural, a suicide, an accident, or a homicide. He testified that the medical determination of homicide is different than the criminal determination because, under the medical definition, a homicide means that "the death resulted from the intentional action of another person."[170] Dr. Grey then described Ms. Bott's injuries. Specifically, he testified about the numerous and extensive bruises and abrasions on Ms. Bott's body, including her chest area, shoulders, abdomen, face, knees, and hips. He described a laceration through Ms. Bott's lower lip where her teeth were forced through her skin; a one-inch-wide, three-inch-deep stab wound on her face; and bruises consistent with strangulation. Regarding her internal injuries, Dr. Grey testified about the severe tearing around Ms. Bott's heart and a tear in her aorta.

¶ 153 When the prosecution asked whether the injuries appeared to be "purposefully inflicted," Dr. Grey stated that they did. He explained that, based on the nature, extent, and types of injuries Ms. Bott suffered, her death would not be consistent with someone "tripping and falling." Instead, Dr. Grey concluded that Ms. Bott's death was a homicide, meaning her death was caused by an intentional act of another person. The prosecution also asked Dr. Grey whether the injuries Ms. Bott experienced would have been painful. In response, Dr. Grey explained that he believed that incurring the injuries would have been "a very painful, uncomfortable process" as long as the victim was conscious. On cross-examination, Dr. Grey clarified that he was not a pain specialist and that his speculation that the injuries would be painful was not based on his professional medical opinion.

¶ 154 On appeal, Mr. Maestas asserts that the trial court committed a prejudicial error in admitting certain portions of the medical examiner's testimony. First, he asserts that the medical examiner's testimony that the injuries were "purposefully inflicted" violated rule 704 of the Utah Rules of Evidence because it improperly addressed Mr. Maestas's mental state. Second, he contends that the

169. *Hamilton,* 827 P.2d at 238 (internal quotation marks omitted).

170. By contrast, under the criminal determination of homicide, the State must prove that the defendant had the intent to cause the death of another. *See* UTAH CODE § 76–5–203(2)(a) ("Criminal homicide constitutes murder if . . . the actor intentionally or knowingly causes the death of another. . . .").

testimony about the injuries causing pain to a conscious victim violated rules 702 and 403 because it was not helpful to the jury and was unduly prejudicial. We note that the decision to admit expert testimony is reviewed under an abuse of discretion standard.[171] An appellate court can find abuse only if "no reasonable [person] would take the view adopted by the trial court."[172] With this standard in mind, we reject both of Mr. Maestas's arguments.

██ ¶ 155 First, we conclude that the medical examiner's testimony did not violate rule 704. Rule 704 states that an expert witness may not "state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged ... [because] these matters are for the trier of fact alone."[173] But in this case, Dr. Grey's testimony did not address Mr. Maestas's mental state. Dr. Grey never indicated that Mr. Maestas had knowingly or intentionally caused Ms. Bott's death. In fact, at the beginning of his testimony, Dr. Grey explained that his medical determination of homicide is "very distinct" from the criminal determination of whether an individual intended to cause death. And his statement that Ms. Bott's injuries appeared to be "purposefully inflicted" was in the context of his medical determination that Ms. Bott's death was a homicide, rather than an accident, a suicide, or a natural death. Because Dr. Grey explained his role in making the medical determination of homicide, and because his answer about the injuries being "purposefully inflicted" was in the context of that medical determination, Dr. Grey's testimony did not address Mr. Maestas's mental state

while committing the crime. Thus, his testimony did not violate rule 704.[174]

██ ¶ 156 Second, even if the medical examiner's testimony was not helpful to the jury, it was not prejudicial. Rule 702(a) permits expert testimony if it "will help the trier of fact to understand the evidence or to determine a fact in issue."[175] Under rule 702, "the question that must be posed prior to the admission of any expert evidence is whether, on balance, the evidence will be helpful to the finder of fact."[176] If a trial court determines that the evidence will be helpful, that potential helpfulness must be balanced against its potential for unfair prejudice.[177]

¶ 157 In this case, it may not have been helpful for Dr. Grey to state that the type of injuries Ms. Bott experienced could cause pain in a conscious victim. But we cannot say that the testimony was unduly prejudicial. The idea that a stab wound, strangulation, and blunt force trauma could cause pain was well within the knowledge of the average individual. Having been provided the details about the manner and number of injuries to Ms. Bott's body, the jury could have readily inferred on its own that Ms. Bott's injuries would have been painful to a conscious victim. Coupled with Dr. Grey's testimony that his prediction of pain was not based on his medical expertise, it is unlikely that the jury would have given Dr. Grey's statement significant weight. We therefore conclude that any error was not prejudicial and that the trial court did not abuse its discretion in admitting the medical examiner's testimony.

### C. The Prosecution Did Not Engage in Misconduct

¶ 158 Next, Mr. Maestas claims that he is entitled to a new guilt phase because the

171. *Butterfield*, 2001 UT 59, ¶ 28, 27 P.3d 1133.

172. *Id.* (alteration in original) (internal quotation marks omitted).

173. Utah R. Evid. 704(b).

174. *See State v. Tucker*, 2004 UT App 217, ¶ 9, 96 P.3d 368 (concluding that a medical examiner's testimony about the death being a homicide, meaning the "deliberate act of one individual leading to the death of another individual," did not violate rule 704 because it was clear that the

medical examiner was not testifying as to the defendant's state of mind).

175. Utah R. Evid. 702(a).

176. *State v. Larsen*, 865 P.2d 1355, 1361 (Utah 1993) (internal quotation marks omitted).

177. *Id.* at 1363 n. 12 ("We also note that an integral element of a rule 702 determination to admit expert evidence is a balancing of the probativeness of the evidence against its potential for unfair prejudice.").

prosecution made three comments that tainted the fairness of the proceeding. Because he failed to make contemporaneous objections to the prosecution's allegedly improper comments, we review these claims for plain or manifest error, meaning an error that is both harmful and obvious.[178]

¶ 159 As an initial matter, we note that the prosecution's remarks constitute misconduct meriting reversal if they "call to the attention of the jurors matters they would not be justified in considering in determining their verdict and ... the error is substantial and prejudicial such that there is a reasonable likelihood that in its absence, there would have been a more favorable result for the defendant." [179] In assessing whether allowing the prosecution's comments was a harmful error, "we will consider the comments both in context of the arguments advanced by both sides as well as in context of all the evidence." [180]

¶ 160 With this standard in mind, we address Mr. Maestas's claims that the prosecution committed misconduct (1) by stating in its closing arguments that "defendants usually testify;" (2) by asserting that Mr. Maestas could test the DNA if he disagreed with the Y–STR analysis results; and (3) by implying, without introducing supporting evidence, that defense witnesses were not credible.

1. The Prosecution's Comment that "Defendants Usually Testify" Was Not Harmful

¶ 161 Mr. Maestas claims that, during rebuttal in closing arguments, the prosecution made a prejudicial comment that violated his constitutional right against self-incrimination. Specifically, he points to the following statement by the prosecution:

> [The State's case is] a well built bridge. And it is a bridge with DNA, with finger-

print evidence, with the testimony of two co-defendants. And defendants usually testify. This is a case where all of the bolts are in place, where there is no rust. This is a case that is beyond a reasonable doubt, points to the defendant as the killer of Donna Bott.

Mr. Maestas did not object to the closing argument, but on appeal he asserts that the prosecution's statement that "defendants usually testify" constitutes an obvious and prejudicial error. We disagree.

¶ 162 It is well settled that the prosecution's direct reference to a defendant's decision not to testify "is always a violation of the defendant's [F]ifth [A]mendment right against self-incrimination." [181] "Indirect references to a defendant's failure to testify are [also] constitutionally impermissible if the comments were manifestly intended to be or were of such a character that the jury would naturally and necessarily construe them to be a comment on the defendant's failure to testify." [182] But even assuming that a comment violates a defendant's Fifth Amendment rights, and therefore calls to the attention of the jurors matters they would not be justified in considering, such comments do not necessarily require reversal.[183] Instead, as with any claim of prosecutorial misconduct, "[a]n otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt." [184] Indeed, we have held that a prosecutor's reference to the defendant's failure to testify constituted harmless error where the prosecutor's comments were "isolated as opposed to extensive," the court specifically instructed the jury that the defendant's choice not to testify did not create an adverse presumption and there was "over-

---

**178.** *State v. Menzies (Menzies I),* 845 P.2d 220, 224–25 (Utah 1992).

**179.** *State v. Tillman,* 750 P.2d 546, 555 (Utah 1987).

**180.** *State v. Bakalov,* 1999 UT 45, ¶ 56, 979 P.2d 799.

**181.** *Tillman,* 750 P.2d at 554.

**182.** *Id.*

**183.** *Id.* at 555; *see also State v. Eaton,* 569 P.2d 1114, 1116 (Utah 1977) ("[T]here should be no such reversal merely to criticize a prosecutor who, perhaps in the ardor of advocacy in the trial, oversteps the bounds of propriety, nor merely because error has been committed.").

**184.** *Tillman,* 750 P.2d at 555 (internal quotation marks omitted).

whelming evidence" of the defendant's guilt.[185]

¶ 163 In this case, we conclude that any error was harmless for the following reasons. As an initial matter, we note that it is unclear whether the prosecution was referring to Mr. Maestas or to his codefendants, Mr. Irish and Mr. Renzo, when the prosecution stated that "defendants usually testify." For example, the State highlights six instances in the prosecution's closing arguments where Mr. Irish and Mr. Renzo were referred to as "defendants." And the prosecution's statement came in rebuttal after defense counsel questioned the motives and credibility of Mr. Irish's and Mr. Renzo's testimonies. Thus, in context, this statement was ambiguous and not likely of such a character that the jury would necessarily construe it to be a comment on Mr. Maestas's failure to testify.

¶ 164 Further, even if the prosecution's comment did refer to Mr. Maestas, the jury was explicitly instructed that it should not consider a defendant's choice not to testify. Specifically, the jury was instructed as follows:

> A person accused of a crime may choose whether or not to testify. In this case the defendant chose not to testify. Do not hold that choice against the defendant. Do not try to guess why the defendant chose not to testify. Do not consider it in your deliberations. Decide the case only on the basis of the evidence. The defendant does not have to prove that he is not guilty. The prosecution must prove the defendant's guilt beyond a reasonable doubt.

With this strong instruction, the jury was aware that it should not consider Mr. Maestas's decision not to testify as evidence of his guilt.

¶ 165 Finally, the prosecution's statement was not harmful in light of the wealth of evidence implicating Mr. Maestas in Ms. Bott's murder. The jury heard witness testimony that Mr. Maestas punched and stomped on Ms. Bott's body and expert testimony about DNA and fingerprint evidence that linked Mr. Maestas to the scene. Because the jury was given a strong curative instruction and there was overwhelming evidence of Mr. Maestas's guilt, even assuming the prosecution's statement referred to Mr. Maestas, we conclude that any error was harmless beyond a reasonable doubt.

2. The Prosecution's Comment Regarding Mr. Maestas's Ability to Test the DNA Was Not Improper

¶ 166 Mr. Maestas asserts that the prosecution engaged in misconduct when it indicated that he could conduct his own DNA test if he disagreed with the Y–STR DNA results.[186] According to Mr. Maestas, this improperly and prejudicially shifted the burden to him to prove his innocence. We disagree.

¶ 167 In the criminal justice system, a defendant is presumed innocent and the prosecution must prove guilt beyond a reasonable doubt.[187] But it is not improper for the prosecution "to argue the case based on the total picture shown by the evidence or the lack thereof" or to "fully discuss from [its] perspective[ ] the evidence and all inferences and deductions it supports."[188] Thus, in determining whether the prosecution's comments improperly shifted the burden of proof to a defendant, we must assess the comment "in context of the arguments ad-

---

185. *Id.*

186. During Dr. Wrigley's testimony, the prosecution asked if the lab had the DNA from Ms. Bott's fingernail scrapings "available for other testing ... so somebody else could test it if they wanted to [or] if they disagree[d]" with the Y–STR results. In closing arguments, the prosecution also stated that "the DNA evidence is still there ... [i]f you want to test it, if you think it's not his, test it again. It's all available for whatever kind of test, Y–STR, mitochondrial DNA, RFLP, whatever kind of testing you want to do, it's there."

187. *In re Winship*, 397 U.S. 358, 363–64, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970); *see also State v. Swenson*, 838 P.2d 1136, 1138 (Utah 1992) ("Both the United States Constitution and the Utah Constitution require that the burden of proving all elements of a crime is on the prosecution.").

188. *State v. Ross*, 2007 UT 89, ¶ 55, 174 P.3d 628 (internal quotation marks omitted).

vanced by both sides as well as in context of all the evidence." [189]

¶ 168 In this case, the prosecution's remark was prompted by Mr. Maestas's claims that the State had specifically chosen an inferior and unreliable DNA analysis. Indeed, during closing argument, defense counsel stated, "Why didn't [the State] do the better DNA testing? Why didn't we have a number like one in 400 quintillion? [W]hat the State gives you in asking you to ... convict [Mr.] Maestas of aggravated murder is one in 746." In response, the prosecution explained that the DNA is available for any "better DNA testing" that Mr. Maestas wished to conduct. Because the prosecution's remark simply countered the defendant's arguments that the State purposely selected an unreliable DNA test, it did not shift the burden of proof to Mr. Maestas and we therefore conclude that the remark was not improper.[190]

3. The Prosecution's Insinuation that Certain Prejudicial Information Existed Was Not Harmful

¶ 169 Mr. Maestas claims that the prosecution engaged in misconduct while questioning two defense witnesses on cross-examination. Specifically, he claims that the prosecution "insinuated that additional evidence existed that undermined [two of the defense] witness[es]' testimon[ies], but did not present [any supporting] evidence to the jury." [191] He argues that these comments improperly suggested to the jury that the defense witnesses were untrustworthy. But we conclude that the trial court did not commit a reversible error by failing to intervene when the prosecution asked the questions that Mr. Maestas now challenges.

¶ 170 Although counsel is afforded "considerable latitude in making arguments to the jury," [192] we have explained that, "[g]enerally, it is error to ask ... a question that implies the existence of a prejudicial fact unless the prosecution can prove the existence of that fact." [193] The prosecution's ability to prove a fact is necessary because, "[o]therwise, the only limit on such a line of questioning would be the prosecutor's imagination." [194] And "[t]o allow this sort of examination would be to allow the imaginative and overzealous prosecutor to concoct a damaging line of examination which could leave with the jury the impression that [the witness] was anything the question, by innuendo, seemed to suggest." [195] Nonetheless, "the prosecutor does not have to establish a fact before he can ask about it." [196] Indeed, "[i]t is enough that the prosecutor has reason to believe a fact is true and has the *ability* to establish the fact." [197]

¶ 171 But even if the prosecution fails to limit its questioning to the facts that

---

**189.** *Bakalov*, 1999 UT 45, ¶ 56, 979 P.2d 799.

**190.** *See, e.g., id.* ¶ 60 (concluding that the prosecution's remark that the defendant "could have tested the [DNA]" if he wanted to did not qualify as misconduct because "the prosecutor spoke to counter both the argument that testing was maliciously withheld and defendant's repeated attacks on the prosecutor's integrity").

**191.** The first instance of alleged misconduct came after a defense witness, Peter Rosenberg, testified that Mr. Irish made racist comments during the brief time the two shared a jail cell. On cross-examination, the prosecution asked Mr. Rosenberg why jail records did not show that the two men shared a cell. In response, Mr. Rosenberg stated that he shared a cell with Mr. Irish for only "an hour ... maybe an hour and a half." The second instance of alleged misconduct came on cross-examination of another defense witness, Troy Archuleta. Mr. Archuleta testified that Mr. Irish told him that he had "stolen somebody's car and left him at a store and then committed a crime." On cross-examination, the prosecution asked Mr. Archuleta whether he had told a State investigator to "f* * * off." Mr. Archuleta responded that he did not make this comment. The prosecution did not introduce jail records · or other documentation to support the two questions.

**192.** *State v. Young*, 853 P.2d 327, 349 (Utah 1993).

**193.** *State v. Emmett*, 839 P.2d 781, 786–87 (Utah 1992).

**194.** *Id.* at 787.

**195.** *Id.* at 787 n. 18 (internal quotation marks omitted).

**196.** *State v. Winward*, 941 P.2d 627, 633 (Utah Ct.App.1997).

**197.** *Id.*

it has the ability to prove, and thereby calls to the jury's attention material that it would not be justified in considering, a defendant must still show that the prosecution's comment was prejudicial.[198] To be prejudicial, there must be a reasonable likelihood that, absent the error, the defendant would have received a more favorable result.[199] And "[w]hen there is strong proof of guilt, the conduct or remark of a prosecutor is not presumed prejudicial." [200]

¶ 172 In this case, there is nothing in the record to suggest that the trial court committed an obvious error when it did not intervene during the prosecution's cross-examination of these two defense witnesses. Indeed, there is no indication the prosecution lacked the *ability* to prove the facts suggested by its questions. Because the questions Mr. Maestas challenges dealt with the secondary issue of the witnesses' credibility, and because the defense did not object to these questions at the time, it is understandable that the prosecution did not present evidence regarding the facts to which it alluded.

■■■ ¶ 173 But even if the prosecution's questions were improper, such that the court committed an obvious error in failing to intervene, Mr. Maestas has not demonstrated that the comments were prejudicial. Because there is strong proof of Mr. Maestas's guilt, we do not presume that the remarks were prejudicial. Thus, Mr. Maestas must demonstrate a reasonable likelihood that he would have received a more favorable outcome if the prosecution had not asked the challenged questions.

¶ 174 He argues that, if the prosecution had not insinuated that the defense witnesses were untrustworthy, the jury may have believed the defense witnesses' testimony indicating that the codefendants stole Mr. Maes-

tas's car and framed him for the crimes that they committed, perhaps motivated to act against Mr. Maestas because of his race. But there are several reasons why the jury would not have found this testimony plausible even without any insinuation that the defense witnesses were untrustworthy. The story conflicts with the codefendants' testimony, the expert testimony about DNA and fingerprint evidence that linked Mr. Maestas to the scene of the crime, and Mr. Maestas's statements to the police investigator that he had been driving his car on the night that the crime occurred. Accordingly, Mr. Maestas has failed to demonstrate that he would have received a more favorable outcome if the prosecution had not asked the questions he challenges.

■■■ ¶ 175 For the foregoing reasons, we reject Mr. Maestas's arguments that the prosecution's comments entitle him to a new guilt phase.[201]

### D. The State Presented Evidence Sufficient to Support Mr. Maestas's Convictions

¶ 176 Finally, Mr. Maestas argues that the State failed to present sufficient evidence to support his convictions for the aggravated murder of Ms. Bott and the aggravated burglary of Ms. Chamberlain's home.

■■■■ ¶ 177 "[I]n considering an insufficiency-of-evidence claim, we review the evidence and all reasonable inferences drawn therefrom in a light most favorable to the verdict." [202] And we will not reverse a jury verdict if "we conclude that some evidence exists from which a reasonable jury could find that the elements of the crime had been proven beyond a reasonable doubt." [203] Thus, "[w]e reverse a jury verdict only when

198. *See Young,* 853 P.2d at 349.

199. *Id.*

200. *Id.*

201. "While we find no reversible error" as a result of the statements made by the prosecution, we note that "the ends of justice are best served by prosecutors who confine their arguments in all criminal cases, and especially in death penalty cases, within the boundaries of scrupulous fairness." *Tillman,* 750 P.2d at 557. "The State's

obligation is to assure that justice is done. That obligation does not include or authorize overreaching, exaggeration, or any form of personalizing by the prosecutor in the deliberation process." *Id.*

202. *State v. Honie,* 2002 UT 4, ¶ 44, 57 P.3d 977.

203. *State v. Montoya,* 2004 UT 5, ¶ 29, 84 P.3d 1183 (internal quotation marks omitted).

the evidence, so viewed, is sufficiently inconclusive or inherently improbable such that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime for which he or she was convicted."[204] With this standard in mind, we conclude that there was sufficient evidence for the jury to find that Mr. Maestas had the intent to cause Ms. Bott's death and that he committed the aggravated burglary of Ms. Chamberlain's home.

¶ 178 First, there is sufficient evidence that Mr. Maestas had the requisite mental state to support his conviction for aggravated murder. Under the aggravated murder statute, the State must prove beyond a reasonable doubt that "the actor intentionally or knowingly cause[d] the death of another" in connection with any of several statutory aggravating factors.[205] A person acts intentionally "when it is his conscious objective or desire to engage in the conduct or cause the result."[206] And he acts knowingly "when he is aware that his conduct is reasonably certain to cause the result."[207]

¶ 179 We have recognized that a defendant's mental state can be proven by circumstantial evidence,[208] including the nature and extent of the criminal act.[209] When the mental state is proven by circumstantial evidence, we examine whether the State presented any evidence that the defendant had the requisite intent or knowledge and whether "the inferences that can be drawn from that evidence have a basis in logic and reasonable human experience sufficient to prove that [the defendant] possessed the requisite intent."[210]

¶ 180 In this case, the evidence is sufficient to indicate that Mr. Maestas intentionally or knowingly caused Ms. Bott's death. The State presented the testimony of Mr. Irish and Mr. Renzo, who stated that they had observed Mr. Maestas punch and stomp on Ms. Bott's body. In addition, the jury heard the testimony of the medical examiner, who described Ms. Bott's numerous injuries—including a stab wound to her face; extensive bruises and abrasions on her chest, shoulders, abdomen, face, knees, and hips; injuries consistent with strangulation; several broken ribs; tearing around her heart; and a tear in her aorta. Given the witness testimony, the nature and multiple types of injuries, and the age of the victim, the jury could have reasonably inferred that Mr. Maestas's "conscious objective" was to cause Ms. Bott's death or that he was "reasonably certain" that his conduct would cause her death. Accordingly, we reject his claim that there was insufficient evidence to show that he acted with the requisite intent or knowledge.

¶ 181 Second, there is sufficient evidence that Mr. Maestas committed the aggravated burglary of Ms. Chamberlain's home. Under the aggravated burglary statute, the State must prove beyond a reasonable doubt that the actor committed burglary in connection with one of several aggravating factors.[211] "An actor is guilty of burglary who enters or remains unlawfully in a building . . . with intent to commit . . . a felony; . . . theft; . . . [or] an assault on any person. . . ."[212] And the relevant aggravating factor that raises the offense to aggravated burglary occurs when, during the course of a burglary, "the actor . . . causes bodily injury

**204.** *State v. Dunn*, 850 P.2d 1201, 1212 (Utah 1993).

**205.** Utah Code § 76–5–202(1).

**206.** *Id.* § 76–2–103(1).

**207.** *Id.* § 76–2–103(2).

**208.** *See State v. Casey*, 2003 UT 55, ¶ 48, 82 P.3d 1106 ("It is well established that criminal intent is seldom proved by direct evidence but must be instead inferred from the circumstances of the given facts." (internal quotation marks omitted)); *State v. James*, 819 P.2d 781, 789 (Utah 1991) ("[U]nless a confession is made by the defendant concerning intent, or unless the court is somehow able to open the mind of the defendant to examine his motivations, intent is of necessity proven by circumstantial evidence.").

**209.** *See James*, 819 P.2d at 791 ("[I]ntent can be implied or inferred from the character of the act." (internal quotation marks omitted)).

**210.** *State v. Holgate*, 2000 UT 74, ¶ 21, 10 P.3d 346 (internal quotation marks omitted).

**211.** Utah Code § 76–6–203(1).

**212.** *Id.* § 76–6–202(1)(a)–(c).

to any person who is not a participant in the crime."[213]

¶ 182 In this case, Ms. Chamberlain testified that she saw someone enter her home through the window who then pulled her shirt over her head. She testified that, as the person pulled off her shirt, he scratched her arm causing it to "bleed[ ] really badly." And Mr. Renzo testified that he saw Mr. Maestas hit Ms. Chamberlain two times.[214] According to Ms. Chamberlain, the person attacking her then demanded that she "take off [her] clothes" and tell him where to find her purse. At that point, Ms. Chamberlain was able to push her medical alert button, startling the intruder and causing him to flee from her home with her purse. Although Ms. Chamberlain was not able to identify Mr. Maestas as the perpetrator, Mr. Irish and Mr. Renzo testified that Mr. Maestas committed these acts. In addition, the police discovered Ms. Chamberlain's wallet in Mr. Maestas's car. This evidence is sufficient for a reasonable jury to find that Mr. Maestas committed the aggravated burglary of Ms. Chamberlain's home.

¶ 183 Although he acknowledges this evidence, Mr. Maestas asserts that the court cannot rely on the testimony of Mr. Irish or Mr. Renzo because their statements were self-serving and conflicted with Ms. Chamberlain's testimony. But "[c]ontradictory testimony alone is not sufficient to disturb a jury verdict."[215] Nonetheless, although an appellate "court must ordinarily accept the jury's determination of witness credibility," it may disregard that testimony when it is physically impossible or inherently improbable.[216] "Testimony is physically impossible when what the witness claims happened could not have possibly occurred."[217] And testimony is inherently improbable if it

is "incredibly dubious" and "apparently false."[218]

¶ 184 Here, we cannot say that Mr. Irish or Mr. Renzo's testimony was physically impossible or inherently improbable. Indeed, a good deal of Mr. Irish's and Mr. Renzo's testimony was consistent with Ms. Chamberlain's. For example, just as Ms. Chamberlain testified, Mr. Renzo testified that Mr. Maestas pulled Ms. Chamberlain's shirt over her head and demanded her purse. In addition, the jury could have found Mr. Renzo and Mr. Irish credible because their version of the night's events was corroborated by the DNA and fingerprint evidence found at Ms. Bott's home and by the fact that Ms. Chamberlain's wallet was found inside Mr. Maestas's car. In light of these facts, Mr. Maestas has not established that the evidence was so inconclusive or inherently improbable that the jury must have entertained a reasonable doubt that he committed the aggravated burglary of Ms. Chamberlain's home. Accordingly, we conclude that there is sufficient evidence to support Mr. Maestas's convictions for the aggravated murder of Ms. Bott and the aggravated burglary of Ms. Chamberlain's home.

¶ 185 In sum, we reject each of Mr. Maestas's four challenges concerning the evidence and arguments presented during the guilt phase of his trial. We therefore decline to grant him a new guilt phase on these bases.

## III. DEATH PENALTY EXEMPTION HEARING

¶ 186 Prior to the guilt phase of the trial, Mr. Maestas filed a motion pursuant to *Atkins v. Virginia*[219] and Utah Code sections 77–15a–101 to –106 (Exemption Statute), arguing that he was mentally retarded[220] and

---

213. *Id.* § 76–6–203(1)(a).

214. Although Ms. Chamberlain did not testify whether the perpetrator hit her, we consider this evidence because we view all the evidence in the light most favorable to the jury's verdict. *See Honie*, 2002 UT 4, ¶ 44, 57 P.3d 977.

215. *State v. Watts*, 675 P.2d 566, 568 (Utah 1983).

216. *State v. Robbins*, 2009 UT 23, ¶ 16, 210 P.3d 288.

217. *Id.* ¶ 17.

218. *Id.* ¶ 18.

219. 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).

220. As previously noted, we recognize that the phrases "mentally retarded" and "mental retardation" are now disfavored, because this language is used in the *Atkins* opinion and the Utah Code, we use these phrases in this opinion.

asking the court to strike the death penalty as a sentencing option.[221] On appeal, he claims that the trial court erred in ruling that he was not mentally retarded. He also challenges the constitutionality of the Exemption Statute.

¶ 187 As an initial matter, we note that, in *Atkins,* the U.S. Supreme Court held that executing mentally retarded individuals constitutes cruel and unusual punishment under the Eighth Amendment "in the light of ... evolving standards of decency."[222] But the Court recognized that "[n]ot all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus."[223] Thus, the Court left to the states "the task of developing appropriate ways to enforce th[is] constitutional restriction upon [their] execution of sentences."[224]

¶ 188 In accordance with the holding in *Atkins,* the Utah Legislature enacted the Exemption Statute,[225] which exempts a defendant from being subject to the death penalty if he or she meets the statutory definition of "mentally retarded."[226] Under the Exemption Statute, a defendant qualifies as mentally retarded if

(1) the defendant has significant subaverage general intellectual functioning that results in and exists concurrently with significant deficiencies in adaptive functioning that exist primarily in the areas of reasoning or impulse control, or in both of these areas; and

(2) the subaverage general intellectual functioning and the significant deficiencies

in adaptive functioning under Subsection (1) are both manifested prior to age 22.[227]

¶ 189 The Exemption Statute presumes that a defendant is not mentally retarded and places the burden on the defendant to prove by a preponderance of the evidence that he or she meets both prongs of the statutory definition.[228] And the Exemption Statute provides that the court, rather than a jury, determines whether a defendant has met that burden.[229] Thus, to be exempt from the death penalty because of mental retardation, a defendant must prove to the court that he or she has both "significant subaverage general intellectual functioning" (SSGIF) *and* "significant deficiencies in adaptive functioning" (SDAF) in either reasoning or impulse control.[230]

¶ 190 Pursuant to Mr. Maestas's request, the trial court held a hearing (*Atkins* hearing) to determine whether he met the definition of "mentally retarded" under the Exemption Statute. Over the course of three days, the court heard testimony regarding Mr. Maestas's intellectual and adaptive functioning, including testimony from two mental health experts for the defense and one mental health expert for the prosecution. The court concluded that, although Mr. Maestas had demonstrated SDAF in the area of impulse control, he had failed to demonstrate either SDAF in the area of reasoning or SSGIF. The court also concluded that Mr. Maestas had not shown that his intellectual deficits resulted in his adaptive functioning deficits. Thus, the court determined that he did not qualify as mentally retarded under the Exemption Statute.

**221.** *Id.* § 77–15a–101(1) ("A defendant who is found by the court to be mentally retarded as defined in Section 77–15a–102 is not subject to the death penalty.").

**222.** 536 U.S. at 321, 122 S.Ct. 2242 (internal quotation marks omitted).

**223.** *Id.* at 317, 122 S.Ct. 2242.

**224.** *Id.* (second alteration in original) (internal quotation marks omitted).

**225.** Utah Code §§ 77–15a–101 to –106.

**226.** *Id.* § 77–15a–101(1).

**227.** *Id.* § 77–15a–102.

**228.** *Id.* § 77–15a–104(12)(a) ("[A] defendant is presumed to be not mentally retarded unless the court, by a preponderance of the evidence, finds the defendant to be mentally retarded.").

**229.** *Id.* § 77–15a–104(11)(a) (explaining that "the judge shall make the determination" of whether the defendant is exempt from the death penalty because of mental retardation).

**230.** *Id.* § 77–15a–102(1); *id.* § 77–15a–104(11)(a); *id.* § 77–15a–104(12)(a).

¶ 191 On appeal, Mr. Maestas challenges the trial court's conclusion that he did not qualify as not mentally retarded and the constitutionality of the Exemption Statute. In particular, he argues that (A) the trial court erred in concluding that he had not demonstrated SSGIF by a preponderance of the evidence; (B) the trial court incorrectly interpreted the Exemption Statute to require him to demonstrate a causal relationship between his SSGIF and his SDAF, or if such an interpretation is correct, that the requirement is unconstitutional; and (C) the Exemption Statute is unconstitutional because it allows the court, rather than a jury, to determine whether defendants are mentally retarded and because it requires defendants to bear the burden of proof in establishing mental retardation. We reject each of these arguments.

### A. The Trial Court Did Not Err in Concluding that Mr. Maestas is Not Mentally Retarded

¶ 192 Mr. Maestas argues that the trial court erred in concluding that he had failed to demonstrate by a preponderance of the evidence that he met the statutory definition of "mentally retarded." As discussed above, the Exemption Statute requires defendants to prove that they have both "significant subaverage general intellectual functioning" and "significant deficiencies in adaptive func-

tioning" in the area of reasoning *or* impulse control.[231] Because the court determined that Mr. Maestas had shown SDAF in the area of impulse control, he met the requirement for one prong of the Exemption Statute.[232] Thus, the court's conclusion that Mr. Maestas did not qualify as mentally retarded hinges on its determination that he did not adequately demonstrate that he had SSGIF.

■ ¶ 193 Because we must consider the trial court's interpretation of the Exemption Statute, as well as its application to the facts of Mr. Maestas's case, we are faced with a mixed question of fact and law. "[W]ith regard to many mixed questions of fact and law, it is either not possible or not wise for an appellate court to define strictly how a legal concept is to be applied to each new set of facts."[233] Indeed, the trial court's "[d]iscretion is broadest—and [our] standard of review is most deferential—when the application of a legal concept is highly fact dependant and variable."[234] In this case, the application of the Exemption Statute to an individual defendant is extremely "fact dependant and variable."[235] Thus, the trial court is in "the best position to assess the credibility of witnesses and to derive a sense of the proceeding as a whole, something an appellate court cannot hope to garner from a cold record."[236]

231. *Id.* § 77–15a–102(1).

232. We do not consider Mr. Maestas's claim that the trial court erred in failing to find that he had SDAF in the area of reasoning because the Exemption Statute requires only that defendants demonstrate such deficits "in the areas of reasoning *or* impulse control." *Id.* (emphasis added). Thus, even if the court had erred in determining that he did not have the requisite deficits in the area of reasoning, such an error would have necessarily been harmless because it would not have affected the outcome of the *Atkins* hearing. *See, e.g., State v. Arguelles*, 2003 UT 1, ¶ 94, 63 P.3d 731 ("[W]e need not reverse ... if we find [an] error to be harmless beyond a reasonable doubt."); *State v. Evans*, 2001 UT 22, ¶ 20, 20 P.3d 888 ("[H]armless error is an error that is sufficiently inconsequential that there is no reasonable likelihood that it affected the outcome of the proceedings.").

233. *State v. Levin*, 2006 UT 50, ¶ 22, 144 P.3d 1096.

234. *Id.* ¶ 24; *see also id.* ¶ 25 (explaining that the appropriate standard of review for a mixed question of fact and law is determined by considering "(1) the degree of variety and complexity in the facts to which the legal rule is to be applied; (2) the degree to which a trial court's application of the legal rule relies on facts observed by the trial judge, such as a witness's appearance and demeanor, relevant to the application of the law that cannot be adequately reflected in the record available to appellate courts; and (3) other policy reasons that weigh for or against granting discretion to trial courts" (internal quotation marks omitted)).

235. *See id.* ¶ 24.

236. *State v. Pena*, 869 P.2d 932, 936 (Utah 1994,) *holding modified by Levin*, 2006 UT 50, 144 P.3d 1096.

¶ 194 With this standard in mind, we consider whether the trial court erred in concluding that Mr. Maestas failed to establish by a preponderance of the evidence that he had SSGIF. We first address the type of showing a defendant must make to adequately demonstrate the requisite intellectual deficits under the Exemption Statute, and we then evaluate the trial court's conclusion that Mr. Maestas did not adequately demonstrate such a deficit.

1. The Showing Required to Establish Significant Subaverage General Intellectual Functioning Under the Exemption Statute

¶ 195 As an initial matter, we note that, although the Exemption Statute requires defendants to demonstrate "significant subaverage general intellectual functioning" by a preponderance of the evidence,[237] it does not further explain what this requirement entails. Accordingly, we must use our tools of statutory interpretation to determine the meaning of this phrase. "When interpreting a statute, our primary objective is to give effect to the legislature's intent." [238] To discern legislative intent, we "read the text of a statute as a whole and interpret its provisions in harmony with other subsections." [239]

¶ 196 Both the language and the context of the Exemption Statute make it clear that, to be considered mentally retarded, a defendant must have substantial intellectual impairments such that his or her intellectual functioning is *significantly* below average. Indeed, the Exemption Statute explicitly states that "a defendant is 'mentally retarded' if the defendant has *significant* subaverage gener-

al intellectual functioning that results in and exists concurrently with *significant* deficiencies in adaptive functioning that exist primarily in the areas of reasoning or impulse control." [240]

¶ 197 Indeed, the purpose of the Exemption Statute is to set Utah's standard for determining whether defendants are mentally impaired to such a degree that it would be unconstitutional to apply the death penalty to them. The U.S. Supreme Court has noted that "[n]ot all people who claim to be mentally retarded [will be] so impaired as to fall within the range of mentally retarded offenders" [241] exempt from the death penalty, and accordingly, it "le[ft] to the [s]tate[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences." [242] Thus, under the standard that the Exemption Statute sets for determining whether a defendant's impairments are severe enough to rise to the level of mental retardation, showing below average intellectual functioning is not enough; a defendant must instead demonstrate intellectual functioning that is *significantly* below average.

¶ 198 In determining whether defendants have demonstrated SSGIF, scores on intelligence quotient (IQ) tests can be one helpful measure.[243] Courts should carefully consider expert testimony regarding the validity and interpretation of IQ tests when evaluating a defendant's IQ scores.[244] Courts should also look to clinical guidelines for assistance in determining whether IQ scores indicate that a defendant's intellectual

237. UTAH CODE § 77–15a–102(1); *id.* § 77–15a–104(12)(a).

238. *Alliant Techsystems, Inc. v. Salt Lake Cnty. Bd. of Equalization*, 2012 UT 4, ¶ 21, 270 P.3d 441 (internal quotation marks omitted).

239. *Id.*

240. UTAH CODE § 77–15a–102(1) (emphases added).

241. *Atkins*, 536 U.S. at 317, 122 S.Ct. 2242 (internal quotation marks omitted).

242. *Id.* (third and fourth alterations in original).

243. AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 41 (4th ed., 2000) (hereinafter DSM–IV–TR) ("General intellectual functioning is defined by the intelligence quotient (IQ or IQ equivalent) obtained by assessment with one or more of the standardized, individually administered intelligence tests ....").

244. *Id.* at 42 ("The choice of testing instruments and interpretation of results should take into account factors that may limit test performance (e.g., the individual's sociocultural background, native language, and associated communicative, motor, and sensory handicaps).").

impairments are substantial enough to qualify as SSGIF under the Exemption Statute.

¶ 199 Indeed, in *Atkins,* the U.S. Supreme Court noted that states' "statutory definitions of mental retardation ... generally conform to the clinical definitions" of the American Psychiatric Association (APA) and the American Association on Mental Retardation, which is now called the American Association of Intellectual and Developmental Disabilities.[245] For instance, under the clinical guidelines of the APA, "[s]ignificantly subaverage intellectual functioning is defined as an IQ of about 70 or below (approximately 2 standard deviations below the mean)," taking into account the standard error of measurement for the testing instrument.[246] An IQ score falling in the range constituting mental retardation under the APA guidelines or other generally accepted clinical guidelines is one indication of the deficits required by the Exemption Statute.

■■■ ¶ 200 But we note that IQ scores are just one factor to be considered in determining if the defendant has SSGIF. The testing instrument or other circumstances may result in an IQ score that does not truly reflect a defendant's intellectual functioning.[247] Thus, courts should carefully consider other relevant evidence of intellectual impairment. This is particularly true when the defendant's IQ score falls in the range spanning the cusp of clinical mental retardation.[248] Again, expert testimony will be valuable in helping courts determine whether the evidence shows that a defendant has SSGIF. But ultimately, courts are "not bound to accept the testimony of an expert and [are] free to judge the expert testimony as to its credibility and its persuasive influence in light of all of the other evidence in the case."[249] It falls to the court to determine if the full body of evidence and testimony show by a preponderance of the evidence that a defendant's intellectual impairments are severe enough to qualify as *significantly* subaverage.

2. The Trial Court Did Not Err in Concluding that Mr. Maestas Lacked Significant Subaverage General Intellectual Functioning

■■■ ¶ 201 Having considered the showing required to establish "significant general intellectual functioning" under the Exemption Statute,[250] we next turn to Mr. Maestas's claim that the trial court erred in concluding that he had not adequately demonstrated the required deficits. As discussed above, the application of the Exemption Statute to an individual defendant is very fact specific, and we are accordingly deferential to the trial court's determination.[251] In particular, "[w]e review the [trial] court's factual findings for clear error,"[252] and "in those instances in

245. 536 U.S. at 317 n. 22, 122 S.Ct. 2242. For example, much like our statute, the APA currently defines mental retardation as "characterized by significantly subaverage intellectual functioning (an IQ of approximately 70 or below) with onset before age 18 years and concurrent deficits or impairments in adaptive functioning." DSM–IV–TR, *supra* note 243, at 39.

246. DSM–IV–TR, *supra* note 243, at 41 ("It should be noted that there is a measurement error of approximately 5 points in assessing IQ, although this may vary from instrument to instrument...").

247. For instance, the APA notes that the interpretation of test results "should take into account factors that may limit test performance." *Id.* at 42.

248. *See id.* at 41–42 ("[I]t is possible to diagnose [m]ental [r]etardation in individuals with IQs between 70 and 75 who exhibit significant deficits in adaptive behavior. Conversely, [m]ental [r]e-

tardation would not be diagnosed in an individual with an IQ lower than 70 if there are no significant deficits or impairments in adaptive functioning.").

249. *Egbert & Jaynes v. R.C. Tolman Constr. Co.,* 680 P.2d 746, 748 (Utah 1984); *see also, e.g., Tucker v. Tucker,* 910 P.2d 1209, 1216 (Utah 1996) ("[T]he trial court, as trier of fact,[is] entitled to weigh the evidence and reject all or part of any witness's testimony, even that of an expert." (citation omitted)).

250. UTAH CODE § 77–15a–102(1).

251. *Levin,* 2006 UT 50, ¶¶ 24–25, 144 P.3d 1096 (explaining that, when considering mixed questions of fact and law, the trial court's "[d]iscretion is broadest—and [our] standard of review is most deferential—when the application of a legal concept is highly fact dependant and variable").

252. *T–Mobile USA, Inc. v. Utah State Tax Comm'n,* 2011 UT 28, ¶ 9, 254 P.3d 752 (first

which the trial court's findings include inferences drawn from the evidence, we will not take issue with those inferences unless the logic upon which their extrapolation from the evidence is based is so flawed as to render the inference clearly erroneous."[253]

¶ 202 In determining that Mr. Maestas had not adequately demonstrated SSGIF, the court considered the reports from mental health experts, the testimony of those experts and other witnesses, and the exhibits entered into evidence. Much of the testimony and evidence focused on Mr. Maestas's IQ and background. In regard to Mr. Maestas's IQ, the court heard extensive testimony about the validity of IQ tests in general, the validity of the various IQ tests that had been administered to Mr. Maestas over time, and other research and theories about IQ tests, including how factors like the standard error of measurement[254] and the Flynn effect[255]

could affect his IQ scores. Considering the testimony and evidence presented, the court found that Mr. Maestas's actual IQ was likely in the range of seventy-seven to eighty-five, and concluded that his general intellectual functioning was "between borderline and low average" rather than significantly subaverage.[256]

¶ 203 In reaching this conclusion, the trial court found that Mr. Maestas's score of seventy-seven on an IQ test in 2005 "constitute[d] meaningful evidence suggesting that [Mr. Maestas's] general intellectual functioning is not significantly [s]ubaverage." Indeed, the court accepted the prosecution's expert testimony that, if the test had been administered and scored properly, it would have resulted in an IQ score of at least eighty-five.[257] Further, the court noted that other IQ tests Mr. Maestas took as a youth indicated that his score was in the eighty to

alteration in original) (internal quotation marks omitted).

**253.** *Glew v. Ohio Sav. Bank,* 2007 UT 56, ¶ 18, 181 P.3d 791.

**254.** Mr. Maestas contends that there may be an even higher margin of error when testing the bottom 2 percent of the population. But to support this position, he points only to one defense expert's statement that many individuals with borderline or mild mental retardation may have a low frustration tolerance that can cause variable or inconsistent effort on IQ tests. The trial court apparently did not consider the expert's testimony sufficient to establish a higher error of measurement for the bottom 2 percent of the population and Mr. Maestas offers no argument to cause us to reach a different conclusion.

**255.** One defense expert testified at the *Atkins* hearing that the "Flynn effect" is the concept that "IQ scores in the population as a whole tend to rise over time." In his brief to this court, Mr. Maestas claims that individual IQ scores must be adjusted downward to account for the Flynn effect or risk overestimating a person's actual IQ, and he asserts that the trial court did not give proper consideration to the Flynn effect in its ruling. The court concluded that "application of the Flynn [e]ffect was not intended to require that each individual IQ test score must be adjusted downwards." But after hearing testimony about the reliability of Mr. Maestas's IQ tests and what those tests indicated about his actual IQ, the court nevertheless found that taking into account the defense's theory of the Flynn effect along with the standard error of measurement would still result in Mr. Maestas having an IQ score of at least seventy-six.

**256.** Taking into account the standard error of measurement, an IQ score of seventy to seventy-five is in the upper end of the range provided for mental retardation. DSM–IV–TR, *supra* note 243, at 49 (defining mild mental retardation as an "IQ level 50–55 to approximately 70,") *id.* at 41 (noting that "there is a measurement error of approximately 5 points in assessing IQ," such that an IQ score of seventy may "represent a range of 65–75"). The prosecution's expert testified that data from a 2005 IQ test indicated that Mr. Maestas's IQ score was at least eighty-five and that his intellectual functioning fell in the "low average" range rather than the mentally retarded range. After weighing the various assessments of Mr. Maestas, the defense experts testified that Mr. Maestas's actual IQ was likely seventy to eighty. One defense expert testified that this would place Mr. Maestas in the bottom 2–6 percent of the population, but acknowledged that a person in the bottom 4–6 percent of the population would likely fall into the "borderline intellectual functioning" range, rather than the mentally retarded range.

**257.** The prosecution's witness testified that the administrator had misscored some items on the test and had also failed to prompt or encourage Mr. Maestas at some points when such prompts would have been appropriate. One of the defense experts concurred that the administrator should have prompted or encouraged Mr. Maestas at some points when he did not. Accordingly, after conducting his review of the raw data from the 2005 test, the prosecution's expert testified that Mr. Maestas's IQ score would have been at least eighty-five if the administrator had adhered to proper procedures.

eighty-nine range.[258]

¶ 204 Noting that "[t]he experts ... agreed that scores from IQ tests are not determinative of a person's intellectual functioning," the court went on to consider other factors to determine whether the severity of Mr. Maestas's intellectual impairments rose to the level of SSGIF. One such factor was that Mr. Maestas had struggled academically and was enrolled in special education classes in school. But the court found that, without more, evidence of his academic difficulties was insufficient to establish the requisite intellectual deficits.[259] Based on the evidence presented, the court found that it was just as likely that Mr. Maestas's academic struggles were the result of "other dominant factors in [his] life," including "traumatic events, extreme poverty, social and emotional deprivation, ... alcohol and substance abuse," a learning disability, sexual abuse, and domestic violence in his childhood home. Importantly, the court noted that, while Mr. Maestas "has been routinely characterized [as] having learning disabilities and intellectual deficits throughout his childhood and adult life, no qualified evaluator, until now, has ever diagnosed him with mental retardation or significant subaverage general intellectual functioning." The court considered this a strong indication that Mr. Maestas's intellectual impairments were not substantial enough to constitute the requisite intellectual deficits.[260]

¶ 205 Because there is adequate evidence to support the trial court's factual findings and inferences, we conclude that it did not err in ruling that Mr. Maestas failed to adequately demonstrate that his general intellectual functioning was *significantly* subaver-

258. At the ages of fifteen and seventeen, Mr. Maestas took two IQ tests that resulted in him being classified as, respectively, in the "low dull normal" range and the "dull normal" range. One of the defense experts testified that such classifications would indicate an IQ score of eighty to eighty-nine. A defense expert also concluded that Mr. Maestas's performance on the 2005 test seemed consistent with these IQ tests he had taken as a youth. Although Mr. Maestas had taken other IQ tests between those in his youth and the one in 2005, the court chose not to consider them because the instruments used were screening measures and therefore had "limited usefulness in terms of assessing [Mr. Maestas's] overall intellectual functioning," and because there were questions about the reliability and proper administration of these tests. In addition, the prosecution's expert administered an IQ test to Mr. Maestas in 2007 that resulted in a score of sixty-five. But in light of his other assessments of Mr. Maestas, the prosecution's expert testified that Mr. Maestas had not put forth a full effort and that the resulting score underestimated his intellectual functioning. The defense experts likewise acknowledged that the IQ score of sixty-five was "most likely an underestimate of his true ability, due in large part to the variability and inconsistency of his effort on the tests" and was therefore "not a full indication of how well [Mr. Maestas] could do if he tried his actual hardest."

259. Mr. Maestas argues that the court should have given greater weight to the notation in his school records of "EMR," which he claims means "Educable Mentally Retarded." But the court considered the notation and found that it was not strong evidence of *significant* subaver-

age general intellectual functioning because there was no indication of who made the notation or on what basis it was made. The prosecution's expert testified that the EMR notation was not accompanied by IQ scores or any explanation from a qualified evaluator, which would typically support an official diagnosis of mental retardation. As a result, the court determined that the notation was likely made by a teacher, rather than a qualified evaluator. Further, the court pointed out that the notation was made only in the 1969–70 school year for four subjects (bodybuilding, science, social studies, and health), while Mr. Maestas's school records for that time labeled him as "educable" in other subjects, including reading and arithmetic. Because of the ambiguities regarding the "EMR" notation, the court concluded that "insufficient background information was provided to allow the [c]ourt to make a reasonable assessment of this classification."

260. In reaching this conclusion, the court also noted that its observations of Mr. Maestas during court proceedings and the letters Mr. Maestas sent to the court "suggest that, while he likely has cognitive deficits, his intellectual functioning is not significantly [s]ubaverage." Mr. Maestas argues that it was inappropriate for the court to consider its own observations because it can be difficult for an untrained person to recognize mental retardation. Although we acknowledge that it would be inappropriate for the court to rely solely on its own observations of the defendant to the exclusion of the evidence presented by the parties, in this instance, we are not troubled by the court considering its observations of Mr. Maestas as merely one factor in its determination.

age.[261] Accordingly, we reject Mr. Maestas's claim of error and uphold the trial court's determination that he did not demonstrate intellectual deficits significant enough to qualify as mentally retarded under the Exemption Statute.

*B. We Do Not Consider Whether the Statute Requires a Causal Relationship Between a Defendant's Significantly Subaverage General Intellectual Functioning and His Significant Deficits in Adaptive Functioning*

¶ 206 Mr. Maestas challenges the trial court's interpretation of the Exemption Statute's requirement that a defendant show that his "significant subaverage general intellectual functioning . . . results in" his "significant deficits in adaptive functioning." [262] He argues that requiring him to demonstrate a causal relationship between his SSGIF and SDAF is unconstitutional under *Atkins.* But, because we uphold the trial court's finding that Mr. Maestas did not demonstrate SSGIF, the issue of whether he qualifies as mentally retarded under the Exemption Statute is resolved on other grounds, and a favorable ruling for Mr. Maestas on this issue would not result in him being found ineligible for the death penalty. In other words, regardless of whether the Exemption Statute requires that Mr. Maestas's SSGIF result in his SDAF, the ultimate outcome of the *Atkins* hearing is the same: Mr. Maestas did

not qualify as mentally retarded under the Exemption Statute because he did not demonstrate SSGIF. Because Mr. Maestas cannot qualify as mentally retarded without showing the requisite intellectual deficits, regardless of whether the Exemption Statute requires a causal relationship between a defendant's SSGIF and SDAF, it is unnecessary for us to reach this issue.[263]

*C. We Reject Mr. Maestas's Constitutional Challenges to Utah's Exemption Statute*

¶ 207 Mr. Maestas argues that the Exemption Statute is unconstitutional because (1) it violates the Sixth Amendment by allowing the trial court, rather than a jury, to determine whether a defendant is mentally retarded, and (2) it violates the Eighth Amendment and the Due Process Clause by requiring the defendant to prove by a preponderance of the evidence that he is mentally retarded, rather than placing the burden on the State to prove beyond a reasonable doubt that the defendant is not mentally retarded.[264]

¶ 208 Mr. Maestas offers two main arguments in support of his claims. First, he asserts that the holding in *Atkins* makes the *absence* of mental retardation an element necessary to impose death and that the State therefore has a duty to prove the absence of

---

**261.** *Pena,* 869 P.2d at 936 (explaining that there are circumstances in which the trial court is in "the best position to assess the credibility of witnesses and to derive a sense of the proceeding as a whole").

**262.** *See* UTAH CODE § 77–15a–102(a).

**263.** *See Selvig v. Blockbuster Enters., LC,* 2011 UT 39, ¶ 29 n. 4, 266 P.3d 691 (declining to address whether one party waived its election of remedies defense after determining that the election of remedies provision in the contract does not apply to the claims at issue); *Summit Water Distrib. Co. v. Summit Cnty.,* 2005 UT 73, ¶ 50, 123 P.3d 437 ("Our settled policy is to avoid giving advisory opinions in regard to issues unnecessary to the resolution of the claims before us."); *Provo City Corp. v. Thompson,* 2004 UT 14, ¶ 22, 86 P.3d 735 ("We have observed on many occasions that this court is not inclined to issue mere advisory opinions." (internal quotation marks omitted)); *Gallivan v. Walker,* 2002 UT 89,

¶ 97, 54 P.3d 1069 (Durham, J., concurring) ("[C]ourts should generally resolve cases on the narrowest applicable grounds unless specific reasons exist for offering broader guidance.").

**264.** *See* UTAH CODE § 77–15a–104(12)(a). Mr. Maestas also claims that the Exemption Statute is unconstitutional because "article I, section 9 require[s] that a death sentence be imposed only in those cases where there is a 'high degree of confidence that that penalty is appropriate.'" (quoting *State v. Wood,* 648 P.2d 71, 81 (Utah 1982)). But he does not offer any analysis of the text of article I, section 9 or any case law to support this argument. Although there is not "a formula of some kind for adequate framing and briefing of state constitutional issues . . . before this court[,] . . . . [w]e have . . . frequently noted that mere mention of state [constitutional] provisions will not suffice." *State v. Tiedemann,* 2007 UT 49, ¶ 37, 162 P.3d 1106. Thus, because he has provided us with no argument to consider, we do not address this claim.

mental retardation to a jury beyond a reasonable doubt, as with an element of a crime.[265] Second, he contends that the absence of mental retardation is essentially an aggravating circumstance that exposes defendants to greater punishment than they would otherwise be eligible to receive, and he emphasizes that the State must prove to the jury beyond a reasonable doubt that aggravating circumstances outweigh mitigating circumstances and that death is the appropriate penalty.[266] On these bases, he contends that the only way to have a "high degree of confidence that [the death] penalty is appropriate"[267] is to have a jury determine whether the State has proven beyond a reasonable doubt that a criminal defendant is *not* mentally retarded before that defendant can be sentenced to death. Although Mr. Maestas did not preserve these claims, he argues that we may review them for plain or manifest error, meaning that an error must be both obvious and harmful.[268] We conclude that Mr. Maestas has not shown that the trial court committed an obvious error.

¶ 209 "To establish that the error should have been obvious to the trial court, [a defendant] must show that the law governing the error was clear at the time the alleged error was made."[269] In this case, Mr. Maestas has not shown an obvious error for three reasons. First, there is no governing law in this jurisdiction and no consensus among other jurisdictions mandating that the State bear the burden of proving the lack of mental retardation to a jury in capital cases.

Second, although we recognize that a jury must find that the State has proven beyond a reasonable doubt all functional elements of a crime and, in capital sentencing, that aggravating circumstances outweigh mitigating circumstances,[270] Mr. Maestas's arguments that the absence of mental retardation is analogous to an element of a crime or an aggravating circumstance conflict with the law governing these issues. Third, practical considerations and procedural safeguards support our conclusion that it was not an obvious error for the trial court to apply the challenged provisions of the Exemption Statute.

¶ 210 First, we note that neither we nor the U.S. Supreme Court have directly considered whether the Sixth Amendment requires a jury to determine whether a defendant is mentally retarded for purposes of death penalty eligibility. We have also not considered whether the Eighth Amendment and the Due Process Clause require the State to bear the burden of proving that a defendant is not mentally retarded before the death penalty can be imposed. Thus, there is no governing law in this jurisdiction that would support Mr. Maestas's claim that the trial court committed an obvious error in applying the provisions of the Exemption Statute that he challenges. Further, in other jurisdictions, some courts have ruled that it does not violate a defendant's constitutional rights for a judge to determine whether a defendant is mentally retarded for purposes of death penalty eligibility.[271] Likewise, some courts

---

265. Utah Code § 76-1-501(1) ("A defendant in a criminal proceeding is presumed to be innocent until each element of the offense charged against him is proved beyond a reasonable doubt.").

266. *See Wood*, 648 P.2d at 83 (explaining that "the sentencing authority ... must be persuaded beyond a reasonable doubt that total aggravation outweighs total mitigation ... [and] that the imposition of the death penalty is justified and appropriate in the circumstances" (internal quotation marks omitted)).

267. *Id.* at 81.

268. *Honie*, 2002 UT 4, 15, 57 P.3d 977.

269. *State v. Dean*, 2004 UT 63, ¶ 16, 95 P.3d 276.

270. *Wood*, 648 P.2d at 83.

271. *See, e.g., Maldonado v. Thaler*, 662 F.Supp.2d 684, 705–07 (S.D.Tex.2009) (rejecting the argument that *Atkins* made freedom from mental retardation an element of all capital crimes and that therefore a jury must determine mental retardation); *State v. Grell*, 212 Ariz. 516, 135 P.3d 696, 706 (2006) (rejecting the argument that a jury must find that a defendant is not mentally retarded because mental retardation is neither equivalent to an element of a crime nor a fact that increases the available penalty); *Rodriguez v. State*, 919 So.2d 1252, 1267 (Fla.2005) (rejecting the argument that a state statute is unconstitutional for permitting a judge to determine whether the defendant is mentally retarded); *Pruitt v. State*, 834 N.E.2d 90, 112–13 (Ind.2005) (rejecting the defendant's argument that mental retardation is a factual determination that may result in a sentence enhancement and therefore must be determined by a jury); *Bowling v. Com-*

have concluded that statutes requiring a defendant to prove mental retardation do not violate the defendant's constitutional rights.[272] Thus, there is no consensus among other jurisdictions that the State must bear the burden of proving lack of mental retardation to a jury in a capital case.

¶ 211 Second, Mr. Maestas's arguments that the absence of mental retardation is analogous to an element of a crime or an aggravating factor do not comport with the law governing these issues. The absence of mental retardation is unlike an element of a crime, such as intent, that must be proven to the jury before a defendant can be convicted. Indeed, mental retardation has nothing to do with a defendant's *conviction;* it relates solely to the *sentence* that the defendant is eligible to receive.

¶ 212 Further, in *Atkins,* the Court did not define mental retardation as an element that must be proven to a jury; instead, *Atkins* analogized mental retardation to an affirmative defense.[273] And the Court has not prohibited states from placing the burden of proof regarding affirmative defenses on the defendant.[274] Like an affirmative defense, a

defendant's mental retardation serves to relieve or mitigate his criminal punishment. Importantly, a defendant's mental retardation alone "do[es] not warrant an exemption from criminal sanctions." [275]

¶ 213 Indeed, in *Atkins,* the Court recognized that "mentally retarded persons who meet the law's requirements for criminal responsibility should be tried and punished when they commit crimes." [276] But their punishment cannot include the death penalty.[277] Because defendants who prove they are mentally retarded may nonetheless be convicted for their criminal conduct, mental retardation is not akin to an element of a crime. Thus, the constitution does not require that the determination of a defendant's mental retardation be made by a jury.

¶ 214 Similarly, the absence of mental retardation is not an aggravating circumstance in capital sentencing. Indeed, in *Atkins,* the Court stated that, although "[t]hose mentally retarded persons who meet the law's requirements for criminal responsibility should be tried and punished when they commit crimes," [278] mental retardation "*diminish[es]*

*monwealth,* 163 S.W.3d 361, 378–81 (Ky.2005) (rejecting a defendant's argument that the state statute at issue was unconstitutional for allowing the judge to determine mental retardation and stating that "[n]o court that has addressed the issue in the absence of an exemption statute or when faced with a statute permitting the trial judge to decide whether the defendant is mentally retarded has held that there is a constitutional right to a jury trial on this issue" (emphasis omitted)); *State v. Were,* 118 Ohio St.3d 448, 890 N.E.2d 263, 294 (2008) (rejecting the argument that a jury must determine whether a defendant was mentally retarded because mental retardation was not an aggravating circumstance that increased the possible punishment).

272. *See, e.g., Grell,* 135 P.3d at 702 (concluding that there is "no constitutional bar to imposing the burden of proving mental retardation on the defendant," and noting that only one state currently "place[d] the burden of disproving mental retardation on the state"); *State v. Jimenez,* 188 N.J. 390, 908 A.2d 181, 188–91 (2006) (concluding that it is appropriate for the defendant to bear the burden of proving mental retardation and noting that "[e]very state that has addressed the issue has found that the defendant should bear the burden of proof on an *Atkins* claim"), *modified per curiam,* 924 A.2d 5B (N.J.2007); *State v. Lott,* 97 Ohio St.3d 303, 779 N.E.2d 1011, 1016 (2002) (concluding that "[p]lacing the

burden of proof on" the defendant to prove mental retardation "does not violate constitutional principles").

273. *See Atkins,* 536 U.S. at 317, 122 S.Ct. 2242 (comparing proof of mental retardation to the affirmative defense of insanity); *see also Grell,* 135 P.3d at 702 ("Proof of mental retardation is like proof of an affirmative defense. . . .").

274. *See, e.g., Martin v. Ohio,* 480 U.S. 228, 236, 107 S.Ct. 1098, 94 L.Ed.2d 267 (1987) (upholding a state's requirement that a defendant must prove the affirmative defense of self defense); *Ford v. Wainwright,* 477 U.S. 399, 417, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986) (plurality opinion) (permitting states to place the burden of proof on the defendant to prove the affirmative defense of insanity); *Patterson v. New York,* 432 U.S. 197, 206–10, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977) (upholding a state's requirement that a defendant prove the affirmative defense of extreme emotional disturbance).

275. *See Atkins,* 536 U.S. at 318, 122 S.Ct. 2242.

276. *Id.* at 306, 122 S.Ct. 2242.

277. *Id.* at 321, 122 S.Ct. 2242.

278. *Id.* at 306, 122 S.Ct. 2242.

the[ ] personal culpability"[279] of defendants to the extent that it constitutes excessive punishment to impose the death penalty on persons with this impairment.[280] Thus, mental retardation is more analogous to a mitigating circumstance—a circumstance so mitigating that the Court has determined that its presence makes the imposition of the death penalty unconstitutionally excessive.

¶ 215 Indeed, when a defendant is convicted of a crime that provides for the death penalty as a possible sentence, "an *increase* in a defendant's sentence is not predicated on the outcome of the mental retardation determination; only a decrease."[281] Because mental retardation serves only to decrease a defendant's sentence, the absence of mental retardation is not an aggravating circumstance. Thus, the constitution does not require that a jury determine whether a defendant is mentally retarded, nor does it require that the prosecution bear the burden of proof.

¶ 216 Third, we note that practical considerations and procedural protections support our conclusion that it was not an obvious error for the trial court to take the role of determining whether Mr. Maestas was mentally retarded and to have Mr. Maestas bear the burden of proof on this matter. The court is well equipped by experience and training to evaluate and weigh complex evidence and expert testimony about a defendant's mental functioning. And although

"[t]he difficulties a mentally retarded person may have in testifying, communicating, and expressing remorse may negatively influence the jury,"[282] the court is less likely to be negatively influenced by the presentation of the evidence. Additionally, it was appropriate to place the burden of proof on Mr. Maestas because the evidence of mental retardation was largely within Mr. Maestas's possession and control.

¶ 217 Further, Utah's death penalty scheme has other procedural safeguards to ensure that there is a high degree of confidence that the death penalty is appropriate. Indeed, even though the court determined whether Mr. Maestas qualified as mentally retarded under the Exemption Statute, the State was required to prove to the jury that the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt and that death was the appropriate penalty.[283] Thus, the jury was the ultimate finder of fact in imposing the death penalty. Further, even though the court concluded that Mr. Maestas was *not* mentally retarded, Mr. Maestas still had the option of presenting evidence of any mental deficiency as a mitigating circumstance during sentencing, and had he elected to do so, the State would have had to persuade the jury that, even considering such evidence, the totality of the aggravating circumstances outweighed the totality of the mitigating circumstances such that death was the appropriate penalty. Because of these procedural safeguards, the

**279.** *Id.* at 318, 122 S.Ct. 2242 (emphasis added).

**280.** *See id.* at 321, 122 S.Ct. 2242 ("Construing and applying the Eighth Amendment in the light of our evolving standards of decency, we therefore conclude that such punishment is excessive and that the Constitution places a substantive restriction on the State's power to take the life of a mentally retarded offender." (internal quotation marks omitted)).

**281.** *Walker v. True*, 399 F.3d 315, 326 (4th Cir. 2005) (internal quotation marks omitted) (discussing Virginia's exemption statute); *see also In re Johnson*, 334 F.3d 403, 405 (5th Cir.2003) (per curiam); *Beckworth v. State*, 946 So.2d 490, 509 n. 6 (Ala.Crim.App.2005); *People v. Jackson*, 45 Cal.4th 662, 88 Cal.Rptr.3d 558, 199 P.3d 1098, 1109 (2009); *Nixon v. State*, 2 So.3d 137, 145 (Fla.2009); *Head v. Hill*, 277 Ga. 255, 587 S.E.2d 613, 620 (2003); *Pruitt*, 834 N.E.2d at 101–03; *Bowling*, 163 S.W.3d at 379–80; *State v. Williams*, 831 So.2d 835, 860 n. 35 (La.2002),

*superseded by* 2003 La. Acts 998, *as recognized in State v. Anderson*, 996 So.2d 973, 983–85 (La. 2008); *Russell v. State*, 849 So.2d 95, 148 (Miss. 2003); *State v. Johnson*, 244 S.W.3d 144, 151 (Mo.2008); *Jimenez*, 908 A.2d at 190 (N.J.2006); *State v. Flores*, 135 N.M. 759, 93 P.3d 1264, 1267 (2004); *People v. Smith*, 193 Misc.2d 462, 751 N.Y.S.2d 356, 357 (Sup.Ct.2002); *State v. Hill*, 177 Ohio App.3d 171, 894 N.E.2d 108, 120 (2008); *Howell v. State*, 138 P.3d 549, 561–62 (Okla.Crim.App.2006); *State v. Laney*, 367 S.C. 639, 627 S.E.2d 726, 731–32 (2006); *Howell v. State*, 151 S.W.3d 450, 465–67 (Tenn.2004); *Ex parte Briseno*, 135 S.W.3d 1, 9–10 (Tex.Crim.App. 2004); *Winston v. Commonwealth*, 268 Va. 564, 604 S.E.2d 21, 50–51 (2004).

**282.** *Grell*, 135 P.3d at 707.

**283.** *See Wood*, 648 P.2d at 83.

challenged provisions of the Exemption Statute do not preclude a "high degree of confidence that [the death] penalty is appropriate," [284] and accordingly, the trial court did not commit an obvious error in applying these provisions.

¶ 218 In sum, because Mr. Maestas failed to prove by a preponderance of the evidence that he had the requisite intellectual deficits, we uphold the trial court's conclusion that he did not qualify as mentally retarded under the Exemption Statute. And, because we uphold the court's finding that Mr. Maestas lacked significant subaverage general intellectual functioning, it is unnecessary for us to consider whether the Exemption Statute requires that a defendant's intellectual deficits have a causal relationship to his deficits in adaptive functioning. Finally, we conclude that the trial court did not commit an obvious error in applying the provisions of the Exemption Statute that allow the court to determine whether a defendant is mentally retarded and require the defendant to bear the burden of proof regarding mental retardation.

## IV. PENALTY PHASE

¶ 219 The Utah Code provides that "[w]hen a defendant has pled guilty to or been found guilty of a capital felony, there shall be further proceedings before the court or jury on the issue of sentence." [285] In this penalty phase proceeding, the sentencing body engages in a two-step process. [286] First, it must determine whether the totality of the aggravating circumstances outweighs the totality of the mitigating circumstances beyond a reasonable doubt. [287] Second, it must decide whether "the imposition of the death penalty is justified and appropriate in the circumstances." [288]

¶ 220 Mr. Maestas challenges certain evidence presented in the penalty phase of his trial. Specifically, he asserts that he is enti-

tled to a new penalty phase because the trial court erred (A) in granting his request to waive the right to present mitigating evidence, (B) in denying his motion to present the jury with evidence regarding the execution process and prison conditions, and (C) in allowing the State to present certain evidence as aggravating circumstances. We reject each of these claims.

### A. The Trial Court Did Not Err in Granting Mr. Maestas's Request to Waive the Right to Present Mitigating Evidence

¶ 221 Mr. Maestas argues that he is entitled to a new penalty phase because the trial court erred in granting his request to waive the right to present mitigating evidence. Before addressing his claim, we set forth the circumstances of Mr. Maestas's waiver.

¶ 222 Following the State's presentation of aggravating circumstances, the defense began to present evidence of mitigating circumstances. Its first witness was a police officer who testified about the poverty and difficult living conditions in Mr. Maestas's childhood hometown. The officer also testified about responding to a homicide at the Maestas home involving the stabbing of Mr. Maestas's sister by her boyfriend. The court recessed after this testimony.

¶ 223 The next morning, before the jury entered the courtroom, Mr. Maestas presented a letter to the court objecting to certain mitigating evidence that defense counsel intended to present. [289] Because defense counsel insisted on presenting this evidence, Mr. Maestas also asked the court to dismiss his counsel and allow him to proceed pro se. In response, the court asked that defense counsel discuss Mr. Maestas's concerns with him and try to reach a mutual agreement about how to proceed regarding the evidence to which Mr. Maestas objected.

**284.** *See id.* at 81.

**285.** Utah Code § 76–3–207(1)(a).

**286.** *See State v. Lafferty (Lafferty II)*, 2001 UT 19, ¶ 128, 20 P.3d 342.

**287.** Utah Code § 76–3–207(5)(b).

**288.** *Id.*

**289.** Specifically, Mr. Maestas objected to defense counsel's plan to present a witness who would testify that she had observed Mr. Maestas having sex with his sister when he was a child.

¶ 224 After a recess, defense counsel reported to the court that they had discussed Mr. Maestas's concerns with him, but that they still intended to present all the planned mitigating evidence despite Mr. Maestas's objections. Specifically, defense counsel explained that Mr. Maestas did not want to present "any unflattering or negative history about his family." But counsel responded, "[T]hat is simply not something that we can abide given our responsibilities under the [C]onstitution to provide effective representation and . . . relevant mitigating evidence in this matter." Counsel further stated, "[W]hether or not we're going to put on specific evidence, that's our call to make. That's not Mr. Maestas'[s] decision." Accordingly, counsel reported, "We're at an impasse. He does not want us to use everything we have. We are planning to use everything we have."

¶ 225 At that point, the court reminded defense counsel that a defendant has the right to direct his defense. The court also expressed concern over defense counsel's unwillingness to compromise and their determination to present evidence in violation of Mr. Maestas's wishes. The court then asked, "In light of what I've just stated is there any hope, are you willing to accommodate his desires?" Defense counsel responded, "From our point of view it's not negotiable." Counsel added that they would "not simply . . . follow Mr. Maestas's wishes on this" unless the court ordered them "not to present evidence that . . . contravenes Mr. Maestas's wishes."

¶ 226 In considering Mr. Maestas's request to dismiss his counsel because they insisted on presenting mitigating evidence to which he objected, the court concluded that waiver of counsel "at this point[,] under the circumstances[,] cannot be voluntary," because defense counsel's insistence on presenting evidence that contravened Mr. Maestas's wishes placed him in a position where he felt he had to waive counsel in order to prevent the evidence to which he objected from coming

forward. Accordingly, the court ordered defense counsel "to advise Mr. Maestas of mitigation[,] [i]ts purpose, its effect, its reasons, what it's intended to show, what [it] is intended to demonstrate[,] [and] the reasons why defense counsel thinks it's appropriate." It further ordered counsel "to consult with Mr. Maestas as to what changes, if any, to that testimony [there] will be. And then abide by Mr. Maestas's wishes regarding mitigation presentation. If that means no mitigation will be presented, so be it."

¶ 227 After providing defense counsel the opportunity to talk with Mr. Maestas, the court met again with Mr. Maestas, defense counsel, and the prosecution. Defense counsel reported what they had explained to Mr. Maestas concerning the purpose and importance of mitigating evidence, and they proffered to the court the mitigating evidence that they were planning to present.[290] Following defense counsel's remarks, the court reiterated to Mr. Maestas the purpose of aggravating and mitigating evidence in the penalty phase and explained that it was in Mr. Maestas's best interest to allow defense counsel to present mitigating evidence. He then asked if Mr. Maestas understood the purpose of mitigating evidence, what evidence defense counsel planned to present, and the potential benefit of presenting this mitigating evidence. Following each question, Mr. Maestas responded that he understood. The court then asked Mr. Maestas what his decision was regarding the presentation of mitigating evidence. Mr. Maestas responded, "I waive it all. . . . I don't want to present the evidence."

¶ 228 The court again asked Mr. Maestas if he understood that it was in his best interest to present the evidence, and Mr. Maestas responded in the affirmative. Likewise, the court asked if Mr. Maestas had fully considered defense counsel's advice not to waive the right to present mitigating evidence, as well as the potential consequences of not presenting the mitigating evidence. Mr.

290. As a brief overview, defense counsel explained that they planned to present evidence regarding Mr. Maestas's neuro-psychology, his social history (including family background and issues of abuse), the interplay between Mr. Maes-tas's social history and the current offense, his institutional risk assessment, and his intelligence (including his IQ tests and the relationship between his intelligence and social history).

Maestas responded in the affirmative to both questions. The court then asked whether Mr. Maestas understood that he could be disadvantaged by not presenting mitigating evidence after the State had already put on evidence of aggravating circumstances. Mr. Maestas again responded that he understood.

¶ 229 In addition, the court asked whether anyone was forcing Mr. Maestas to waive the right to present mitigating evidence, whether any promises had been made to get him to make this decision, and whether he had received any information from any source to convince him to waive the right to present mitigating evidence. Mr. Maestas responded in the negative to each question. He informed the court that he made the decision "from [his] own free will." Regarding his request to dismiss his counsel, Mr. Maestas reported to the court that he had decided to retain his counsel because he felt that the attorneys would be better able to handle the closing argument. Following this discussion, defense counsel objected at length to Mr. Maestas's request to waive the right to present mitigating evidence, arguing that counsel had a constitutional duty to both investigate and present mitigating evidence on a defendant's behalf.

¶ 230 At that point, the court held another recess. Upon returning, the court again reiterated that Mr. Maestas had been advised by his attorneys and the court that it was in his best interest to present mitigating evidence. The court then asked Mr. Maestas, "[G]iven my advice, [and] your attorneys' advice to continue as intended with mitigation evidence, do you wish to change and follow that advice, or are you going to insist on going forward without the mitigation evidence?" Mr. Maestas responded, "I insist on going forward without the mitigation evidence." After further discussion, the court said, "I'm going to give you one last opportunity to change your mind if that's what you would like at this point." Mr. Maestas responded, "I won't change my mind, your Honor." The court then explained that, if Mr. Maestas insisted on waiving the presentation of mitigating evidence, this decision would be irrevocable. Mr. Maestas responded that he

understood. The court then stated that it found Mr. Maestas "knowingly, voluntarily and intelligently ... waived [the] right to present additional mitigation evidence in this trial." Accordingly, the court ordered defense counsel not to present further mitigating evidence.

¶ 231 In accordance with the court order, defense counsel did not present any other mitigating evidence. Instead, Mr. Maestas briefly addressed the jury prior to closing arguments. While addressing the jury, he said, "My attorneys wanted to put on evidence ... which was kind of important. And it kind of covered my background a little bit, and it had something to do with my family." But he explained, "I didn't want my family to become involved in this case so I asked them not to put on any evidence." Mr. Maestas went on to state, "I accept your verdict. I feel bad about Ms. Bott. I feel bad about Ms. Chamberlain. And I feel bad about everybody." He concluded by saying, "From the beginning I said I wasn't guilty of this crime. And today, again, I'm going to tell everybody I didn't kill Ms. Bott. I hope you understand because I didn't. And I'm sorry. Thank you for listening—listening to my case."

¶ 232 During closing arguments, defense counsel explained to the jury that certain mitigating evidence had not been presented at Mr. Maestas's request "because it was so terrible, and so horrifying, and so upsetting to him and his family, that he would rather face a death sentence than have you hear what kind of life and background he came from." Defense counsel then reiterated testimony given by the police officer regarding the fatal stabbing of Mr. Maestas's sister and the "damaging environment" of Mr. Maestas's early childhood home. Counsel also highlighted the testimony given by a witness for the prosecution that Mr. Maestas's behavior in prison had improved over time and that he had gone long periods of time without any discipline.[291] According to defense counsel, this testimony supported a conclusion that Mr. Maestas "can be maintained in prison," and therefore can "safely accept the punishment of ... a life in prison without

---

**291.** *See infra* Part IV.C.4.d.

parole." Defense counsel concluded with a plea for the jurors to "show[ ] mercy."

¶ 233 On appeal, Mr. Maestas argues that the trial court violated his Sixth Amendment right to counsel when it ordered defense counsel not to present further mitigating evidence,[292] that the lack of mitigating evidence rendered his sentence unreliable under the Eighth Amendment, and that the lack of mitigating evidence violated the "unnecessary rigor" clause of article I, section 9 of the Utah Constitution. We review these constitutional questions for correctness.[293] Under this standard, we reject each of Mr. Maestas's arguments and affirm his sentence.

1. The Trial Court Did Not Violate the Sixth Amendment by Granting Mr. Maestas's Request to Waive the Right to Present Mitigating Evidence

■■■ ¶ 234 The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence." [294] Mr. Maestas argues that the Sixth Amendment right to counsel requires that defense counsel control what mitigating evidence is presented to the jury in a capital proceeding. Accordingly, he argues that the court violated his right to counsel by granting his request to waive the right to present further mitigating evidence.

■■■ ¶ 235 But the U.S. Supreme Court has held that the Sixth Amendment "implies a right in the defendant to conduct his own defense, with *assistance* at what, after all, is his, not counsel's trial." [295] Further, the Court has stated that the "language and spirit of the Sixth Amendment contemplate that counsel ... shall be an aid to a willing defendant—not an organ of the State interposed between an unwilling defendant and his right to defend himself personally." [296] In other words, the Sixth Amendment "speaks of the 'assistance' of counsel, and an assistant, however expert, is still an assistant." [297] In accordance with this reasoning, the U.S. Supreme Court has held that the Sixth Amendment "does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his defense." [298] Thus, a defendant has a Sixth Amendment right to make important decisions about his or her defense. This suggests that, under the Sixth Amendment, a defendant may waive the right to presentation of mitigating evidence.[299]

**292.** Mr. Maestas also claims that the trial court violated his right to counsel under article I, section 12 of the Utah Constitution. He contends that this claim was preserved because counsel "argued below that [his] state and federal constitutional rights were violated and also submitted a motion indicating that all motions were being made under the state and federal constitutions." But "[w]e have ... frequently noted that mere mention of state [constitutional] provisions will not suffice" to preserve a claim. *State v. Tiedemann*, 2007 UT 49, ¶ 37, 162 P.3d 1106; *see also State v. Cruz*, 2005 UT 45, ¶ 33, 122 P.3d 543 ("[M]ere mention does not preserve [an] issue for appeal.... [A]n objection must at least be raised to a level of consciousness such that the trial [court] can consider it." (fourth alteration in original) (internal quotation marks omitted)). As Mr. Maestas never specifically argued below that the trial court violated article I, section 12 of the Utah Constitution by allowing him to waive the right to present mitigating evidence, this claim is not preserved. Accordingly, we review the claim for plain error. *State v. Menzies (Menzies I)*, 845 P.2d 220, 224–25 (Utah 1992). To demonstrate obvious error, a party "must show that the law governing the error was clear at the time the alleged error was made." *State v. Dean*, 2004 UT 63, ¶ 16, 95 P.3d 276. Because we have

never ruled that article I, section 12 of the Utah Constitution requires that defense counsel present mitigating evidence over the objections of a defendant, the trial court did not commit an obvious error on this basis. Accordingly, we reject Mr. Maestas's article I, section 12 claim.

**293.** *See State v. Candedo*, 2010 UT 32, ¶ 7, 232 P.3d 1008.

**294.** U.S. Const. amend. VI.

**295.** *McKaskle v. Wiggins*, 465 U.S. 168, 174, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984).

**296.** *Faretta v. California*, 422 U.S. 806, 820, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).

**297.** *Id.; accord State v. Wood*, 648 P.2d 71, 91 (Utah 1982) ("[A]n attorney acts as an assistant for his client, and not as a master.").

**298.** *Faretta*, 422 U.S. at 819, 95 S.Ct. 2525.

**299.** *See State v. Arguelles*, 2003 UT 1, ¶ 83, 63 P.3d 731 ("Although the United States Supreme Court has never decided whether a defendant may waive the presentation of mitigating evi-

¶ 236 Indeed, in *State v. Arguelles*, we specifically held that a defendant's Sixth Amendment right to "control the course of the proceedings carries with it the right to choose how much—if any—mitigating evidence is offered." [300] In reaching our conclusion, we noted that only a limited number of jurisdictions considering this issue have required the presentation of mitigating evidence over a defendant's objection, while the "vast majority" of jurisdictions have "reached the opposite conclusion" and allowed defendants to decide how much, if any, mitigating evidence to present.[301] We "agree[d] with the reasoning" of this majority and stated that, "[g]iven the importance of the right to represent oneself and direct the proceedings, we are loathe to take a stance that would run directly contrary to this right." [302]

¶ 237 Like other decisions that a represented defendant has the right to make, such as the decision to plead guilty to an offense or testify in the proceedings,[303] the decision to waive the right to present mitigating evidence is not a mere tactical decision that is best left to counsel; [304] instead, it is a fundamental decision that goes to the very heart of the defense.[305] Mitigating evidence often involves information that is very personal to the defendant, such as intimate, and possibly repugnant, details about the defendant's life, background, and family. As such, like other decisions reserved for the defendant, the de-

cision not to put this private information before the jury is a very personal decision. Additionally, like the decision to testify or plead guilty, the decision not to present mitigating evidence may be very significant to the outcome of the proceedings. Moreover, it would make little sense to allow defendants to incriminate themselves by testifying or to forgo a trial and plead guilty to an offense, but bar them from waiving the presentation of mitigating evidence in the penalty phase. For these reasons, the decision to waive the right to present mitigating evidence is a "fundamental decision[ ] regarding the case" [306] that falls under the defendant's "right to control the nature of his or her defense." [307]

¶ 238 Although Mr. Maestas argues that our decision in *Arguelles* addressed only the right of *unrepresented* defendants to waive the right to present mitigating evidence, there is nothing in our reasoning to limit our holding to unrepresented defendants. Our conclusion was based on a defendant's right to "control the course of proceedings," [308] and this right is not eradicated by a defendant's decision to retain counsel.[309] Indeed, in *Arguelles*, when citing examples of court decisions that allowed defendants to waive the right to present mitigating evidence, we included decisions from several courts that had considered whether a represented defendant could waive this right.[310]

dence, its opinions suggest that such a right naturally extends from the Sixth Amendment.").

300. *Id.* ¶ 82.

301. *Id.*

302. *Id.* ¶¶ 82–83.

303. *Jones v. Barnes*, 463 U.S. 745, 751, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983).

304. *See Wood*, 648 P.2d at 91 ("Trial tactics lie within the prerogative of counsel and may not be dictated by his client.").

305. *See Florida v. Nixon*, 543 U.S. 175, 187, 125 S.Ct. 551, 160 L.Ed.2d 565 (2004) ("[C]ertain decisions regarding the exercise or waiver of basic trial rights are of such moment that they cannot be made for the defendant by a surrogate.").

306. *Jones*, 463 U.S. at 751, 103 S.Ct. 3308.

307. *State v. Woodland*, 945 P.2d 665, 668 (Utah 1997).

308. *Arguelles*, 2003 UT 1, ¶ 82, 63 P.3d 731.

309. *See, e.g., Wood*, 648 P.2d at 91–92.

310. *See Arguelles*, 2003 UT 1, ¶ 82, 63 P.3d 731; *see also Singleton v. Lockhart*, 962 F.2d 1315, 1322 (8th Cir.1992) (finding no ineffective assistance of counsel where counsel complied with client's demand to present no mitigating evidence); *State v. Ashworth*, 85 Ohio St.3d 56, 706 N.E.2d 1231, 1237–39 (1999) (upholding death verdict where defendant chose to present no mitigating evidence); *Wallace v. State*, 893 P.2d 504, 511–12 (Okla.Crim.App.1995) (upholding death verdict where a represented defendant openly sought death penalty and chose to present no mitigating evidence); *Zagorski v. State*, 983 S.W.2d 654, 659 (Tenn.1998) (finding no ineffective assistance of counsel where counsel complied with client's demand to present no mitigating evidence).

¶ 239 In addition, we have consistently protected a defendant's right to direct his or her defense, even when that defendant is represented by counsel. In *State v. Woodland*, we stated that "the accused has the right to control the nature of his or her defense." [311] Accordingly, we affirmed the trial court's conclusion that the defendant had "knowingly and voluntarily waived his right to assert a mental illness defense," [312] even though the defendant made his decision in violation of his counsel's legal advice. [313]

¶ 240 Similarly, in *State v. Wood*, we recognized that defendants do not lose the right to direct their defense by virtue of having retained representation. [314] In *Wood*, when defense counsel disagreed with the defendant's insistence on presenting a defense of innocence, we noted that, "[a]lthough [the defendant] could have stood on the right to represent himself and rel[ied] on the defense of innocence, he would most likely have severely prejudiced himself." [315] Thus, "[t]o avoid forcing a defendant to resort to self-representation to assert a defense of innocence, an attorney should present such a defense" upon a client's insistence, "even though against the better judgment of the attorney, as long as it is done within the ethical and lawful constraints imposed upon attorneys." [316]

¶ 241 We also note that, although the U.S. Supreme Court has not directly addressed this issue, it has indicated that a represented defendant may waive the right to present mitigating evidence. For example, in *Blystone v. Pennsylvania*, the Court noted that,

"contrary [to] advice from his counsel," the defendant "decided not to present any proof of mitigating evidence during his sentencing proceedings." [317] Nonetheless, the Court did not overturn the defendant's death sentence. [318] In addition, in *Schriro v. Landrigan*, the Court considered a post-conviction death penalty case involving the defendant's claim of ineffective assistance of counsel. [319] Because defense counsel, at the defendant's request, did not put on mitigating evidence, the defendant claimed that they had provided ineffective assistance. [320] In concluding that the federal district court had not erred in refusing to hold an evidentiary hearing on this issue, the Court never indicated that a represented defendant could not waive the right to present mitigating evidence. [321] Instead, the Court's statements implied that the represented defendant *could* waive this right. For instance, the Court noted that it had "never required a specific colloquy to ensure that a defendant knowingly and intelligently refused to present mitigating evidence." [322] It also explained that, if the defendant "instructed his counsel not to offer any mitigating evidence," then "counsel's failure to investigate further could not have been prejudicial." [323]

¶ 242 Thus, because the Sixth Amendment is meant to *protect* the control a defendant has over his or her own case, we decline to interpret the amendment as *limiting* a defendant's "right to control the nature of his or her defense" [324] when that defendant is represented by counsel. Accordingly, a de-

311. 945 P.2d at 668.

312. *Id.* at 670–71.

313. *Id.* at 668–69.

314. *See* 648 P.2d at 91 (explaining that "[a]n attorney who refuses to present such a basic claim as that of innocence acts outside the duties of an attorney, even if the claim of innocence detracts from other defenses presented by counsel").

315. *Wood*, 648 P.2d at 92.

316. *Id.*

317. 494 U.S. 299, 306 n. 4, 110 S.Ct. 1078, 108 L.Ed.2d 255 (1990).

318. *Id.* at 302–03, 306–08, 110 S.Ct. 1078 (upholding Pennsylvania's death penalty scheme in the face of a challenge to the requirement that the jury must return a sentence of death if it finds that the aggravating factors outweigh the mitigating factors).

319. 550 U.S. 465, 471–73, 127 S.Ct. 1933, 167 L.Ed.2d 836 (2007).

320. *Id.*

321. *See id.* at 475, 479, 127 S.Ct. 1933.

322. *Id.* at 479, 127 S.Ct. 1933.

323. *Id.* at 475, 127 S.Ct. 1933.

324. *Woodland*, 945 P.2d at 668.

fendant's right "to choose how much—if any—mitigating evidence is offered" [325] applies to represented defendants as well. We therefore conclude that the Sixth Amendment does not mandate that defense counsel present mitigating evidence over the wishes of a represented defendant.

■ ¶ 243 In this case, after Mr. Maestas informed the court that he wished to dismiss defense counsel and proceed as his own counsel, the trial court stated that he could not knowingly and voluntarily waive the right to counsel. The court concluded that, because of "intransigence on the part of defense counsel," Mr. Maestas was essentially placed in a position where he felt forced to dismiss his counsel in order to prevent the presentation of the evidence to which he objected. "To avoid forcing a defendant to resort to self-representation," [326] it was appropriate for the trial court to protect Mr. Maestas's Sixth Amendment right to direct his defense by allowing him to waive the presentation of mitigating evidence.

¶ 244 Accordingly, rather than granting Mr. Maestas's request to proceed as his own counsel, the court instructed defense counsel to discuss with Mr. Maestas the role of mitigating evidence and the evidence that they planned to present, and then to reach a compromise with Mr. Maestas regarding the presentation of mitigating evidence. After this discussion, defense counsel reported that Mr. Maestas did not want any negative information about his family to be presented. But instead of reaching a compromise with Mr. Maestas, as instructed by the court, counsel *insisted* on presenting *all* the mitigating evidence that they had planned. After further discussion between Mr. Maestas, the court, and counsel, Mr. Maestas agreed to retain defense counsel but maintained that he wanted to waive the presentation of all mitigating evidence. Under these circumstances, accepting Mr. Maestas's waiver was appropriate in light of both his right to coun-

sel and right to direct his case because it allowed Mr. Maestas a say in his defense while enabling him to remain represented by defense counsel.

¶ 245 Further, we note that the trial court conducted a lengthy and searching inquiry before concluding that Mr. Maestas had knowingly and voluntarily waived his right to present mitigating evidence. Indeed, before making its determination, the court gave counsel multiple opportunities to speak with Mr. Maestas, and it specifically required counsel "to advise Mr. Maestas of mitigation[, i]ts purposes, its effects, its reasons, what it's intended to show, what [it] is intended to demonstrate[, and] the reasons why defense counsel thinks it's appropriate." In addition to privately meeting with Mr. Maestas, defense counsel proffered to the court, in Mr. Maestas's presence, a summary of the mitigating evidence that they planned to present. Both counsel and the court repeatedly reiterated to Mr. Maestas the importance of presenting mitigating evidence. Following this extensive discussion, the court asked Mr. Maestas several questions to make sure he was knowingly and voluntarily waiving the presentation of mitigating evidence, and Mr. Maestas responded appropriately to each question.

¶ 246 Nonetheless, Mr. Maestas contends that, because he suffers from some degree of intellectual impairment, this inquiry was not sufficient to determine if he had knowingly and voluntarily waived his right to present mitigating evidence. But we have "recognized a competent defendant's right to exert control over his or her defense." [327] And we have held that a defendant "should not be required to display a heightened level of competency to waive his right to a particular defense." [328] Similarly, we have held that "[t]he same standard applies to both a determination of competency to plead guilty and a determination of competency to stand trial." [329] We decline to require defendants to

**325.** *Arguelles*, 2003 UT 1, ¶ 82, 63 P.3d 731.

**326.** *Wood*, 648 P.2d at 92.

**327.** *Woodland*, 945 P.2d at 670.

**328.** *Id.*

**329.** *Arguelles*, 2003 UT 1, 50 n. 11, 63 P.3d 731 (internal quotation marks omitted); *see also Godinez v. Moran*, 509 U.S. 389, 399, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993) ("[W]e can conceive of no basis for demanding a higher level of

demonstrate a higher level of competency to waive the right to present mitigating evidence than we require them to demonstrate to stand trial, plead guilty, or waive other rights.[330]

¶ 247 In this case, Mr. Maestas's competency was never challenged. Although he has put forth evidence regarding intellectual impairments, this evidence does not call his competency into question.[331] Further, in reviewing his responses to the judge's inquiries regarding his decision to waive the presentation of mitigating evidence, we agree with the trial court that Mr. Maestas knowingly and voluntarily waived his right to present mitigating evidence.

¶ 248 For the foregoing reasons, we conclude that the trial court's acceptance of Mr. Maestas's waiver and its order that counsel not present further mitigating evidence did not violate Mr. Maestas's Sixth Amendment right to counsel.

2. **Mr. Maestas's Waiver of the Right to Present Mitigating Evidence Did Not Violate the Eighth Amendment by Rendering His Death Sentence Unreliable**

¶ 249 Mr. Maestas also contends that the lack of mitigating evidence presented during the penalty phase resulted in an unreliable sentence in violation of the Eighth Amendment. We disagree.

¶ 250 The U.S. Supreme Court has held that the Eighth Amendment requires that a "capital defendant generally must *be allowed* to introduce any relevant mitigating evidence regarding his character or record and any of the circumstances of the offense." [332] But the Court has never ruled that a defendant is *required* to present mitigating evidence, such that this right cannot be waived.[333] Further,

competence for those defendants who choose to plead guilty.").

330. Mr. Maestas contends that the U.S. Supreme Court's holding in *Indiana v. Edwards*, 554 U.S. 164, 128 S.Ct. 2379, 171 L.Ed.2d 345 (2008), stands for the proposition that "a defendant's right to self-representation—or to direct the presentation of evidence—cannot be upheld if the defendant is not mentally capable of making the decision." But in *Edwards*, the Court stated only that "the Constitution *permits* States to insist upon representation by counsel for those competent enough to stand trial ... but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves." *Id.* at 178, 128 S.Ct. 2379 (emphasis added). Thus, *Edwards* allows, but does not require, states to have heightened standards for determining competency to waive the right to counsel. The standard that we impose in Utah is that the defendant must (1) be competent and (2) "intelligently and knowingly waive the right to assistance of counsel." *State v. Lafferty (Lafferty I)*, 749 P.2d 1239, 1248 (Utah 1988). We do not require that defendants show a heightened level of competence to waive the right to counsel. Further, Mr. Maestas did not waive his right to counsel in this case; he waived his right to present further mitigating evidence. And *Edwards* deals solely with defendants' ability to waive the right to counsel rather than their ability to make other decisions regarding their defense. Accordingly, *Edwards* is not applicable and we are not persuaded that defendants must demonstrate a higher level of competence to waive the presentation of mitigating evidence than that required to stand trial.

331. UTAH CODE § 77-15-2 ("[A] person is incompetent to proceed if he is suffering from a mental disorder or mental retardation *resulting either in:* (1) his inability to have a rational and factual understanding of the proceedings against him or of the punishment specified for the offense charged; or (2) his inability to consult with his counsel and to participate in the proceedings against him with a reasonable degree of rational understanding." (emphasis added)); *Lafferty I*, 749 P.2d at 1243 ("[T]he relevant inquiry is whether [the defendant] had the *ability* to assist counsel, not whether he in fact chose to assist counsel or to comply with all of counsel's wishes.").

332. *California v. Brown*, 479 U.S. 538, 541, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987) (emphasis added) (internal quotation marks omitted); *see also Skipper v. South Carolina*, 476 U.S. 1, 8, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986) (explaining that a defendant must be *"permitted* to present any and all relevant mitigating evidence that is available" (emphasis added)).

333. We note that the Court has held that defense counsel must make a reasonable investigation into mitigating circumstances on behalf of a defendant, even if the defendant is uncooperative. *See, e.g., Rompilla v. Beard*, 545 U.S. 374, 377, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005) (holding that, "even when a capital defendant's family members and the defendant himself have suggested that no mitigating evidence is available, his lawyer is bound to make reasonable efforts to obtain and review material that counsel knows the prosecution will probably rely on as evidence of aggravation at the sentencing phase of trial"); *Burger v. Kemp*, 483 U.S. 776, 788, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987) (considering whether counsel's "performance in evaluating the miti-

we have concluded that, in capital cases, the Eighth Amendment does *not* require the admission of mitigating evidence over a defendant's wishes.[334] Indeed, if the Eighth Amendment were construed to require the admission of all available mitigating evidence, capital defendants could preclude the death penalty by refusing to cooperate in providing such evidence.

¶ 251 Additionally, in *State v. Arguelles*, we explained that a defendant's decision to waive the presentation of mitigating evidence did not affect the reliability of his death sentence because other procedural safeguards ensured that his sentence satisfied the requirements of the Eighth Amendment.[335] Specifically, we noted three procedural safeguards that insured the reliability of the defendant's sentence: (1) "the death penalty is not available unless the defendant has pled guilty to or been found guilty of committing a capital crime," (2) "the sentencer may not impose the death penalty unless it finds beyond a reasonable doubt that aggravating circumstances outweigh mitigating circumstance *and* that imposition of the death penalty is justified and appropriate under the circumstances," and (3) "the sentence must withstand mandatory appellate review."[336] "Given these procedural safeguards, the importance of [a] defendant's

right to waive counsel and control his defense, and the impracticality of requiring the presentation of all mitigating evidence," we upheld the defendant's sentence "regardless of his failure to offer additional mitigating evidence."[337]

¶ 252 These three procedural safeguards also ensured the reliability of Mr. Maestas's death sentence in spite of his decision to waive the presentation of further mitigating evidence. First, the jury found Mr. Maestas guilty beyond a reasonable doubt of committing aggravated murder, which is a death-eligible offense.

¶ 253 Second, the jury was properly instructed regarding the standard for imposing the death penalty. The jury was instructed that it could return a sentence of death only if it was persuaded beyond a reasonable doubt that the State had established both that "the totality of aggravating circumstances outweighs the totality of mitigating circumstances ... in terms of their respective substance and persuasiveness," and "that the imposition of the death penalty is justified and appropriate in this case." The jury was further instructed, "[E]ven if you determine that the totality of aggravating circumstances outweighs the totality of mitigating

gating evidence available to him, and in deciding not to pursue further mitigating evidence, undermines confidence in the adversarial process of this case"). Likewise, we have held that counsel "must adequately investigate all potentially mitigating factors" in order "to provide effective assistance of counsel at the sentencing phase." *State v. Taylor*, 947 P.2d 681, 686 (Utah 1997). But such cases deal with counsel's duty to *investigate* mitigating evidence where defendants have not waived the right to present such evidence. Neither we nor the U.S. Supreme Court have ever held that defense counsel is required to *present* mitigating evidence in defiance of a defendant's desire to waive the right to present such evidence.

334. *Arguelles*, 2003 UT 1, ¶ 82, 63 P.3d 731.

335. *Id.* ¶ 85 ("[W]e are not convinced that defendant's failure to offer all possible mitigating evidence undermined the reliability of the verdict. Even where a defendant seeks the death penalty, the death verdict will not stand without conformity with the procedural safeguards provided in our death penalty statutes."). In *Arguelles*, because the defendant was seeking the death penal-

ty, he "indicated ... that he would present 'very little, if any' mitigation evidence." *Id.* ¶ 31. He presented "one witness, five documents containing medical and psychological information, and a handwritten sheet of mitigating factors for the judge to consider." *Id.* The defendant explained that he only presented this evidence because "[i]t was indicated to me that by law it may well be remanded back to the court if I didn't offer the court some sort of mitigation." *Id.* ¶ 34 (internal quotation marks omitted). On appeal, the court assistant (an attorney appointed to handle the mandatory appeal of the case as a result of the defendant's refusal to oppose his sentence) claimed "that the presentation of mitigating evidence by [the defendant] was merely a 'sham,' creating a breakdown in the adversarial system that necessarily draws into question the reliability of the death verdict." *Id.* ¶ 80. Nonetheless, we concluded that the lack of further mitigating evidence under these circumstances did not result in the defendant receiving an unreliable death sentence. *Id.* ¶ 85.

336. *Id.* ¶ 85 (internal quotation marks omitted).

337. *Id.*

circumstances, if you have a reasonable doubt as to whether imposition of the death penalty is justified and appropriate in this case, you cannot return a sentence of death."

¶ 254 Further, in determining whether the imposition of the death penalty was appropriate in this case, the jury was informed that it could consider factors "including, but not limited to," (1) "[t]he nature and circumstances of the crime"; (2) Mr. Maestas's "character, background, history, mental and physical condition"; (3) the "impact of the crime on the victim's family and community"; and (4) "any other facts in aggravation or mitigation of the penalty." Similarly, the jury was instructed that, "[i]n determining whether aggravating or mitigating circumstances exist, you may consider all of the evidence produced either by the State or the defendant in this hearing and during the guilt phase of the trial, including testimony and exhibits admitted and presented to you during either proceeding." [338]

¶ 255 Third, Mr. Maestas's sentence withstands our appellate review. As discussed, both defense counsel and the trial court thoroughly reviewed the purpose and importance of mitigating evidence with Mr. Maestas, as well as the potential consequences of waiving the presentation of such evidence. The court conducted a rigorous inquiry into the circumstances of Mr. Maestas's waiver to ensure that Mr. Maestas fully understood the potential consequences of his decision to proceed without mitigating evidence and that his waiver was knowing and voluntary. Following this inquiry, Mr. Maestas was given the opportunity to address the jury, and, in closing arguments, defense counsel directed the jury to the mitigating evidence that had been presented prior to Mr. Maestas's waiver, as

well as other evidence favorable to Mr. Maestas. In addition, the jury was properly instructed regarding the weighing of aggravating and mitigating evidence, as well as the standard for returning a sentence of death. In light of these procedural safeguards, we conclude that Mr. Maestas's waiver of the right to present mitigating evidence did not violate the Eighth Amendment by rendering his death sentence unreliable.

¶ 256 Finally, we note that Mr. Maestas, as required by the Eighth Amendment,[339] had a full opportunity to present any relevant mitigating evidence during the penalty phase. Indeed, defense counsel investigated and prepared extensive mitigating evidence, and both counsel and the court attempted at length to persuade Mr. Maestas that the evidence prepared by defense counsel should be presented. Further, Mr. Maestas did present some mitigating evidence, and, in closing arguments, defense counsel appropriately directed the jury to the mitigating evidence that had been presented, as well as other favorable evidence. Thus, although Mr. Maestas elected not to present further evidence, the requirements of the Eighth Amendment were satisfied by affording him the opportunity to do so.

### 3. Mr. Maestas's Waiver of the Right to Present Mitigating Evidence Did Not Violate Article I, Section 9 of the Utah Constitution

¶ 257 Finally, we conclude that Mr. Maestas's waiver of the right to present mitigating evidence did not violate the "unnecessary rigor" clause of article I, section 9 of the Utah Constitution. That clause states that "[p]ersons arrested or imprisoned shall not be treated with unnecessary rigor." [340] And

---

338. We note that, in affirming the defendant's death sentence in *Blystone*, the U.S. Supreme Court pointed out that although the defendant had "decided not to present any proof of mitigating evidence during his sentencing proceedings[,] . . . the jury was specifically instructed that it should consider any mitigating circumstances which [the defendant] had proved by a preponderance of the evidence, and . . . any mitigating evidence presented at trial, including that presented by either side during the guilt phase of the

proceedings." 494 U.S. at 306 n. 4, 110 S.Ct. 1078. The Court concluded that this was "sufficient to satisfy the dictates of the Eighth Amendment." *Id.* at 308, 110 S.Ct. 1078.

339. *See, e.g., Brown,* 479 U.S. at 541, 107 S.Ct. 837; *Skipper,* 476 U.S. at 8, 106 S.Ct. 1669.

340. Utah Const. art. I, § 9.

we have previously held that the unnecessary rigor clause "is focused on the circumstances and nature of the process and conditions of confinement."[341]

¶ 258 Despite the fact that article I, section 9 is focused on a defendant's confinement, Mr. Maestas argues that the provision applies to the penalty phase of a capital trial. Specifically, he contends that "[c]arrying out a death sentence is part of the nature of the process and conditions of confinement." He argues that "article I, section 9 requires at the very least that death sentences be imposed in a reliable manner, that sentences be individualized, and that the jury consider all relevant mitigating evidence."

¶ 259 Given our explicit language that article I, section 9 is focused on the "process and conditions of *confinement*,"[342] we are not persuaded that this clause governs the sentencing of a capital defendant. Nonetheless, we note that we have concluded elsewhere in this opinion that Mr. Maestas's death sentence was imposed in a reliable manner, that it was an individualized determination, and that the jury was appropriately instructed to consider all relevant mitigating evidence. Accordingly, we reject Mr. Maestas's claim that his death sentence violated article I, section 9 of the Utah Constitution.

¶ 260 In sum, Mr. Maestas's decision to waive the presentation of mitigating evidence did not violate the Sixth Amendment, the Eighth Amendment, or article I, section 9 of the Utah Constitution. Accordingly, we conclude that the trial court did not err in granting Mr. Maestas's request to waive the presentation of mitigating evidence and we decline to grant him a new penalty phase on this basis.

## B. The Trial Court Did Not Err in Denying Mr. Maestas's Motion to Allow the Jury to View the Manner of Execution or Incarceration

¶ 261 During the penalty phase of the trial, Mr. Maestas filed motions to allow the jury to view both the manner in which he would be executed, should he receive a sentence of death, and the manner in which he would be imprisoned, should he receive a sentence of life without parole. In the alternative, his motions requested that he be allowed to introduce evidence regarding the manner of execution and imprisonment. The trial court denied these motions, reasoning that such information was not proper mitigating evidence. On appeal, Mr. Maestas argues that the trial court's decision violated his rights under the Eighth Amendment of the U.S. Constitution because that constitutional provision allows him to present *any* evidence that might cause the jury to decline to impose a sentence of death. We are not persuaded by Mr. Maestas's argument.

¶ 262 We recognize that the Eighth Amendment "establishes two separate prerequisites to a valid death sentence."[343] First, it requires that death penalty statutes "be structured so as to prevent the penalty from being administered in an arbitrary and unpredictable fashion."[344] Second, it requires that capital defendants be allowed to introduce evidence regarding their character, history, and any of the circumstances of the offense.[345] Evidence concerning the defendant's background, character, and circumstances of the crime is considered "relevant mitigating evidence" under the Eighth Amendment because such evidence allows the sentencing body to make "an *individualized* determination" that the death sentence should be imposed in the specific circumstance.[346] The Eighth Amendment provides

---

341. *Dexter v. Bosko*, 2008 UT 29, ¶ 17, 184 P.3d 592; *see also id.* ¶ 19, (holding that "[a] prisoner suffers from unnecessary rigor when subject to unreasonably harsh, strict, or severe treatment").

342. *Id.* ¶ 17 (emphasis added).

343. *Brown*, 479 U.S. at 541, 107 S.Ct. 837.

344. *Id.*

345. *Id.*

346. *Tuilaepa v. California*, 512 U.S. 967, 972, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994) (internal quotation marks omitted); *see also id.* (explaining that the Eighth Amendment is satisfied "when the jury can consider relevant mitigating evidence of the *character and record of the defendant* and the *circumstances of the crime*" (emphases added)).

that this "mitigating evidence" may be used to ensure that the "punishment ... [is] directly related to the personal culpability of the defendant."[347]

¶ 263 Although the Eighth Amendment allows for the presentation of evidence related to the defendant's character, the defendant's history, or the circumstances of the crime, it does not *require* a court to allow any other evidence that might cause the jury to decline to impose a sentence of death.[348] Indeed, evidence that is unrelated to these three matters does not aid the sentencing body in making an individualized determination about the defendant's personal culpability. For this reason, the U.S. Supreme Court has held that "a court [may] exclude, as irrelevant, evidence *not* bearing on the defendant's *character, prior record,* or the *circumstances of his offense.*"[349]

¶ 264 In this case, because information regarding the execution process and conditions of imprisonment does not relate to Mr. Maestas's personal culpability, we reject his claim that such information is constitutionally required. Indeed, information regarding the manner of execution and imprisonment was not related to Mr. Maestas's character, his background, or the circumstances of his offense. Further, other jurisdictions agree that "evidence regarding the conditions of prison life in a maximum security prison is not proper mitigating evidence"[350] under the Eighth Amendment because "none of this

evidence concerns the history or experience of the defendant."[351] Because information regarding the manner of execution and imprisonment is not constitutionally relevant mitigating evidence, the jury's inability to consider such information did not result in a violation of the Eighth Amendment.[352] Accordingly, the trial court did not err in denying Mr. Maestas's motion.

## C. The Trial Court Did Not Commit Any Prejudicial Error in Admitting Certain Evidence of Aggravating Circumstances

¶ 265 In a penalty phase proceeding, the jury is presented with evidence to determine whether the totality of the aggravating circumstances outweighs the totality of the mitigating circumstances beyond a reasonable doubt.[353] In weighing the aggravating and mitigating circumstances, the jury does not engage in "a mere comparison of the number of aggravating [circumstances] to the number of mitigating [circumstances]."[354] Rather, Utah's standards require that the sentencing body compare the totality of the aggravating circumstances against the totality of the mitigating circumstances "in terms of their respective substantiality and persuasiveness."[355]

¶ 266 Concerning the aggravating circumstances, the jury may hear evidence on the statutory aggravating factors that raise the crime from criminal homicide to the charge of aggravated murder.[356] But the jury is not

---

347. *Penry v. Lynaugh*, 492 U.S. 302, 327–28, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), *abrogated on other grounds by Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002); *see also Saffle v. Parks*, 494 U.S. 484, 492–93, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990) (noting that the Eighth Amendment requires "a moral inquiry into the culpability of the defendant, and not an emotional response to the mitigating evidence" (internal quotation marks omitted)).

348. *See, e.g., Lockett v. Ohio*, 438 U.S. 586, 604 n. 12, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); *see also State v. Kell*, 2002 UT 106, ¶ 51, 61 P.3d 1019 (noting that the federal constitution does not require that the jury be presented with evidence "to make a purely emotional decision instead of a reasoned response") (internal quotation marks omitted).

349. *Lockett*, 438 U.S. at 604 n. 12, 98 S.Ct. 2954 (emphases added).

350. *Burns v. Commonwealth*, 261 Va. 307, 541 S.E.2d 872, 893 (2001).

351. *Cherrix v. Commonwealth*, 257 Va. 292, 513 S.E.2d 642, 653 (1999).

352. *Lockett*, 438 U.S. at 604 n. 12, 98 S.Ct. 2954.

353. Utah Code § 76–3–207(5)(b).

354. *Arguelles*, 2003 UT 1, ¶ 119, 63 P.3d 731.

355. *Id.* (internal quotation marks omitted).

356. Utah Code § 76–3–207(3). These statutory aggravating factors include that "the homicide was committed in an especially heinous, atrocious, cruel, or exceptionally depraved manner," *id.* § 76–5–202(1)(r), or in the course of an attempt to commit forcible sexual abuse, aggravated robbery, or aggravated burglary, *id.* § 76–5–202(1)(d).

limited to these statutory aggravating factors.[357] Instead, the jury may also consider "the nature and circumstances of the crime"; "the defendant's character, background, history, and mental and physical condition"; "the impact of the crime on the victim's family and community"; and "any other facts in aggravation ... that the court considers relevant to the sentence."[358]

¶ 267 With this understanding, we turn to Mr. Maestas's arguments on appeal. Mr. Maestas claims that the trial court erred in allowing the jury to consider (1) as statutory aggravating factors that the murder was committed in an especially heinous or cruel manner and in the course of an attempt to commit forcible sexual abuse, (2) evidence that two of his prior convictions involved crimes greater than those to which he pled guilty, (3) victim impact evidence regarding his prior crimes and the aggravated murder of Ms. Bott, and (4) other evidence of aggravating circumstances. We reject each of Mr. Maestas's claims and we affirm his sentence.

1. Mr. Maestas Was Not Prejudiced When the Jury Concluded that His Crime Satisfied Two Statutory Aggravating Factors

¶ 268 As discussed above, in the penalty phase of a capital trial, a jury may consider the statutory aggravating factors that elevate the crime to aggravated murder.[359] But statutory aggravating factors play a different role in the penalty phase than in the guilt phase of a trial. In the guilt phase, the jury acts as a finder of fact and, to convict the defendant of aggravated murder, the jury must find that the State has proven one statutory aggravating factor beyond a reasonable doubt.[360] In contrast, in the penalty phase, the jury determines the appropriate sentence for the defendant. In this role, the jury must consider all evidence relevant to the sentence, including statutory aggravating factors proven during the guilt phase, to determine beyond a reasonable doubt whether the totality of the aggravating circumstances outweighs the totality of the mitigating circumstances and whether death is the appropriate penalty.[361]

¶ 269 In the guilt phase of this case, the jury was presented with evidence supporting four statutory aggravating factors: the homicide was committed (1) in the course of an aggravated robbery;[362] (2) in the course of an aggravated burglary;[363] (3) "in an especially heinous, atrocious, cruel, or exceptionally depraved manner";[364] and (4) in the course of an attempt to commit forcible sexual abuse.[365] After the State presented its case, Mr. Maestas moved for a directed verdict, arguing that there was insufficient evidence to support the statutory aggravating factors of heinousness and attempt to commit forcible sexual abuse. The trial court denied Mr. Maestas's motion, and the jury subsequently found that all four statutory aggravating factors were present.

¶ 270 In the penalty phase, the State, during its presentation of aggravating circumstances, included the four statutory aggravating factors that the jury had found during the guilt phase. In addition, the trial court instructed the jury that it could consider all four statutory aggravating factors, among other circumstances, when it considered whether the totality of the aggravating circumstances outweighed the totality of the mitigating circumstances. After weighing the aggravating and mitigating circumstances, the jury decided that the totality of the aggravating circumstances outweighed the totality of the mitigating circumstances

357. *See State v. Menzies (Menzies II),* 889 P.2d 393, 405 (Utah 1994) ("[T]he various facts of the crime that ... do not rise to the level of ... statutory [aggravating factors] could still have been considered.").

358. Utah Code § 76–3–207(2)(a).

359. *Id.* § 76–3–207(3).

360. *See id.* § 76–5–202(1) (noting that a conviction for aggravated murder requires the State to prove that the defendant caused the death under one of several statutory aggravating factors).

361. *See id.* § 76–3–207(5)(b).

362. *See id.* § 76–5–202(1)(d).

363. *See id.*

364. *See id.* § 76–5–202(1)(r).

365. *See id.* § 76–5–202(1)(d).

beyond a reasonable doubt. In addition, the jury concluded that the imposition of the death penalty was appropriate and justified under the circumstances and unanimously returned a sentence of death.

¶ 271 On appeal, Mr. Maestas alleges that he is entitled to a new penalty phase because there was insufficient evidence for the jury to find the statutory aggravating factors of heinousness and attempt to commit forcible sexual abuse.[366] And he contends that, because there was insufficient evidence to support these statutory aggravating factors in the guilt phase, the jury improperly considered them when weighing the aggravating and mitigating circumstances in the penalty phase.

¶ 272 As an initial matter, we note that "we will not automatically set aside a death sentence if one [statutory] aggravating factor is [later found to be] invalid."[367] Instead, "an invalid factor will simply be removed from the calculus," and we will uphold the death sentence if the aggravating circumstances still outweigh the mitigating circumstances beyond a reasonable doubt.[368] Thus, to prevail on his claim, Mr. Maestas must show that it was an error for the jury to consider these two statutory aggravating factors, and that, but for this error, he would have received a more favorable sentence.[369]

¶ 273 In this case, there is considerable evidence supporting the conclusion that the jury did not err in finding that the murder was especially heinous or cruel[370] and committed in the course of an attempt to commit forcible sexual abuse.[371] But we

---

**366.** Mr. Maestas does not argue that the outcome of the guilt phase was affected by any insufficiency in the evidence regarding these two statutory aggravating factors. Indeed, Mr. Maestas acknowledges, and does not challenge, that the jury found that the homicide was committed in the course of an aggravated robbery and in the course of an aggravated burglary, both of which constitute statutory aggravating factors sufficient to support his conviction for aggravated murder.

**367.** *Arguelles*, 2003 UT 1, ¶ 104, 63 P.3d 731.

**368.** *Id.*

**369.** *See State v. Archuleta*, 850 P.2d 1232, 1248 (Utah 1993) (explaining that if a statutory aggravating factor has been improperly considered, "we will determine if . . . we can still confidently conclude beyond a reasonable doubt that the remaining aggravating circumstances . . . outweigh the mitigating [circumstances] and that the imposition of the death penalty was justified and appropriate.").

**370.** To meet the statutory aggravating factor that the murder was committed in an especially heinous or cruel manner, "the State must prove not only serious physical abuse or serious bodily injury before death, but also that any such abuse or injury evidence a mental state materially more depraved or culpable than that of most other murders and the physical abuse or injury must be qualitatively and quantitatively different and more culpable than that necessary to accomplish the murder." *Kell*, 2002 UT 106, ¶ 56, 61 P.3d 1019 (alterations omitted) (internal quotation marks omitted). In this case, the jury heard testimony that Ms. Bott was a seventy-two-year-old woman who suffered a severe beating, chok-

ing, and a stab wound to her face. The evidence of Ms. Bott's profound internal injuries, external injuries, and her age supports the conclusion that the jury did not err in finding that the murder was especially heinous or cruel.

**371.** To meet the statutory aggravating factor that the murder was committed in the course of an attempt to commit forcible sexual abuse, the State must prove that the defendant attempted to "touch[] the anus, buttocks, or any part of the genitals of another . . . or otherwise take[] indecent liberties with another . . . with intent to cause substantial emotional or bodily pain to any person or with the intent to arouse or gratify the sexual desire of any person, without the consent of the other." UTAH CODE § 76-5-404(1). Although the Utah Code does not define what conduct qualifies as "tak[ing] indecent liberties with another," we have applied the doctrine of ejusdem generis and interpreted this phrase to mean activities of the "same magnitude of gravity as that specifically described in the statute." *State ex rel. J.L.S.*, 610 P.2d 1294, 1296 (Utah 1980). And, in considering whether conduct constitutes an indecent liberty, the Utah Court of Appeals has stated that, the fact finder "must consider the totality of the facts," including "the nature of the victim's participation," "the duration of the defendant's acts," "the defendant's willingness to terminate his conduct at the victim's request," "the relationship between the victim and the defendant," and "the age of the victim." *State v. Balfour*, 2008 UT App 410, ¶ 15, 198 P.3d 471 (internal quotation marks omitted).

In this case, the jury heard testimony that Ms. Bott's underwear had been torn off her body, and that she had an abrasion on her hip. And the medical examiner testified that the abrasion could have been caused by the act of tearing her

need not decide if the jury's finding was erroneous because, regardless of whether there was sufficient evidence for the jury to find the two contested statutory aggravating factors, we conclude that any potential error in considering these factors was harmless for two reasons.

¶ 274 First, under Utah's death penalty scheme, the jury is not limited to considering only the statutory aggravating factors that it found during the guilt phase.[372] Instead, the jury may consider a wide range of evidence, including "the nature and circumstances of the crime"[373] as well as "[a]ny evidence the court considers to have probative force."[374] Thus, regardless of whether Mr. Maestas's actions were especially heinous or cruel, or whether they constituted forcible sexual abuse, the jury was entitled to consider the evidence used to prove the aggravating factors. Because the jury may examine the nature and circumstances of the crime, it was appropriate for the jury to consider the evidence that Ms. Bott was stabbed, strangled, and beaten to death, as well as the details about her extensive internal and external injuries. It was likewise appropriate for the jury to consider the evidence that Ms. Bott's underwear had been torn off her body in the midst of the struggle. Thus, even if this evidence was not sufficient to prove the statutory aggravating factors of heinousness or forcible sexual abuse in the guilt phase, it was appropriate for the jury to consider these facts when determining whether the totality of the aggravating circumstances outweighed the totality of the mitigating circumstances.

¶ 275 Second, even if the two statutory aggravating factors were removed from the jury's calculus, the overall aggravating circumstances would still outweigh the mitigating circumstances beyond a reasonable

doubt. Indeed, Mr. Maestas recognizes that the jury found two other statutory aggravating factors that it could properly consider in determining the appropriate penalty.[375] In addition, the jury was presented with evidence of Mr. Maestas's prior crimes, and evidence of his character.[376] Further, during the second day of his presentation of mitigating evidence, Mr. Maestas specifically requested that the presentation be stopped, and he waived the right to introduce any further mitigating evidence.[377] Thus, the jury was presented with little evidence of mitigating circumstances to weigh against the evidence of aggravating circumstances. Because of the substantial amount of aggravating evidence, in contrast to the sparsity of any mitigating circumstances, the jury had sufficient evidence to conclude that the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt.

¶ 276 For these reasons, we conclude that any alleged error in the jury's consideration of the two statutory aggravating factors was harmless, and that the imposition of the death penalty was therefore justified and appropriate.[378] Accordingly, we are unpersuaded by Mr. Maestas's argument that he is entitled to a new penalty phase on this basis.

2. The Trial Court Did Not Commit Prejudicial Error in Allowing the State to Present Evidence that Mr. Maestas Committed Greater Crimes than Those to Which He Pled Guilty

¶ 277 Mr. Maestas raises several claims of error concerning the introduction of evidence that he committed greater crimes than those to which he pled guilty. Before addressing his specific claims, however, we provide a brief overview of the law concerning the

underwear off her body. This evidence supports the conclusion that the jury did not err in finding that the murder was committed in the course of an attempt to commit forcible sexual abuse.

372. *See Menzies II*, 889 P.2d at 405 ("[T]he various facts of the crime that ... do not rise to the level of ... statutory [aggravating factors] could still have been considered.").

373. Utah Code § 76–3–207(2)(a)(I).

374. *Id.* § 76–3–207(2)(b).

375. Again, these aggravating factors are that the homicide was committed in the course of an aggravated robbery and in the course of an aggravated burglary. *See id.* § 76–5–202(1)(d).

376. *See infra* Parts IV.C.2 & 4.

377. *See supra* Part IV.A.

378. *See Arguelles*, 2003 UT 1, ¶ 104, 63 P.3d 731.

presentation of such evidence and a review of the evidence that was presented to the jury in this case.

¶ 278 As discussed above, Utah's death penalty scheme provides that, during the penalty phase of a capital trial, the jury may consider, among other things, evidence relating to "the defendant's character, background, [and] history." [379] And in *Lafferty I*, we held that our death penalty scheme permits the admission of evidence that the defendant committed other crimes for which he was not convicted.[380] We recognized that evidence of a defendant's past criminal behavior is "essential to a balanced and thorough analysis of the appropriateness of the death penalty." [381] But to ensure that a defendant is not unfairly prejudiced by the introduction of his past criminal behavior, we held that when the State introduces such evidence, the jury must be instructed on the elements of the crime that the State is seeking to prove.[382] In addition, the State bears the burden of proving to the jury that the defendant actually committed the crime.[383] When these requirements are satisfied, the jury may consider crimes for which the defendant had not been convicted as aggravating circumstances.[384]

¶ 279 In this case, the State sought to prove beyond a reasonable doubt that Mr. Maestas had committed two other aggravated burglaries in the past. Specifically, the State proffered evidence that Mr. Maestas had committed the aggravated burglary of Alinda McClean's home in the 1970s and the aggravated burglary of Leone Nelson's home in the 1980s.

¶ 280 Regarding the aggravated burglary of Ms. McClean's home, the State introduced testimony of the police officer who investigated the crime. The officer testified that, in 1976, an intruder broke into the home of seventy-nine-year-old Ms. McClean, stole her television and other personal property, and severely beat her. As a result of the assault, Ms. McClean had severe bruising on her face, chest, head, feet, and legs. In addition, Ms. McClean's right eye had to be removed. The officer also testified that Ms. McClean had blood and skin under her fingernails, leading the police to conclude that she had fought her attacker. At the time of the incident, Ms. McClean gave police a description of the assailant and the description matched Mr. Maestas. The officer also stated that, one day after the attack, Mr. Maestas was in possession of the television and other personal property that had been stolen from Ms. McClean's home. Further, the officer testified that Mr. Maestas had scratches on his body and that he gave police a false alibi for the night of the incident.

¶ 281 The State also introduced the testimony of Ms. McClean's granddaughter, who described her grandmother's injuries.[385] In addition, the State produced a certified copy of a conviction showing that, as a result of the incident, Mr. Maestas had pled guilty to the third degree felony of theft by receiving. Because Mr. Maestas was on parole at the time of the attack, the State also introduced parole revocation documents summarizing the events of the aggravated burglary and the police investigation into whether Mr. Maestas's parole should be revoked as a result of the incident. The documents stated that "there [was] sufficient probable cause to believe that [Mr. Maestas] was in violation of his parole."

¶ 282 Regarding the aggravated burglary of Ms. Nelson's home, the State introduced the testimony of Ms. Nelson. Ms. Nelson stated that, in 1989, a man attacked her in her home and tried to rob her. In describing the attack, Ms. Nelson testified that she was hit repeatedly on her face and back, choked until she almost passed out, stomped on, and had her clothes ripped off her body. Ms.

379. Utah Code § 76–3–207(2)(a)(ii).

380. 749 P.2d at 1259.

381. *Id.*

382. *Id.* at 1260.

383. *Id.*

384. *Id.*

385. The State presented Ms. McClean's granddaughter's testimony because Ms. McClean had passed away by the time of Mr. Maestas's penalty phase hearing.

Nelson testified about attempting to identify her attacker. When the police presented her with a potential suspect, who she later found out was Mr. Maestas's brother, she stated that the suspect looked like her attacker, but that she was "really not positive." She did tell police that the suspect's voice sounded like the voice of the man who attacked her. In this penalty phase proceeding, Ms. Nelson identified Mr. Maestas as the man who attacked her in 1989. After Ms. Nelson testified, the State introduced a certified copy of a conviction showing that, as a result of this incident, Mr. Maestas had pled guilty to the class A misdemeanor of theft.

¶ 283 At the conclusion of the penalty phase, the jury was instructed regarding the elements of aggravated burglary. The jury was also informed that, if it found beyond a reasonable doubt that Mr. Maestas had committed the aggravated burglary of Ms. McClean's home or of Ms. Nelson's home, it could consider this evidence as an aggravating circumstance. In addition, the jury was instructed that, even if it found that Mr. Maestas had committed the aggravated burglaries, it could also consider his convictions for theft and theft by receiving, which resulted from these same incidents, as additional aggravating circumstances. After its deliberation, the jury concluded beyond a reasonable doubt that Mr. Maestas had committed both aggravated burglaries.

¶ 284 On appeal, Mr. Maestas asserts that he is entitled to a new penalty phase proceeding for three reasons: (a) the trial court erred in allowing the State to introduce evidence that his prior convictions involved greater crimes than those to which he pled guilty, (b) the trial court committed plain error in admitting the parole revocation documents into evidence, and (c) the jury's finding was erroneous because there was insufficient evidence to conclude beyond a rea-

sonable doubt that he had committed the two prior crimes. We disagree.

a. The Trial Court Did Not Err in Allowing the State to Introduce Evidence that Mr. Maestas Had Committed Two Other Aggravated Burglaries in the Past

¶ 285 Although Mr. Maestas recognizes that our holding in *Lafferty I* allows the State to present evidence of criminal conduct that did not result in a conviction, he argues that the trial court erred in allowing evidence of these aggravated burglaries for four reasons. First, he claims that it was unduly prejudicial for the jury to be "tainted by the inflammatory nature" of the two other aggravated robberies because the crimes would "remind the jurors of the underlying capital homicide." Second, he contends that our holding in *Lafferty I* is inapplicable here. He argues that *Lafferty I* permits only evidence of conduct for which the defendant was *not* convicted, and, by pleading guilty to the lesser offenses of theft and theft by receiving, he *was* convicted for the incidents involving Ms. McClean and Ms. Nelson. Third, he asserts that the trial court violated his constitutional protection against double jeopardy by allowing the jury to consider his convictions for the lesser offenses as well as the greater crimes that the State sought to prove during the penalty phase of the trial. Finally, he contends that he was prejudiced by the trial court's decision to allow the State to present evidence of his convictions *and* evidence of the aggravated burglaries because that decision led the jury to impermissibly count the same aggravating circumstance twice. We reject each of these claims.

¶ 286 First, we conclude that Mr. Maestas has not satisfied his burden of showing that the evidence was unduly prejudicial.[386] He has pointed to nothing suggesting that the jury was confused or inflamed by the evidence.[387] He simply ar-

386. *See State v. Dodge*, 564 P.2d 312, 313 (Utah 1977) (noting that where a defendant challenges the introduction of evidence, he bears the burden to demonstrate that the evidence was prejudicial).

387. To be inflammatory, evidence must stir the passions of the jury, such that their anger or

indignation overcomes their ability to make a reasoned decision. *See Boyle v. Christensen*, 2011 UT 20, ¶ 18, 251 P.3d 810 ("[C]omments meant to inflame passion or prejudice in the jury would be improper because they divert the jury from its duty to base its verdict on the evidence presented.").

gues that the jury concluded he had committed the offenses based on insufficient evidence and that this means the jurors *must have* been confused or inflamed.[388] But Mr. Maestas's speculation that prejudice occurred is insufficient to satisfy his burden. In addition, we can find nothing in the record to support the assertion that the evidence confused or inflamed the jury. To the contrary, we conclude that the evidence of the other aggravated burglaries was probative of Mr. Maestas's violent propensities and of his character. Because the evidence was probative and not unduly prejudicial, there is nothing to suggest that its introduction resulted in an unreliable sentence. Accordingly, we decline to grant Mr. Maestas a new penalty phase on this basis.

¶ 287 Second, although our holding in *Lafferty I* refers to the State presenting "evidence of violent crimes which have not yet resulted in convictions," [389] the rationale for the holding also applies to evidence of conduct beyond crimes for which the defendant was convicted. In *Lafferty I*, we concluded that evidence about a defendant's prior nonconvicted crimes was "essential to an evenhanded consideration of death penalty issues" because it provided the sentencing body with "important information about the accused's violent propensities and future dangerousness." [390] The only limitations on this evidence were that the jury be instructed on the elements of the crime and that the State prove all elements beyond a reasonable doubt.[391] We therefore allowed evidence of a defendant's past criminal behavior so that the jury would have an accurate picture of the defendant's background, history, and character.[392]

¶ 288 This same rationale applies to all evidence of a defendant's prior criminal acts. Indeed, evidence of a defendant's past criminal conduct, even conduct exceeding that to which he pled guilty, provides the jury with important information about the defendant's violent propensities. And it presents the jury with an accurate picture of the defendant's background, history, and character. Because it is consistent with our rationale in *Lafferty I*, we hold that evidence of crimes beyond those for which the defendant has been convicted may be admitted, so long as the jury is instructed on the elements of the crime and finds that each element has been proven beyond a reasonable doubt.

¶ 289 Consistent with the rule announced in *Lafferty I*, the jury in this case was instructed on the elements of aggravated burglary and told that it could consider the evidence as an aggravating circumstance only if it found beyond a reasonable doubt that Mr. Maestas had committed the crime against Ms. McClean or Ms. Nelson. Because the evidence was relevant to Mr. Maestas's history, character, and background, and because the jury was properly informed and instructed in accordance with our rule in *Lafferty I*, the trial court did not err in allowing the State to present evidence that Mr. Maestas committed the two aggravated burglaries, even though he had pled guilty to lesser offenses. Accordingly, we decline to grant Mr. Maestas a new penalty phase on this basis.

¶ 290 Third, we reject Mr. Maestas's assertion that this evidence violated the constitutional protection against double jeopardy. It is well settled that the Double Jeopardy Clause of the U.S. Constitution protects a defendant from a second prosecution for the same offense after conviction and against multiple punishments for the same offense.[393] But the protections against double jeopardy do not prohibit a sentencing body from considering a defendant's past

---

388. As discussed in Part IV.C.2.c., however, we conclude that there was sufficient evidence for the jury to make these determinations.

389. 749 P.2d at 1259.

390. *Id.*

391. *Id.* at 1260 ("[W]e hold that the sentencing body ... may not rely on other violent criminal activity as an aggravating [circumstance] supporting a death penalty unless it is first convinced beyond a reasonable doubt that the accused did commit the other crime.").

392. *See id.* at 1259–60.

393. *Bernat v. Allphin*, 2005 UT 1, ¶ 11, 106 P.3d 707.

criminal conduct when determining the appropriate sentence for a subsequent crime.[394] When a sentencing body enhances a defendant's sentence based on his past criminal behavior, "the enhanced punishment imposed for the later offense is not to be viewed as either a new jeopardy or [an] additional penalty for the earlier crimes."[395] Instead, the enhanced sentence is considered "a stiffened penalty for the latest crime."[396] For this reason, the U.S. Supreme Court has consistently rejected the claim that the Double Jeopardy Clause prohibits a sentencing body from considering a defendant's past criminal behavior.[397] We have also noted that a sentencing body may consider evidence beyond a defendant's conviction when determining an appropriate sentence.[398]

¶ 291 In this case, the protections against double jeopardy were not violated when the State presented the evidence regarding Mr. Maestas's convictions and the aggravated burglaries of Ms. McClean's home and Ms. Nelson's home. This evidence was presented so the jury could consider it when determining the appropriate sentence for the capital homicide. Because the jury was determining the appropriate penalty for a subsequent crime, the introduction of evidence concerning Mr. Maestas's past criminal behavior did not constitute a second prosecution for that past behavior and did not result in multiple punishments for the same offense. Thus, the protections against double jeopardy were not

violated, and we decline to grant Mr. Maestas a new penalty phase on this basis.

¶ 292 Finally, we reject the argument that the jury impermissibly double counted the same aggravating circumstance. As an initial matter, we note that Mr. Maestas has not pointed to any evidence that the jury double counted the same aggravating circumstance when determining whether the totality of the aggravating circumstances outweighed the totality of the mitigating circumstances. Indeed, it was the underlying *conduct* that created the aggravating circumstances, and there was no indication that the jury mistakenly believed that the convictions and the aggravated burglaries arose from different underlying conduct. In other words, there is no indication that the jury thought that the convictions and aggravated burglaries arose out of four separate incidents instead of the two occasions that created the aggravating circumstances. Further, Mr. Maestas has not shown that it would have been erroneous for the jury to have considered, as separate aggravating circumstances, the aggravated burglaries and his convictions for the lesser offenses arising from those incidents.

¶ 293 But even were we to find that the jury did double count the aggravated burglaries and the convictions, and that this double counting was erroneous, any such error would have been harmless. Indeed, even if we remove the evidence of the aggravated

---

394. *See Witte v. United States,* 515 U.S. 389, 398, 115 S.Ct. 2199, 132 L.Ed.2d 351 (1995).

395. *Id.* at 400, 115 S.Ct. 2199 (internal quotation marks omitted).

396. *Id.* (internal quotation marks omitted).

397. *See, e.g., id.* at 398, 115 S.Ct. 2199 ("[W]e specifically have rejected the claim that double jeopardy principles bar a later prosecution or punishment for criminal activity where that activity has been considered at sentencing for a separate crime."); *Poland v. Arizona,* 476 U.S. 147, 156, 106 S.Ct. 1749, 90 L.Ed.2d 123 (1986) ("Aggravating circumstances are not [considered] separate penalties or offenses [during the penalty phase of a capital trial], but are standards to guide the making of [the] choice between the alternative verdicts of death and life imprisonment." (third alteration in original) (internal quotation marks omitted)); *Gryger v.*

*Burke,* 334 U.S. 728, 732, 68 S.Ct. 1256, 92 L.Ed. 1683 (1948) (upholding a recidivism · statute against a double jeopardy challenge because the enhanced punishment imposed for the later offense "is not to be viewed as either a new jeopardy or an additional penalty for the earlier crimes," but instead as "a stiffened penalty for the latest crime").

398. *See, e.g., State v. Howell,* 707 P.2d 115, 118–19 (Utah 1985) (concluding that it was appropriate for a sentencing judge to consider evidence that the defendants sexually abused their children, even though the defendants were convicted only on charges of physical child abuse); *see also Witte,* 515 U.S. at 397, 115 S.Ct. 2199 ("Traditionally, sentencing courts have not only taken into consideration a defendant's prior convictions, but have also considered a defendant's past criminal behavior, even if no conviction resulted from that behavior." (alteration omitted) (internal quotation marks omitted)).

burglaries from the jury's calculus, the totality of the aggravating circumstances would still outweigh the totality of the mitigating circumstances beyond a reasonable doubt.[399] Accordingly, we decline to grant Mr. Maestas a new penalty phase on this basis.

¶ 294 For the foregoing reasons, we conclude that the trial court did not commit prejudicial error in allowing the State to introduce evidence that Mr. Maestas's prior convictions involved greater crimes than those to which he pled guilty.

b. The Trial Court Did Not Commit Plain Error in Admitting the Parole Revocation Documents Into Evidence

¶ 295 Mr. Maestas next argues that the trial court erred in admitting the parole revocation documents concerning the aggravated burglary of Ms. McClean. Specifically, he contends that the parole revocation documents "contained inflammatory, unduly prejudicial, unreliable, and irrelevant information" that violated the rules of evidence and the constitution. Because Mr. Maestas did not raise this argument in the trial court, we review his claim for plain error, meaning that the error must be both obvious and harmful.[400]

¶ 296 As an initial matter, we note that different rules governing the admissibility of evidence apply to the penalty phase of a trial. "[E]vidence may be admissible during the penalty phase, even if excluded by the rules of evidence during the guilt phase." [401] Indeed, section 76–3–207(2) of the Utah Code

explicitly provides that, "[i]n capital sentencing proceedings, .... *[a]ny evidence* the court considers to have probative force may be received regardless of its admissibility under the exclusionary rules of evidence." [402] The traditional rules of evidence are not applicable in a penalty phase proceeding because the sentencing body does not determine guilt or innocence, but instead makes an individualized determination of the appropriate sentence.[403] "And modern concepts individualizing punishment have made it all the more necessary that a sentencing [body] not be denied an opportunity to obtain pertinent information by a requirement of rigid adherence to restrictive rules of evidence properly applicable to the [guilt phase of a] trial." [404]

¶ 297 Concerning constitutional principles, we note that, under the principles of due process, the evidence presented in the penalty phase must be relevant and reliable.[405] In addition, although we have never analyzed whether a defendant in a penalty phase should be afforded the right to confront witnesses, we note that other courts that have addressed this issue have reached conflicting results.[406]

¶ 298 In this case, because a court may admit "[a]ny evidence" in the penalty phase that it "considers to have probative force," [407] there is a strong argument that the trial court did not err in admitting the parole revocation documents. But we need not resolve whether the evidence in this case was erroneously admitted because any potential error was harmless for two reasons.[408]

---

399. *See infra* ¶ 334.

400. *Menzies I*, 845 P.2d at 224–25.

401. *Lafferty II*, 2001 UT 19, ¶ 105, 20 P.3d 342.

402. Utah Code § 76–3–207(2)(a)–(b) (emphasis added).

403. *See Williams v. New York*, 337 U.S. 241, 247, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949).

404. *Id.*

405. *See State v. Johnson*, 856 P.2d 1064, 1071 (Utah 1993), *superseded on other grounds by* Utah Code § 76–5–406.5(1)(k), *as recognized in State v. Hammond*, 2001 UT 92, ¶ 20, 34 P.3d 773. In *Johnson*, we noted that the Due Process Clause

"in both the United States and Utah Constitutions requires that a sentencing [body] act on reasonably reliable and relevant information in exercising discretion in fixing a sentence." *Id.* (internal quotation marks omitted).

406. *See People v. Banks*, 237 Ill.2d 154, 343 Ill. Dec. 111, 934 N.E.2d 435, 461–62 (2010) (providing a list of cases holding that the Confrontation Clause of the U.S. Constitution *does not* apply to the penalty phase of a capital case and a list of cases holding that the Confrontation Clause *does* apply to such a case).

407. Utah Code § 76–3–207(2)(b).

408. *Kell*, 2002 UT 106, ¶ 52, 61 P.3d 1019 ("If [any] potential error is not prejudicial, we need not reach the constitutional questions.").

¶ 299 First, the parole revocation documents contained information that was largely duplicative of the testimony presented in the penalty phase proceeding. For example, the parole revocation documents summarized the police investigation into the aggravated burglary of Ms. McClean's home. But the State also introduced the testimony of the police officer who had investigated the incident and the officer described the investigation for the jury. Because the officer's testimony contained the same information as the parole revocation documents, we conclude that any error in admitting the documents was harmless. Second, as discussed below, even without the parole revocation documents, there was enough evidence for the jury to conclude beyond a reasonable doubt that Mr. Maestas had committed the aggravated burglary of Ms. McClean's home.[409]

¶ 300 For the foregoing reasons, we conclude that any error that the trial court may have committed in admitting the parole revocation documents was harmless. Accordingly, we decline to grant Mr. Maestas a new penalty phase on this basis.

c. There Was Sufficient Evidence for the Jury to Conclude that Mr. Maestas Committed the Two Other Aggravated Burglaries

¶ 301 Mr. Maestas's final claim is that there was insufficient evidence for the jury to conclude beyond a reasonable doubt that he had committed the aggravated burglary of Ms. McClean's home and the aggravated burglary of Ms. Nelson's home. Although he does not dispute that Ms. McClean and Ms. Nelson were attacked during the course of the burglaries, he contends that the evidence was insufficient to identify him as the perpetrator of those crimes.

¶ 302 As an initial matter, we note that, "[i]n considering an insufficiency of the evidence claim, we review the evidence and all inferences which may reasonably be drawn from it in the light most favorable to the verdict of the jury."[410] Thus, we will reverse

a jury verdict "only when the evidence, so viewed, is sufficiently inconclusive or inherently improbable that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime of which he or she was convicted."[411] With this standard in mind, we conclude that there was sufficient evidence for the jury to find beyond a reasonable doubt that Mr. Maestas committed the two aggravated burglaries.

¶ 303 Regarding the aggravated burglary of Ms. McClean's home, the jury heard the investigative police officer's testimony that Mr. Maestas matched the description of the assailant; that Ms. McClean had blood and skin under her fingernails, and Mr. Maestas had scratches on his face and arms; that Mr. Maestas gave a false alibi for the night of the incident; and that he was in possession of the television and other personal property that was stolen from Ms. McClean's home. In addition, the jury was presented with evidence that Mr. Maestas had pled guilty in this matter to the offense of theft by receiving. And regarding the aggravated burglary of Ms. Nelson's home, the jury heard Ms. Nelson testify that Mr. Maestas was the perpetrator. Further, the jury was presented with evidence that Mr. Maestas had pled guilty in this matter to the offense of theft.

¶ 304 We conclude that, when viewed in the light most favorable to the jury's verdict, the foregoing evidence was sufficient to identify Mr. Maestas as the perpetrator in both aggravated burglaries. Nothing about this evidence was inconclusive or inherently improbable such that reasonable minds must have entertained a reasonable doubt that Mr. Maestas committed the crimes. Accordingly, we reject Mr. Maestas's challenge to the jury's verdict, and we decline to grant him a new penalty phase on this basis.

¶ 305 For the foregoing reasons, we conclude that the trial court did not commit prejudicial error in allowing the State to present evidence that Mr. Maestas committed greater crimes than those to which he pled guilty.

---

409. *See infra* ¶¶ 301–02.

410. *State v. Brown,* 948 P.2d 337, 343 (Utah 1997) (internal quotation marks omitted).

411. *Id.* (alteration omitted) (internal quotation marks omitted).

### 3. We Need Not Address Mr. Maestas's Constitutional Challenges to Certain Evidence Presented During the Penalty Phase

¶ 306 Mr. Maestas also claims that certain testimony in the penalty phase of his trial constituted unconstitutional victim impact evidence. Specifically, he asserts that the court committed reversible error by admitting prejudicial victim impact evidence from two witnesses who testified about Mr. Maestas's prior crimes,[412] and one witness who testified about the impact of Ms. Bott's death. He contends that, because this evidence was prejudicial, its admission violated the Eighth Amendment and the Due Process Clause of the U.S. Constitution. Further, he contends that *any* victim impact evidence, particularly victim impact evidence regarding past crimes, violates article I, sections 7, 9, and 24 of the Utah Constitution. We conclude that the evidence to which he objects did not prejudice Mr. Maestas. Accordingly, we do not consider his constitutional challenges.[413]

¶ 307 We note that, during the penalty phase of a capital case, section 76-3-207(2)(a)(iii) of the Utah Code (Victim Impact Provision) expressly allows the introduction of evidence pertaining to "the victim and the impact of the crime on the victim's family and community without comparison to other persons or victims." Nonprejudicial evidence regarding the victim and the impact of the crime on the victim's family has been upheld under the Eighth Amendment of the U.S. Constitution.[414] And although the Utah Constitution recognizes certain rights of crime victims,[415] we have never addressed what limitations, if any, the state constitution places on the use of victim impact evidence during the penalty phase of a capital trial.[416]

¶ 308 Ultimately, however, we need not decide what limitations, if any, the state constitution places on the use of victim impact evidence. "Before treating the constitutional issue on its merits, we determine whether the victim impact evidence in this case was prejudicial. If this potential error is not prejudicial, we need not reach the constitutional questions." [417] For any constitutional violation to amount to a reversible error, a defendant must demonstrate that the error was prejudicial.[418] To conclude that an error was prejudicial, "we must find not a mere possibility, but a reasonable likelihood that

**412.** Mr. Maestas contends that certain portions of the witnesses' testimony constituted victim impact evidence because some of their statements went beyond a description of his past conduct. But because we conclude that the statements were not prejudicial, we need not decide whether they constituted victim impact evidence.

**413.** *See Kell*, 2002 UT 106, ¶ 52, 61 P.3d 1019 (explaining that "if [a] potential error is not prejudicial, we need not reach the constitutional questions"). Although we need not consider the merits of Mr. Maestas's state constitutional challenges in this case, we do not foreclose the possibility of future challenges to the admissibility of victim impact evidence under the Utah Constitution. Indeed, we have yet to resolve the question of whether victim impact evidence is admissible under our state constitution.

**414.** *Payne v. Tennessee*, 501 U.S. 808, 827, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991) ("A State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed. There is no reason to treat such evidence differently than other relevant evidence is treated."). The holding in *Payne* overruled parts of *Booth v. Maryland*, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), which held that the Eighth Amendment barred victim impact evidence. *Payne*, 501 U.S. at 829–30 & n. 2, 111 S.Ct. 2597.

**415.** *See* Utah Const. art. I, § 28.

**416.** *See, e.g., State v. Ott*, 2010 UT 1, ¶ 24 n. 3, 247 P.3d 344 (concluding that it was not necessary to address the state constitutional claims because the victim impact evidence at issue violated the federal constitution); *Arguelles*, 2003 UT 1, ¶ 123 n. 26, 63 P.3d 731 (declining to address the state constitutional claims because of inadequate briefing, but noting that "[w]e would welcome an in-depth exploration of this issue in the future"); *Kell*, 2002 UT 106, ¶¶ 52, 54, 61 P.3d 1019 (declining to address the state constitutional claims because any error was not prejudicial); *State v. Honie*, 2002 UT 4, ¶ 61 n. 7, 57 P.3d 977 (declining to address the state constitutional claims because the issue was not adequately briefed).

**417.** *Kell*, 2002 UT 106, ¶ 52, 61 P.3d 1019 (footnote omitted).

**418.** *See State v. Jeffs*, 2010 UT 49, ¶ 37, 243 P.3d 1250.

the error affected the result."[419] Evidence may be prejudicial if it is pervasive, if it contains an opinion of the defendant's character or the appropriate sentence,[420] if it exceeds a description of the "family's loss and mourning," or if it fails to be "moderate in tone."[421] Under this standard, evidence may be admissible even if victims provide detailed descriptions of their grief.[422] Further, in determining whether a defendant was prejudiced by the admission of victim impact evidence, we "consider the totality of the evidence before the jury."[423] Because we conclude that Mr. Maestas was not prejudiced by any of the evidence to which he objects, we do not consider his constitutional challenges.[424]

¶ 309 With that in mind, we now turn to the question of whether Mr. Maestas was prejudiced by (a) the alleged victim impact evidence concerning Mr. Maestas's past crimes or (b) the victim impact evidence concerning Ms. Bott's death.

a. The Alleged Victim Impact Evidence Regarding Mr. Maestas's Prior Crimes Was Not Prejudicial

 ¶ 310 We first address the alleged victim impact evidence concerning Mr. Maestas's prior crimes. While introducing evidence that Mr. Maestas committed the ag-

gravated burglary of Ms. McClean's home in the 1970s, the State presented the testimony of Ms. McClean's granddaughter.[425] The granddaughter testified about visiting Ms. McClean in the hospital after the burglary and assault. She stated that Ms. McClean "was beat up and swollen and bruised" with "one eye ... covered with a bandage." The granddaughter testified that she "couldn't believe that somebody hadn't bothered cleaning [Ms. McClean's] hands" so she asked the hospital staff for "one of those little kidney shaped pink things ... that people spit in" and used it to clean "gunk, blood and ... skin" from under Ms. McClean's fingernails.

¶ 311 Next, when the State sought to prove that Mr. Maestas committed the aggravated burglary of Ms. Nelson's home in the 1980s, Ms. Nelson testified about the incident. After describing the burglary and subsequent assault, she stated that the hospital staff treated her poorly when she sought treatment for her injuries. On cross examination, defense counsel asked Ms. Nelson whether she had given "some interviews to the press" concerning her assault, and Ms. Nelson responded that she had. But defense counsel interrupted her when she began to state her reason for the interviews. On redirect, Ms. Nelson explained that she gave the interviews after seeing the press coverage about

419. *Id.* (alteration omitted) (internal quotation marks omitted).

420. *See Payne*, 501 U.S. at 830 n. 2, 111 S.Ct. 2597 (overruling the Court's prior holding in *Booth*, 482 U.S. at 505–07, 107 S.Ct. 2529, that victim impact evidence is inadmissible under the Eighth Amendment, but leaving intact the Court's holding in *Booth* that "the admission of a victim family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence violates the Eighth Amendment").

421. *Kell*, 2002 UT 106, ¶ 54, 61 P.3d 1019; *cf. Ott*, 2010 UT 1, ¶ 41, 247 P.3d 344 (concluding that the victim impact evidence was prejudicial because "there is a reasonable probability that but for the admission of the ... evidence that addressed [the defendant's] character and the victims' opinions of the appropriate sentence, [the defendant] would have received a more favorable sentence").

422. *See Kell*, 2002 UT 106, ¶¶ 52 n. 15, 54, 61 P.3d 1019 (holding that victim impact evidence was not prejudicial despite the family's descrip-

tive account of "collaps[ing from grief] during the funeral and ha[ving] to be carried out of the church") (internal quotation marks omitted); *cf. Ott*, 2010 UT 1, ¶ 44, 247 P.3d 344 (finding the victim impact evidence prejudicial because it "was angry in tone, inflammatory in content and contained messages that [the defendant] was beyond rehabilitation .... and comprised a large portion of the total evidence presented").

423. *Ott*, 2010 UT 1, ¶ 40, 247 P.3d 344 (alteration omitted) (internal quotation marks omitted).

424. *Kell*, 2002 UT 106, ¶ 15, 61 P.3d 1019 (explaining that, unless an error is structural, "if the reviewing court finds that a constitutional error was harmless beyond a reasonable doubt, it need not reverse").

425. The State presented Ms. McClean's granddaughter's testimony because Ms. McClean had passed away by the time of Mr. Maestas's penalty phase hearing.

Ms. Bott's murder because "it really upset [her] ... that [she] wasn't able to keep [Mr. Maestas] in prison so he didn't get out and hurt anyone else."

¶ 312 In analyzing Mr. Maestas's claims, we note that the Victim Impact Provision does not expressly provide for the introduction of victim impact evidence concerning a defendant's prior crimes.[426] But in this case, we need not resolve whether such evidence is admissible under the Victim Impact Provision because any potential error was not prejudicial.[427]

¶ 313 Indeed, the comments Mr. Maestas challenges were moderate in tone and did not express an opinion about his character or the appropriate sentence. In addition, any allegedly improper statements were not pervasive. For example, Ms. McClean's granddaughter made one comment about seeing her grandmother's injuries. This comment came after a police officer had provided the jury with extensive details about Ms. McClean's injuries, including her severe bruising, swollen face, and the fact that her right eye had to be removed as a result of the attack. Similarly, Ms. Nelson's statements about her own hospital visit and being "upset" by Mr. Maestas's release constituted only two sentences in thirteen pages of her testimony describing the attack and the injuries that she sustained.

¶ 314 Given the nature of the contested evidence, and considering the other evidence that had been presented, there is not a rea-sonable probability that, but for the admission of these statements, Mr. Maestas would have received a more favorable sentence. We therefore conclude that these comments were not prejudicial.[428]

b. The Victim Impact Evidence Regarding Ms. Bott's Death Was Not Prejudicial

¶ 315 We next address Mr. Maestas's claim that the State presented prejudicial victim impact evidence about Ms. Bott's death. The State introduced victim impact testimony from Ms. Bott's granddaughter in accordance with the Victim Impact Provision. As part of this testimony, Ms. Bott's granddaughter stated that, after the homicide, she cleaned Ms. Bott's house and personally "cleaned up the blood on the floor." In addition, the granddaughter read the following excerpt from her personal blog:

What shame I felt when I finally found myself knee deep in sorting through [my grandmother's] old things and scrubbing her bloodstained floor with the tears pouring from my eyes. A scene that echoed that of my mother's not long before. Just before I heard the news of my grandmother's brutal rape and murder I had talked with her again on the phone.

I cried to her about how much I missed my mother and proclaimed my guilt in hopes of changing the past. Her last message to me was this: You just need to live your life happy-go-lucky. Just live. Just be happy.

---

426. The Victim Impact Provision provides for evidence in a capital case concerning *"the* victim and the impact of *the* crime on *the* victim's family." UTAH CODE § 76-3-207(2)(a)(iii) (emphases added). Because the provision uses a definite article, allowing for evidence concerning "the" capital offense, it does not expressly contemplate victim impact evidence for "any" of the defendant's prior crimes. Indeed, we note that other courts have determined that the introduction of victim impact evidence concerning a defendant's prior crimes violates the Eighth Amendment and the Due Process Clause. *See, e.g., People v. Dunlap*, 975 P.2d 723, 745 (Colo. 1999) (en banc) ("Evidence regarding the impact of a capital defendant's prior crimes on the victims of those crimes ... is not admissible because it is not relevant to the actual harm caused by the defendant as a result of the homicide for which he is being sentenced."); *People v. Hope*, 184 Ill.2d 39, 234 Ill.Dec. 379, 702 N.E.2d 1282, 1288 (1998) (*"Payne* clearly contemplates that victim impact evidence will come only from a survivor of the murder for which the defendant is presently on trial, not from survivors of offenses collateral to the crime for which the defendant is being tried."); *Cantu v. State*, 939 S.W.2d 627, 637 (Tex.Crim.App.1997) (en banc) (noting that *Payne* does not contemplate admission of victim impact evidence from victims of collateral crimes).

427. *See Kell*, 2002 UT 106, ¶ 52, 61 P.3d 1019.

428. Mr. Maestas also asserts that the trial court abused its discretion in denying his motion for a mistrial based on Ms. Nelson's testimony. But because we conclude that Ms. Nelson's statements were not prejudicial, we also reject his argument that the trial court should have declared a mistrial on this basis.

The next day it occurred to me that I had very little knowledge of my mother or her mother's youth.

There were no stories I could recall and few pictures I could find [of my mother's or grandmother's youth]. So I wrote [my grandmother] my final letter requesting anything her memory could divulge. I included the happiest go lucky picture I had of myself. I found that picture by her bedside splattered with red. Never had time to reply.... Gone is my last link to the past, or knowledge, and of motherly love.

¶ 316 We conclude that this testimony was not prejudicial because it was moderate in tone, provided only a description of the loss that the granddaughter felt as a result of Ms. Bott's death, and did not convey an opinion of Mr. Maestas's character or the appropriate sentence. Although the granddaughter's statements provided vivid images of her grief, such descriptive accountings are not necessarily prejudicial.[429] Further, the statements were not angry in tone and made no effort to pressure the jury to impose the death penalty. Thus, there is not a reasonable probability that, but for the admission of these statements, Mr. Maestas would have received a more favorable sentence. We therefore conclude that these comments were not prejudicial.

¶ 317 Because the evidence Mr. Maestas challenges was not prejudicial, "we decline to reverse the result of the penalty phase and do not need to address the constitutional questions"[430] of whether victim impact evidence, particularly victim impact evidence from past crimes, violates the Utah Constitution.

4. The Other Evidence of Aggravating Circumstances Was Not Improper

¶ 318 Mr. Maestas raises four other arguments concerning the evidence introduced in the penalty phase of his trial. Specifically, he claims that he is entitled to a new penalty phase because (a) the trial court impermissi-

bly admitted a certified copy of his conviction for burglary *and* witness testimony about the incident, (b) testimony about his past criminal behavior warranted a mistrial, (c) testimony that he did not show remorse for the aggravated murder violated his right against self-incrimination, and (d) testimony about his behavior in prison was improper. We disagree.

a. The Trial Court Did Not Err in Admitting Both a Certified Copy of Mr. Maestas's Prior Conviction for Burglary and Witness Testimony About the Incident

¶ 319 Mr. Maestas asserts that he is entitled to a new penalty phase because the trial court erred in admitting a certified copy of his prior conviction for burglary as well as witness testimony concerning the circumstances of that offense. Specifically, he challenges the State's introduction of a certified copy of his 1990 conviction for the burglary of Phyllis Demetropolos's home. The State also called Ms. Demetropolos to testify about the circumstances surrounding that burglary. Although Mr. Maestas did not object to this evidence in the trial court, on appeal, he alleges that the court committed plain error in admitting his prior conviction as well as the testimony concerning the offense. Notably, Mr. Maestas does not assert that Ms. Demetropolos's testimony contained inaccurate information or constituted victim impact evidence. Instead, he contends only that, by admitting the conviction and the testimony, it created a risk that the jury would double count this aggravating circumstance. We are unpersuaded by Mr. Maestas's argument for two reasons.

¶ 320 First, the trial court did not err in admitting the certified conviction and the testimony about the circumstances of the crime. Indeed, as discussed above, we have recognized that accurate information about a defendant's past criminal conduct provides the sentencing body with important informa-

---

**429.** *See Kell*, 2002 UT 106, ¶¶ 52 n. 15, 54, 61 P.3d 1019 (holding that victim impact evidence was not prejudicial despite the family's descriptive account of "collaps[ing] from grief] during

the funeral and ha[ving] to be carried out of the church").

**430.** *Id.* ¶ 54.

tion about the defendant's history, character, and background.[431] In this case, the jury was presented with accurate information about the context and circumstances of Mr. Maestas's prior conviction for burglary. Because the testimony accurately informed the jury about the circumstances of the crime for which Mr. Maestas was convicted, it was appropriate evidence for the jury to consider.

¶ 321 Second, there is no evidence that the jury impermissibly double counted this aggravating circumstance. But even if the jury did so, any such error would have been harmless.[432] Indeed, if we remove Ms. Demetropolos's testimony from the jury's calculus of aggravating and mitigating circumstances, the totality of the aggravating circumstances would still outweigh the totality of the mitigating circumstances beyond a reasonable doubt. Accordingly, we conclude that Mr. Maestas has not shown that the trial court plainly erred, and we decline to grant him a new penalty phase on this basis.

b. The Trial Court Did Not Abuse Its Discretion in Denying Mr. Maestas's Motion for a Mistrial

¶ 322 Next, Mr. Maestas asserts that the trial court abused its discretion in denying his motion for a mistrial after the State elicited improper testimony from an agent with Adult Probation and Parole (AP&P). During the penalty phase, the AP&P agent testified about Mr. Maestas's criminal history and parole revocations. As part of that testimony, he read a presentence investigation report completed by AP&P after Mr. Maestas's 1990 conviction for the burglary of Ms. Demetropolos's home. The report summarized Mr. Maestas's criminal and parole history and stated as follows:

It is obvious to this agent ... [that] Mr. Maestas has no intention of ever complying with the conditions ... the Board of Par-

dons imposed and, in fact, shows his only plans in life are to be a career criminal. This behavior now resulted in Mr. Maestas being charged and convicted for the offenses of a career criminal.

¶ 323 At the close of the agent's testimony, defense counsel expressed concern about the AP&P agent's statement that Mr. Maestas was "convicted for the offenses of a career criminal." The prosecution agreed to remedy any potential error with this statement and to clarify that Mr. Maestas's convictions were for burglaries, not for being a "career criminal." At that point, the prosecution asked the AP&P agent to clarify for the jury that Mr. Maestas's convictions were for burglaries. The AP&P agent provided this clarification.

¶ 324 The next day, however, Mr. Maestas moved for a mistrial based on the AP&P agent's testimony.[433] The trial court denied the motion, concluding that Mr. Maestas's argument was "untimely" and that "[t]he defense specifically agreed to the curative questions by the State regarding [the AP&P agent's] answers." Mr. Maestas asserts that the trial court erred in denying his motion for a mistrial. We reject this argument.

¶ 325 As an initial matter, we note that trial courts have discretion in granting or denying a motion for a mistrial.[434] "In exercising its discretion, the trial court should not grant a mistrial except where the circumstances are such as to reasonably indicate that a fair trial cannot be had and that a mistrial is necessary in order to avoid injustice."[435] "[B]ecause of the advantaged position of the trial judge to determine the impact of events occurring in the courtroom on the total proceedings," an appellate court will find an abuse of discretion only when the trial court "is plainly wrong in

431. *See supra* ¶ 286 ("[E]vidence of a defendant's past criminal conduct ... provides the jury with important information about the defendant's violent propensities. And it presents the jury with an accurate picture of the defendant's background, history, and character.").

432. *See supra* ¶ 291.

433. At this point, Mr. Maestas also asserted that the testimony of Ms. Nelson was improper. But

as we have discussed above, we conclude that any error regarding Ms. Nelson's testimony was not harmful. *See supra* ¶ 312.

434. *State v. Wach*, 2001 UT 35, ¶ 45, 24 P.3d 948.

435. *Id.* (alteration omitted) (internal quotation marks omitted).

that the incident so likely influenced the jury that the defendant cannot be said to have had a fair trial." [436]

¶ 326 In this case, Mr. Maestas has failed to show that the trial court abused its discretion in refusing to grant a mistrial. Indeed, the AP&P agent's brief reference to Mr. Maestas's "career criminal" conviction was not of the type that "so likely influenced the jury that the defendant cannot be said to have had a fair trial." [437] Further, the AP&P agent's reference to this conviction was clarified through his subsequent testimony that Mr. Maestas's convictions were for burglaries. Because the comment was isolated and cured through subsequent testimony, the remark did not render Mr. Maestas's trial so unfair that the trial court was "plainly wrong" in denying his motion for a mistrial.

c. The Testimony Concerning Mr. Maestas's Remorse and Responsibility Did Not Violate His Right Against Self-Incrimination and Was Not Harmful

¶ 327 Mr. Maestas also argues that the trial court erred in admitting witness testimony that he had not shown remorse or taken responsibility for the murder of Ms. Bott. In the penalty phase, the State introduced the testimony of Mr. Maestas's ex-wife. On direct examination, the following exchange took place between the prosecution and Mr. Maestas's ex-wife:

Question: Has [Mr. Maestas] ever admitted responsibility for this crime?

Answer: No. He told me he would never do anything like that.

. . . .

Question: So it's fair to say he's never shown any remorse?

Answer: No, I think, you know, when I asked him, you know, he wasn't going to admit to me but he looked like he was remorseful.

¶ 328 Although Mr. Maestas did not object to the prosecution's questioning in the trial court, on appeal, he argues that the court committed plain error in allowing his ex-wife's testimony. Specifically, he claims that his ex-wife's comment on his lack of remorse or failure to take responsibility violated his constitutional right against self-incrimination and that this violation was prejudicial. We reject this argument.

¶ 329 As an initial matter, we note that there is nothing per se unconstitutional about considering a defendant's lack of remorse as an aggravating circumstance. [438] But in order for a sentencing body to consider a defendant's lack of remorse or failure to take responsibility, the prosecution should present evidence of a defendant's "affirmative words or conduct." [439] A defendant's silence or decision to go to trial cannot be used to show a lack of remorse. [440] This is because the Fifth Amendment to the U.S. Constitution provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." In this case, the State introduced evidence of Mr. Maestas's affirmative words and conduct as expressed to his ex-wife to show that he did not take responsibility for the crime. The State did not improperly comment on Mr. Maestas's decision not to testify in the penalty phase or his decision to proceed to trial. Accordingly, we conclude that Mr. Maestas's Fifth Amendment rights were not violated when the State introduced his ex-wife's testimony.

436. *Id.* (internal quotation marks omitted).

437. *Id.* (internal quotation marks omitted).

438. *See Zant v. Stephens,* 462 U.S. 862, 886–87 & n. 22, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983) (citing with approval a Georgia case for the assertion that lack of remorse is an appropriate aggravating circumstance).

439. *See United States v. Caro,* 597 F.3d 608, 627 (4th Cir.2010); *id.* at 630 (noting that U.S. Supreme Court case law suggests that "considering a defendant's silence" regarding the aggravating circumstance of lack of remorse "may well [be] prohibit[ed]" under the Fifth Amendment).

440. *See, e.g., id.* at 630; *United States v. Whitten,* 610 F.3d 168, 200–02 (2d Cir.2010) (vacating the defendant's death sentence and remanding for a new sentencing phase because "[t]he prosecution cited two constitutional elections made by [the defendant]—to go to trial and not to testify—as reasons to reject two of Wilson's offered mitigators: acceptance of responsibility and remorse," and "then cited the lack of remorse as evidence of an aggravating factor: [the defendant's] future dangerousness").

#### d. The Testimony Concerning Mr. Maestas's Prison Behavior Was Not Improper and Was Not Harmful

¶ 330 Finally, Mr. Maestas challenges witness testimony regarding his behavior while in prison. During the penalty phase, the State introduced the testimony of a caseworker with the Department of Corrections. The caseworker stated that he had supervised Mr. Maestas during "the last four months of [Mr. Maestas's] last incarceration" and was familiar with his prison file. The prison file contained chronological notes, reports, and progress updates compiled over the thirty years Mr. Maestas has been in and out of prison. When asked to give an opinion about Mr. Maestas's behavior in prison, the caseworker stated as follows:

> Mr. Maestas is ... very manipulative and uses violence in an effort to get the things that he wants out of life.... There are some things that he has done that are very positive. However, those all seem to cycle through. If he doesn't get things through positive behavior, he does things that are manipulative and violent to get the things he wants.... I am sure [he is a danger to individuals at the prison]. That danger may be diminishing because of his age, but early on it wasn't the case.

¶ 331 On cross-examination, defense counsel questioned the caseworker about Mr. Maestas's prison file and emphasized reports in that file indicating that Mr. Maestas had not received disciplinary referrals from 1976–79 or 1993–94. In closing arguments, defense counsel highlighted the caseworker's assessment that Mr. Maestas's behavior continued to improve as he got older. Defense counsel then encouraged the jury to consider this evidence as a mitigating circumstance.

¶ 332 Although Mr. Maestas did not object to this testimony at trial, and in fact referred to it in his closing argument, on appeal, he contends that the trial court committed plain error in admitting the caseworker's statements. Specifically, he asserts that the testimony improperly relied upon Mr. Maestas's prison file and that the file was inadmissible hearsay under the rules of evidence and the Confrontation Clause of the U.S. Constitution. Because Mr. Maestas did not raise this argument in the trial court, we review his claim for plain error.

¶ 333 As discussed above, we again note that, under Utah's death penalty scheme, evidence "may be admissible during the penalty phase, even if excluded by the rules of evidence during the guilt phase."[441] Indeed, in the penalty phase of a capital proceeding the parties may introduce "[a]ny evidence the court considers to have probative force" as to the appropriate penalty.[442] And although we have never addressed whether a defendant in a penalty phase should be afforded the right to confront witnesses, we have stated that evidence in a penalty phase must be relevant and reliable.[443]

¶ 334 In this case, there is considerable evidence supporting the conclusion that the caseworker's testimony was not erroneously admitted. But, regardless, any potential error was harmless. The caseworker's statements about Mr. Maestas's behavior in prison is probative of his character and future dangerousness. As such, it may be used as evidence. Indeed, both the prosecution and defense counsel used the caseworker's testimony to highlight different portions of Mr. Maestas's prison record. In fact, defense counsel highlighted Mr. Maestas's diminishing violent behavior and lack of disciplinary actions for periods of his incarceration during closing arguments and defense counsel argued that the jury could consider this evidence as a mitigating circumstance. Because defense counsel used the caseworker's testimony to introduce favorable evidence, and relied on this testimony, and because the testimony was probative of Mr. Maestas's behavior, character, and conduct, we conclude that the overall testimony was not harmful. Accordingly, we decline to grant Mr. Maestas a new penalty phase on this basis.

---

441. *Lafferty II*, 2001 UT 19, ¶ 105, 20 P.3d 342.

442. Utah Code § 76–3–207(2)(b).

443. *Johnson*, 856 P.2d at 1071, *superseded on other grounds by* Utah Code § 76–5–406.5(1)(k), *as recognized in State v. Hammond*, 2001 UT 92, ¶ 20, 34 P.3d 773.

¶ 335 In sum, we reject each of Mr. Maestas's challenges concerning the evidence and arguments presented during the penalty phase of his trial. We therefore decline to grant him a new trial on these bases.

## V. OTHER CONSTITUTIONAL ISSUES

¶ 336 Mr. Maestas raises five other constitutional challenges. He contends that: (A) the trial court violated the Due Process Clause and the Eighth Amendment of the U.S. Constitution by denying his motion to argue last in the penalty phase hearing; (B) the process of death qualification violates the Sixth, Eighth, and Fourteenth Amendments of the U.S. Constitution and article I, sections 7, 10, and 12 of the Utah Constitution because it results in juries that are more prone to convict and impose death sentences; (C) Utah's current death penalty scheme violates the Eighth and Fourteenth Amendments of the U.S. Constitution, as well as "state due process" and article I, section 9 of the Utah Constitution because recent amendments have resulted in a statute that impermissibly fails to narrow the class of death-eligible offenses; (D) under a proportionality review, his death sentence is disproportionate in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments of the U.S. Constitution; and (E) research purporting to find that capital jurors do not abide by constitutional principles in decision making supports an inference that both Utah's death penalty scheme and his death sentence violate the Eighth Amendment of the U.S. Constitution and article I, section 9 of the Utah Constitution.

¶ 337 All five constitutional challenges are questions of law that we review for correctness.[444] For the following reasons, we reject each of these claims.

**A. The Trial Court Did Not Violate the Due Process Clause or the Eighth Amendment of the U.S. Constitution by Denying Mr. Maestas's Motion to Argue Last**

¶ 338 During the penalty phase hearing, Mr. Maestas filed a motion to argue last, which the trial court denied. He argues that, by denying his motion to argue last in the penalty phase, the court allowed the jury to sentence him based on information that he did not have the opportunity to deny or explain. He contends that this resulted in the jury imposing an unreliable sentence in violation of the Due Process Clause and the Eighth Amendment. We reject his argument.

¶ 339 First, we note that the order of procedure and argument for criminal trials is outlined in rule 17(g) of the Utah Rules of Criminal Procedure. Specifically, rule 17(g)(7) provides that when the parties argue before the jury, "the prosecution shall open the argument, the defense shall follow and the prosecution may close by responding to the defense argument." And we have previously held that rule 17(g)(7) "applies to the penalty phase of [a] defendant's trial."[445]

¶ 340 Second, the U.S. Supreme Court has noted that the principles of due process are violated when a death sentence is imposed "on the basis of information which [the defendant] had no opportunity to deny or explain."[446] To determine whether rule 17(g)(7) comports with the principles of due process, we examine the text of the rule in harmony with related rules.[447] Rule 17(g)(5) provides that, after the defense has presented its case, "the parties may offer only rebutting evidence unless the court, for good cause, otherwise permits." Indeed, we have previously concluded that rule 17 limits the prosecution's closing remarks "to only those

444. *See State v. Candedo*, 2010 UT 32, ¶ 7, 232 P.3d 1008.

445. *State v. Young*, 853 P.2d 327, 362 (Utah 1993).

446. *Gardner v. Florida*, 430 U.S. 349, 362, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977) (plurality opinion).

447. *State v. Rothlisberger*, 2006 UT 49, ¶ 21, 147 P.3d 1176 ("[W]e interpret the rule to give meaning to all its parts, avoid construing the rule in a way that renders any portion of it superfluous, and interpret the rule so as to maintain its harmony with other court rules related to it." (footnote omitted)).

matters argued by the defense."[448] Thus, rule 17 limits the prosecution's discretion during its closing argument. This limitation serves to prevent a defendant being sentenced based on information that he did not have an opportunity to explain or deny.

¶341 Mr. Maestas does not claim that the prosecution exceeded the scope of an appropriate rebuttal. Indeed, he fails to point to any information in the prosecution's closing argument that he was prevented from explaining or denying over the course of the proceedings. Thus, because rule 17 appropriately limits the scope of the prosecution's closing argument "to only those matters argued by the defense,"[449] denying Mr. Maestas's motion to argue last did not violate principles of due process.

¶342 Additionally, while Mr. Maestas argues that the denial of the motion resulted in an unreliable sentence in violation of the Eighth Amendment, he offers no case law to support this claim.[450] He simply states that "[d]enying a capital defendant the opportunity to address the jury last in order to rebut or explain all the evidence results in an unreliable sentencing that fails to give full effect to mitigation." But again, Mr. Maestas does not point to any evidence that he was unable to rebut or explain. Further, in the closing argument, defense counsel pointed to the mitigating evidence that had been presented and also directed the jury's attention to other evidence that was favorable to Mr. Maestas. The jury was also appropriately instructed regarding mitigating evidence and the proper standard for imposing the death penalty.[451] In light of this, we are not persuaded that allowing the prosecution to argue last resulted in an unreliable sentence that failed to give full effect to mitigating circumstances.

¶343 For the foregoing reasons, we reject Mr. Maestas's argument that denying his motion to argue last resulted in an unreliable sentence in violation of the Due Process Clause and the Eighth Amendment. Accordingly, we hold that the trial court did not err in denying Mr. Maestas's motion.

### B. The Process of Death Qualification Does Not Violate the U.S. Constitution or the Utah Constitution

¶344 Mr. Maestas argues that death-qualified juries are more prone to convict and impose death sentences, which he contends violates defendants' right to trial by an impartial jury. Accordingly, he argues that the process of death qualification violates the Sixth, Eighth, and Fourteenth Amendments of the U.S. Constitution and article I, sections 7, 10, and 12 of the Utah Constitution. We reject his arguments.

¶345 As an initial matter, "death qualification" concerns the removal of jurors whose "views on capital punishment would prevent or substantially impair the performance of the juror's duties as a juror in accordance

448. *State v. McClain*, 706 P.2d 603, 607 (Utah 1985).

449. *Id.*

450. "We will not make or develop [a defendant's] arguments for him.... [A] reviewing court is entitled to have the issues clearly defined with pertinent authority cited and is not simply a depository in which the appealing party may dump the burden of argument and research." *State v. Gomez*, 2002 UT 120, ¶20, 63 P.3d 72 (internal quotation marks omitted).

451. The jury was instructed that, in determining whether to impose the death penalty, it could consider factors "including, but not limited to": (1) "[t]he nature and circumstances of the crime"; (2) Mr. Maestas's "character, background, history, mental and physical condition"; (3) the "impact of the crime on the victim's family and community"; and (4) "any other facts in aggravation or mitigation of the penalty." Similarly, the jury was instructed, "In determining whether aggravating or mitigating circumstances exist, you may consider all of the evidence produced either by the State or the defendant in this hearing and during the guilt phase of the trial, including testimony and exhibits admitted and presented to you during either proceeding." Further, the jury was instructed that it could return a sentence of death only if it was persuaded beyond a reasonable doubt that the State had established both that "the totality of aggravating circumstances outweighs the totality of mitigating circumstances ... in terms of their respective substance and persuasiveness," and that "the imposition of the death penalty is justified and appropriate in this case."

with the instructions of the court." [452] Accordingly, death qualification refers to the exclusion of "(1) those [jurors] who entertain such conscientious opinions about the death penalty as would preclude [them] from voting to impose the death penalty following conviction regardless of the facts, and (2) those jurors who would always vote to impose the death penalty upon a finding of first degree murder." [453] The U.S. Supreme Court has held that the process of death qualification does not violate the U.S. Constitution.[454] Likewise, we have rejected challenges to death qualification under the Utah Constitution.[455]

¶ 346 In *State v. Alvarez* and *State v. Young*, we considered the argument that death qualification unconstitutionally "creates a conviction-prone jury." [456] In both cases, four justices rejected the defendant's arguments, but based on two different reasons.[457] In *Alvarez*, which was decided more recently, one plurality concluded that "death qualifying the jury does not offend [the] constitutional guarantee" of an impartial jury under the Utah Constitution.[458] It reasoned that "Utah law ... permits exclusion of all jurors who cannot follow their oath and apply the law as instructed by the court," and, accordingly, that death qualification excludes jurors who cannot follow the law regarding the imposition of death sentences, including both "those jurors who would never vote to impose the death penalty ... [and] those jurors who would always vote to impose the death penalty upon a finding of first degree murder." [459] This plurality also reasoned that "a jury panel that is death qualified remains a fair and representative cross-section of the community." [460] The other plurality rejected the defendant's argument because it "would not disturb the existing practices [of death qualification] absent clearer scientific evidence about [its] effects." [461]

¶ 347 In this appeal, Mr. Maestas raises no new argument to cause us to reach a different result than the U.S. Supreme Court reached in *Lockhart v. McCree* or that we reached in *Alvarez* or *Young*.[462] Further, to

452. UTAH R. CRIM P. 18(e)(10).

453. *State v. Alvarez*, 872 P.2d 450, 454 (Utah 1994) (plurality opinion) (second alteration in original) (citation omitted) (internal quotation marks omitted).

454. *Lockhart v. McCree*, 476 U.S. 162, 173, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986) (holding that "the Constitution does not prohibit the States from 'death qualifying' juries in capital cases," even "assum[ing] for purposes of this opinion that the studies [proffered by the defendant] are ... adequate to establish that 'death qualification' in fact produces juries somewhat more 'conviction-prone' than 'non-death-qualified' juries").

455. *Alvarez*, 872 P.2d at 455 (Utah 1994) (plurality opinion of Howe, J., joined by Hall, C.J.) (concluding that "[d]eath qualifying the jury does not offend [the state] constitutional guarantee" of an impartial jury); *id.* at 462 (Zimmerman, J., concurring, joined by Stewart, J.) (concluding that, "absent clearer scientific evidence about the effects of death qualification," it is appropriate to "adhere to the result in *Young* and ... reject ... similar challenge[s]" (citation omitted)); *Young*, 853 P.2d at 342 (plurality opinion of Hall, C.J., joined by Howe, J.) (concluding that the death qualification process does not violate the Utah Constitution); *id.* at 414–17 (Zimmerman, J., concurring in part and dissenting in part) (concluding that the studies discussed by the dissent in *Young* were insufficient to support a conclusion that the death qualification process violates the Utah Constitution); *id.* at 418 (Stewart, J., concurring in part and dissenting in part) (acknowledging the studies discussed by Justice Durham's partial dissent in *Young*, but concluding that, with "a sensitive and searching voir dire, conviction-prone persons can be weeded out").

456. *Alvarez*, 872 P.2d at 454 (plurality opinion) (internal quotation marks omitted); *see also Young*, 853 P.2d at 342.

457. *Alvarez*, 872 P.2d at 454–55 (plurality opinion of Howe, J., joined by Hall, C.J.); *id.* at 462 (Zimmerman, J., concurring in part, joined by Stewart, J.).

458. *Id.* at 455 (plurality opinion of Howe, J., joined by Hall, C.J.).

459. *Id.* at 454 (quoting *Young*, 853 P.2d at 342).

460. *Id.* at 455.

461. *Id.* at 462 (Zimmerman, J., concurring in part, joined by Stewart, J.).

462. Mr. Maestas also claims that death qualification violates the Eighth Amendment of the U.S. Constitution and article I, section 10 of the Utah Constitution. These constitutional provisions were not specifically referred to in *Lockhart*, *Alvarez*, or *Young*. But Mr. Maestas does not pro-

support his state constitutional challenges, he relies almost exclusively on the arguments given and the studies cited by the dissent in *Young*.[463] But a majority of the court in *Young* concluded that these arguments and studies provided an insufficient basis for determining that death qualification is unconstitutional.[464] And although Mr. Maestas cites two additional articles to support his claim, he does not show how these sources offer anything beyond the studies previously rejected in *Young*. Nor does he explain why we should reconsider our position as a result of these two articles. Finally, Mr. Maestas proffers no evidence supporting the inference that the jury in his case was prone to convict or to impose the death penalty, or that voir dire was insufficient to eliminate any biased jurors. Accordingly, we reject Mr. Maestas's federal and state constitutional challenges to the death qualification process.

### C. Utah's Sentencing Scheme Does Not Insufficiently Narrow the Class of Death–Eligible Offenses

¶348 Mr. Maestas argues that Utah's death penalty scheme violates the Eighth and Fourteenth Amendments of the U.S. Constitution because recent amendments to Utah's death penalty scheme have expanded the offenses eligible for the death penalty and broadened the permissible aggravating factors. As a result, he claims that the death penalty scheme fails to sufficiently narrow the class of death-eligible offenses, which allows the arbitrary and capricious imposition of death sentences. We reject his argument.

¶349 The U.S. Constitution requires that death penalty schemes "genuinely narrow the class of persons eligible for the death penalty" and "justify the imposition of a more severe sentence."[465] The U.S. Supreme Court has held that this narrowing may be accomplished either "in the definition of the capital offense" or by "requiring that the sentencer find at least one aggravating circumstance."[466] We have "entertained and rejected ... on multiple occasions" the claim that Utah's death penalty scheme fails to constitutionally narrow the class of offenses eligible for the death penalty.[467] Specifically, we have previously rejected such claims because the defendant did not "raise[ ] grounds for re-examining our substantial body of precedent regarding this issue."[468] We conclude that Mr. Maestas also fails to raise sufficient grounds to cause us to depart from our precedent on this issue.

vide us with any argument to consider based on the text of those provisions or other case law to persuade us that we should reach a different result when considering these provisions. We have "repeatedly noted that a brief is inadequate if it merely contains bald citations to authority [without] development of that authority and reasoned analysis based on that authority." *State v. Robinson*, 2011 UT 30, ¶33 n. 49, 254 P.3d 183 (alterations in original) (internal quotation marks omitted). Accordingly, we do not consider the arguments that death qualification is unconstitutional under the Eighth Amendment of the U.S. Constitution or article I, section 10 of the Utah Constitution.

463. *See Young*, 853 P.2d at 386–95 (Durham, J., concurring in part and dissenting in part).

464. *Id.* at 342 (plurality opinion of Hall, C.J., joined by Howe, J.) (concluding that the death qualification process does not violate the Utah Constitution); *id.* at 414–17 (Zimmerman, J., concurring in part and dissenting in part) (concluding that the studies discussed by the dissent in *Young* were insufficient to support a conclusion that the death qualification process violates the Utah Constitution); *id.* at 418 (Stewart, J.,

concurring in part and dissenting in part) (acknowledging the studies discussed by the dissent in *Young*, but concluding that, with "a sensitive and searching voir dire, conviction-prone persons can be weeded out").

465. *Zant v. Stephens*, 462 U.S. 862, 877, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983).

466. *Loving v. United States*, 517 U.S. 748, 755, 116 S.Ct. 1737, 135 L.Ed.2d 36 (1996).

467. *Archuleta v. Galetka*, 2011 UT 73, ¶60, 267 P.3d 232 ("The claim that Utah's death penalty scheme fails to narrow the class of murders eligible for the death penalty is not a new one .... [and we have] entertained and rejected that claim on multiple occasions."); *see also, e.g., State v. Arguelles*, 2003 UT 1, ¶127, 63 P.3d 731; *State v. Kell*, 2002 UT 106, ¶¶58–59, 61 P.3d 1019; *State v. Honie*, 2002 UT 4, ¶¶17, 26–27, 57 P.3d 977; *State v. Lafferty (Lafferty II)*, 2001 UT 19, ¶141, 20 P.3d 342; *State v. Lovell*, 1999 UT 40, ¶38, 984 P.2d 382; *State v. Holland*, 777 P.2d 1019, 1024 (Utah 1989).

468. *Kell*, 2002 UT 106, ¶¶58–59, 61 P.3d 1019.

¶ 350 Although Mr. Maestas acknowledges that, in *State v. Young*, we rejected the claim that Utah's death penalty scheme is unconstitutional for failing to narrow the class of death-eligible offenses,[469] he argues that amendments to the death penalty scheme since *Young* have expanded the permissible aggravating factors and the offenses eligible for death to the extent that Utah's death penalty scheme is no longer constitutional. But, since *Young*, we have reviewed claims that Utah's death penalty scheme insufficiently narrows the class of death-eligible offenses on multiple occasions and, despite amendments to that scheme over time, we have never found it to be unconstitutional.[470] Mr. Maestas does not address these subsequent cases; specifically, he does not explain how the statute he challenges differs from the statutes that we considered in *Arguelles, Kell, Honie, Lafferty II* and *Lovell*, nor does he explain how his arguments differ from arguments that we rejected in these cases.[471]

¶ 351 As a result, we are not persuaded to depart from our precedent on this issue. We therefore reject Mr. Maestas's claim that Utah's death penalty scheme is unconstitutional for failing to sufficiently narrow the class of death-eligible offenses.

### D. Mr. Maestas's Death Sentence Was Not Disproportionate

¶ 352 Mr. Maestas argues that, under a proportionality review, his death sentence violated the Eighth Amendment and article I, section 9, of the Utah Constitution. Specifically, he asserts that his sentence was disproportionate because of his low level of intellectual functioning, the lack of mitigating evidence presented, and because "the nature of [his crime] suggests homicide was not the primary motivation." We reject his arguments.

¶ 353 Neither the U.S. Constitution nor the Utah Constitution requires capital sentences to be reviewed for proportionality.[472] Nonetheless, we have chosen to assume this responsibility to determine only "(1) whether the death penalty was imposed in an invidious fashion against a particular group of people, (2) whether the death penalty was proportionate to [a] defendant's level of culpability, and (3) whether [a] defendant's sentence was in proportion to the general pattern of cases in our state."[473] After considering these three questions, we conclude that Mr. Maestas's sentence is not disproportionate.

469. *Young*, 853 P.2d at 336–38 (plurality opinion of Hall, C.J., joined by Howe, J.) (holding "that the death penalty under the Utah statutory scheme is constitutional" despite defendant's claim that it "fail[ed] to narrow the class of offenders eligible for the death penalty"); *id.* at 411–14 (Zimmerman, J., concurring in part and dissenting in part) (concluding that the "Utah death penalty scheme is not invalid under either the state or the federal constitution" and explaining that it would be better for courts "to scrutinize ... statutory aggravating circumstances and their application on a case-by-case basis" than to strike the entire scheme); *id.* at 418 (Stewart, J., concurring in part and dissenting in part) (concluding that, although "a judicial narrowing of some ... aggravating circumstances may be constitutionally necessary," the death penalty scheme is not unconstitutional).

470. *See Arguelles*, 2003 UT 1, ¶ 127, 63 P.3d 731; *Kell*, 2002 UT 106, ¶¶ 58–59, 61 P.3d 1019; *Honie*, 2002 UT 4, ¶¶ 17, 26–27, 57 P.3d 977; *State v. Lafferty (Lafferty II)*, 2001 UT 19, ¶ 141, 20 P.3d 342; *Lovell*, 1999 UT 40, ¶ 38, 984 P.2d 382.

471. Although Mr. Maestas contends that an increase in the *number* of statutory aggravating factors since *Young* compels a conclusion that the statute now insufficiently fails to narrow the class of death eligible offenses, he does not explain how the specific aggravating factors contained in the statute result in a death penalty scheme that fails to provide a "meaningful basis for distinguishing the few cases in which it is imposed from the many cases in which it is not." *Furman v. Georgia*, 408 U.S. 238, 313, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (White, J., concurring). Further, Mr. Maestas claims that this expanded list of statutory aggravating factors is particularly problematic given the fact that the statute allows "any other facts in aggravation ... that the court considers relevant" to be presented in the sentencing proceedings. *See* Utah Code § 76–3–207(2)(a)(iv). We have held, however, that, "as the initial narrowing of death-eligible defendants occurs at the guilt phase in Utah's statutory scheme, any expanded consideration of factors at sentencing is constitutional." *Honie*, 2002 UT 4, ¶ 27, 57 P.3d 977.

472. *See Pulley v. Harris*, 465 U.S. 37, 50–51, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984); *Honie*, 2002 UT 4, ¶ 37, 57 P.3d 977.

473. *Honie*, 2002 UT 4, ¶ 37, 57 P.3d 977.

¶ 354 First, Mr. Maestas has not shown that his death sentence was imposed invidiously because he is a member of any particular group. Although he notes that "the victim was white and jurors were predominately white whereas [he] was Latino," he proffers no evidence that juries in Utah invidiously impose the death penalty against Latinos or that his ethnicity played any role in his death sentence.

¶ 355 Second, Mr. Maestas's sentence was not disproportionate to his level of culpability. In reviewing the proportionality of a death sentence, we do not attempt to determine whether the defendant was "extremely culpable or just somewhat culpable."[474] Instead, we defer to "the legislative policy that death is not a disproportionate punishment for aggravated murder."[475] Mr. Maestas was convicted of aggravated murder and the Utah Legislature has determined that his conviction for this crime makes him eligible for the death penalty.[476] Nonetheless, he contends that his death sentence was disproportionate because of his low intellectual functioning and the limited amount of mitigating evidence that he presented at trial. But we have determined that Mr. Maestas did not qualify for the statutory exemption from the death penalty created for mentally retarded defendants[477] and that he validly waived his right to present further mitigating evidence.[478] Thus, there is nothing to persuade us that his sentence was disproportionate to his level of culpability.

¶ 356 Third, Mr. Maestas's sentence was not disproportionate in comparison to the general sentencing pattern in our state. Mr. Maestas argues that "the homicide was committed as part of a beating; beatings of this sort do not always result in death and the nature of this homicide suggests homicide was not the primary motivation." But Mr. Maestas was convicted of aggravated murder for punching, stomping, strangling, and stabbing an elderly woman to death, which means that the jury determined that he "intentionally or knowingly cause[d] the death" of the victim under aggravating circumstances.[479] Although the death penalty may be more common "when the defendant was involved in multiple murders,"[480] "[w]e have repeatedly upheld the imposition of the death penalty in cases of one first degree murder conviction."[481] Thus, Mr. Maestas has pointed to no evidence that the imposition of death in this case "constitute[s] an anomaly"[482] in light of the general sentencing patterns in our state. Accordingly, we find that Mr. Maestas's death sentence was not disproportionate.

E. *National Research Purporting to Show that Capital Jurors Violate Constitutional Principles Does Not Support an Inference that Either Utah's Death Penalty Scheme Is Unconstitutional or that Mr. Maestas's Death Sentence Was Unconstitutional*

¶ 357 Finally, Mr. Maestas argues that Utah's death penalty scheme violates the Fifth, Sixth, Eighth, and Fourteenth Amendments of the U.S. Constitution based on research purporting to show that capital jurors do not always make decisions consistent with constitutional principles. Based on this research, Mr. Maestas contends that we should conclude that Utah's death penalty scheme is unconstitutional or infer that his jury violated constitutional principles in imposing the death sentence.[483] We disagree.

¶ 358 In *McCleskey v. Kemp*, the U.S. Supreme Court considered whether a statis-

474. *Id.* ¶ 40.

475. *Id.*

476. *See* Utah Code § 76-5-202(3)(a).

477. *Supra* Part III.

478. *Supra* Part IV.A.

479. *See* Utah Code § 76-5-202(1).

480. *Holland*, 777 P.2d at 1026.

481. *Lafferty II*, 2001 UT 19, ¶ 121, 20 P.3d 342.

482. *Honie*, 2002 UT 4, ¶ 42, 57 P.3d 977; *see also Lafferty II*, 2001 UT 19, ¶ 121, 20 P.3d 342.

483. In support of this claim, Mr. Maestas also argues that the jury did not understand the meaning of LWOP. We reject this claim, *supra* Part I.D.

tical study was sufficient to establish that a capital jury engaged in racial discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment.[484] The Court held that the research was "clearly insufficient to support an inference that any of the decisionmakers in [the defendant's] case acted with discriminatory purpose."[485] In reaching this conclusion, the Court expressed concern about accepting the proffered statistical research as sufficient to establish the defendant's constitutional claim.

¶ 359 The Court noted that, "[b]ecause discretion is essential to the criminal justice process, [it] would demand exceptionally clear proof before [it] would infer that the discretion has been abused."[486] Further, it explained that "each particular decision to impose the death penalty is made by a .... jury [that] is unique in its composition, and the Constitution requires that its decision rest on consideration of innumerable factors that vary according to the characteristics of the individual defendant and the facts of the particular capital offense."[487] Accordingly, it hesitated to make "an inference drawn from the general statistics to a specific decision in a trial and sentencing."[488] Finally, the Court noted that, because the defendant "offers no evidence specific to his own case that would support an inference that racial considerations played a part in his sentence," the defendant's "claim that these statistics are sufficient proof of discrimination, without regard to the facts of a particular case, would extend to all capital cases" in the state where the defendant was of a different race than the victim.[489]

¶ 360 These same concerns apply to Mr. Maestas's argument that the research he proffers compels a conclusion that Utah's death penalty scheme, and his conviction under that scheme, violate constitutional principles. We agree that "discretion is essential to the criminal justice process," and, accordingly, like the U.S. Supreme Court, we require "exceptionally clear proof" before finding that such "discretion has been abused."[490] Without evidence of a specific constitutional violation in his particular case,[491] the research Mr. Maestas proffers does not constitute sufficient proof to conclude that his jury abused its discretion. Further, because each jury and each capital case is unique, we hesitate to draw an inference about the constitutionality of Utah's death penalty scheme or the constitutionality of a particular jury's decision from research on jurors, particularly when that research is conducted at the national level. Such research does not show that Utah's death penalty scheme is unconstitutional. Likewise, it does not establish that jurors in Utah are prone to violate constitutional principles, let alone that the jury in Mr. Maestas's case violated constitutional principles when it imposed the death sentence. Without evidence of a particular constitutional violation, the research that Mr. Maestas cites is insufficient to overcome our precedent, in which we have repeatedly upheld the constitutionality of Utah's death penalty scheme,[492] or to warrant an inference that his jury violated constitutional principles in imposing its sentence. Accordingly, we reject these claims.

¶ 361 In sum, we reject all five of Mr. Maestas's constitutional challenges and affirm his death sentence.

**484.** 481 U.S. 279, 291–97, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987).

**485.** *Id.* at 297, 107 S.Ct. 1756.

**486.** *Id.*

**487.** *Id.* at 294, 107 S.Ct. 1756.

**488.** *Id.*

**489.** *Id.* at 292–93, 107 S.Ct. 1756.

**490.** *See McCleskey,* 481 U.S. at 297, 107 S.Ct. 1756.

**491.** Because Mr. Maestas's jury decided to impose the death penalty after about three hours of deliberation, he argues that his jury must have violated constitutional principles in making its sentencing determination. But the fact that the jury deliberated for a relatively short period of time before returning a sentence does not compel an inference that it violated constitutional principles in its decision making. There are many reasons why the jury may have deliberated for that amount of time, including because they felt the aggravating circumstances in this case clearly outweighed the mitigating circumstances.

**492.** *See supra* ¶ 347 & n. 468.

## VI. CUMULATIVE ERROR

¶ 362 Lastly, Mr. Maestas argues that he should be granted both a new guilt phase and a new penalty phase because of the cumulative effect of errors made over the course of the proceedings. He argues that the "errors worked together ... to create an unfair and unreliable outcome." We disagree.

¶ 363 "Under the cumulative error doctrine, we will reverse [a jury verdict or sentence] only if the cumulative effect of the several errors undermines our confidence ... that a fair trial was had."[493] "In assessing a claim of cumulative error, we consider all the identified errors, as well as any errors we assume may have occurred."[494] But "[i]f the claims are found on appeal to not constitute error, or the errors are found to be so minor as to result in no harm, the doctrine will not be applied."[495]

¶ 364 In this case, for each of Mr. Maestas's claims of error, we have found that either no substantial error was committed or that any error was harmless beyond a reasonable doubt. Because Mr. Maestas was not harmed by any substantial errors over the course of the proceedings, our confidence in the fairness of his guilty verdict and his sentence of death is not undermined. Thus, the cumulative error doctrine does not apply, and we do not grant Mr. Maestas a new guilt or penalty phase on this basis.

## CONCLUSION

¶ 365 We reject each of Mr. Maestas's challenges to his convictions for aggravated robbery and aggravated murder and to his sentence under Utah's death penalty scheme. Accordingly, we affirm his conviction and death sentence.

Chief Justice DURRANT authored the opinion of the Court, in which Associate Chief Justice NEHRING, Justice DURHAM, Justice PARRISH, and Justice LEE joined.

493. *State v. Dunn*, 850 P.2d 1201, 1229 (Utah 1993) (second alteration in original) (internal quotation marks omitted).

494. *Id.*

495. *State v. Gonzales*, 2005 UT 72, ¶ 74, 125 P.3d 878; *see also, e.g., State v. Ellis*, 748 P.2d 188, 191 (Utah 1987) ("Because we hold that no substantial errors were committed, the concept of cumulative error does not apply.").